IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RONALD JOHNSON,

                              Plaintiff,

                                                      Civ. Action No.
          v.                                          9:09-CV-0002 (GTS/DEP)


C.O. BROWN; BOULTER;
KIERNAN; GUERIN; and EASTERN,

                              Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

RONALD JOHNSON, *Pro Se*
04-A-6880
Woodbourne Correctional Facility
Riverside Drive
Woodbourne, NY  12788

FOR DEFENDANTS:

HON. ANDREW M. CUOMO                  KRISTA A. ROCK, ESQ.
Office of the Attorney General        Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Ronald Johnson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights.  In his complaint plaintiff asserts that he was assaulted by six corrections officers, including the named defendants, that following the assault defendants failed to provide medical treatment for his resulting injuries, and that in retaliation for filing grievances regarding the incident he was threatened and harassed.

Currently pending before the court is defendants' motion for summary judgment.  In their motion, defendants assert that as to several of plaintiff's claims he has failed to state constitutionally cognizable causes of action, and as to others, based upon the record now before the court, no reasonable factfinder could find in plaintiff's favor.  Additionally, defendants assert that they are immune from liability for damages in their official capacities, and are also protected from suit by the doctrine of qualified immunity.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that

defendants' motion be granted and that plaintiff's complaint be dismissed.

I.    BACKGROUND[1]

The facts forming the basis for Johnson's claims are uncomplicated, although the parties vigorously dispute the relevant events, particularly the allegation that the plaintiff was beaten by corrections officers.  Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Johnson was housed at the Watertown Correctional Facility ("Watertown"), located in Watertown, New York.  *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶ 1.  On September 29, 2009, plaintiff was returning to Watertown on a DOCS transport bus driven by Sergeant Guerin, after having been resentenced to post release supervision in Queens County Court. Defendants' Rule 7.1(a)(3) Statement ¶¶ 2-3; *see also* Transcript of Plaintiff's Deposition ("Tr.") (Dkt. No. 34-10) pp. 20-21.  The Watertown bus arrived at the Oneida Correctional Facility at 12:00 p.m. to meet the

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that most of plaintiff's allegations are sharply contested by the defendants.

incoming bus from the Ulster Correctional Facility and to exchange staff.

Guerin Aff. (Dkt. No. 34-4) ¶ 4.  At the staff exchange the Ulster bus, in

which plaintiff was riding, became the bus bound for Watertown.  *Id*.

During the transport to Watertown, plaintiff claims to have asked a question

regarding seating arrangements, precipitating the alleged beatings and

harassment that followed.  Complaint (Dkt. No. 1) § 6.  This is where the

parties' versions of the relevant events begin to diverge.

According to Sergeant Guerin plaintiff did not merely ask a question,

but rather demanded that the inmates in his group be permitted to "spread

out" on the bus instead of being seated together; when Sergeant Guerin

advised that this was not possible because more inmates would be

boarding, Johnson verbally protested in a loud and angry manner.  Guerin

Aff. (Dkt. No. 34-4) ¶ 5.  Consequently, Sergeant Guerin calmly instructed

Johnson to quiet down.  *Id.* at ¶ 6.  Upon arrival at Watertown at 3:15 p.m.,

Sergeant Guerin exited the bus and went to his office to complete

paperwork in connection with the transfers.  Defendants' Rule 7.1(a)(3)

Statement ¶¶ 14-15.

Plaintiff's version of the verbal exchange on the bus significantly

differs from that of Sergeant Guerin.  Plaintiff alleges in his complaint that

4

when he asked the sergeant about security arrangements on the bus, it was Sergeant Guerin who became agitated, loudly instructing Johnson not to tell him how to run his bus.  Complaint (Dkt. No. 1) § 6.  Though he admits that he did not hear what was said, plaintiff speculates that when the bus arrived at Watertown, Sergeant Guerin told the corrections officer meeting them that Johnson had been an "asshole" while on the bus.[2]  Tr. (Dkt. No. 34-10) p. 30.  As a result of Sergeant Guerin's comment, plaintiff believes, Corrections Officer Eastern immediately approached Johnson and said, "welcome home" and remarked to Johnson that he had been an "asshole" on the bus.  Tr. (Dkt. No. 34-10) p. 26.

In his complaint, plaintiff alleges further that after seeing the nurse in the draft room he was placed in a cell isolated from other prisoners, and six corrections officers, including certain of  the named defendants, entered his cell and proceeded to beat him with their fists, as well as to kick and choke him, and that defendant Brown told him that now he knows that he is

---

[2]     Although never served, in the caption of his complaint plaintiff names "C.O. Easton" as a defendant and later identifies "CO Eastern", an officer who worked in the draft room, as a defendant.  Plaintiff testified at his deposition that the corrections officer who met the bus and approached him was the defendant whom he believes is named "Easton" or "Eastern".  Tr. (Dkt. No. 34-10) pp. 26-27.  For the purposes of consistency and clarity in this report and recommendation, that defendant will be referred to throughout as "Eastern", the name listed on the court's records

"nothing but a stupid nigger."[3]  Complaint (Dkt. No. 1) § 6 and Attached

Statement of Facts.  Plaintiff's complaint also alleges that after the beating

was over, Sergeant Kiernan entered the cell and asked Johnson if he was

okay, to which Johnson replied that he was afraid for his life; plaintiff was

then escorted from draft processing to the housing unit at the facility

without being offered any medical assistance.  *Id.*

Plaintiff maintains that when he reported to emergency sick call the

following day, despite notifying the nurse of the beating the day before and

complaining of pain in the head, neck and ribs, he was only given pain

medication and was not X-rayed until three weeks later.  Complaint (Dkt.

No. 1) § 6 and Attached Facts.  The nurse at sick call on September 30,

2009, completed an injury report based upon plaintiff's statement that he

had been jumped by corrections officers the day before and also examined

plaintiff, finding no objective evidence of injury with the exception of a small

bruise over his left eye, and gave plaintiff ibuprofen for his pain.  *See*

Plaintiff's Opposition (Dkt. No. 48) Attachments.  When plaintiff returned to

emergency sick call two days later voicing the same complaints, the nurse

_____

[3]    In papers submitted in opposition to defendants' motion plaintiff clarifies his
position regarding the participants in the beating, noting that defendant Kiernan
witnessed the beating but did not intervene to protect him.  Plaintiff's Memorandum
(Dkt. No. 48) at pp. 11-12.

again examined plaintiff and found no objective evidence of injury, but again provided him with ibuprofen and ordered x-rays. *See id.*

Plaintiff claims to have filed grievances regarding the beating. Complaint (Dkt. No. 1) § 4 and Attached Facts. According to Johnson, in retaliation for filing those grievances he was threatened and bribed by the defendants, and his request for a transfer to another facility, which was motivated by his fear for his own safety, was denied.[4] *Id.*

Defendants Guerin, Brown, and Kiernan dispute plaintiff's version of the events of September 29, 2008, and deny that any threats, assault, or retaliation occurred. *See generally* Guerin Aff. (Dkt. No. 34-4); Brown Aff. (Dkt. No. 34-3); and Kiernan Aff. (Dkt. No. 34-6). Plaintiff has not identified any other officers allegedly involved. According to Sergeant Guerin, who drove the transport bus, he proceeded directly to his office after arriving at Watertown, and did not ask or instruct staff to assault or in any way retaliate against Johnson. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 43-12) ¶¶ 15-16; *see also* Guerin Aff. (Dkt. No. 34-4) ¶¶ 7-8. Corrections Officer Boulter claims to have been on vacation on the day in question, and did not at any time enter the facility on that date. Defendants' Rule

---

[4]    Plaintiff was later transferred out of Watertown in January of 2009. Tr. (Dkt. No. 34-10) p. 62.

7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 27-30; *see also* Boulter Aff. (Dkt. No. 34-1).  Defendant Brown worked the "night shift", from 3:00 to 11:00 p.m., on the day of the alleged assault, and was assigned to Unit 16 as Roundsman; as such, he did not see or speak with Johnson at any time on September 29, 2008.  Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 32-33; *see also* Brown Aff. (Dkt. No. 34-3) ¶¶ 3-4.  Similarly, Kiernan did not see or speak with Johnson at any time on that date, and never threatened the plaintiff in any manner.  Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 22,25; *see also* Kiernan Aff. (Dkt. No. 34-6) ¶¶ 5-8.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on January 1, 2009.  Dkt. No. 1.  As defendants, plaintiff's complaint names Corrections Officers Brown, Boulter, and Eastern; John Doe, the corrections sergeant who drove the Watertown bus;[5] and Sergeant Kiernan.  Plaintiff's complaint references only the Eighth Amendment, and alleges that defendants subjected him to use of excessive force, indifference to his medical needs arising from the

---

[5]   The "John Doe" defendant has since been identified as Sergeant Guerin, who also has been served with the summons and complaint and has appeared in the action.  *See* Dkt. Nos. 23, 24, and 27.

incident, and retaliation and harassment.  *See generally* Complaint (Dkt. No. 1).  Plaintiff seeks $1 million in damages to compensate for the physical and emotional pain that he has suffered.

Following pretrial discovery, defendants filed a motion seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 34.  In their motion, defendants argue that 1) the damage claims against them in their official capacities are barred by the Eleventh Amendment; 2) plaintiff's claims involving retaliation, verbal harassment and threats, and the failure to transfer him to another facility are not actionable; 3) the claims against defendants Boulter, Brown, and Kiernan are subject to dismissal based upon their lack of personal involvement in the alleged constitutional deprivations; 4) the evidence in the record fails to raise a triable issue of fact with respect to plaintiff's claim for excessive use of force; and, 5) in any event, defendants are entitled to qualified immunity from suit.  Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 48, and defendants have submitted a reply to plaintiff's submission.  Dkt. No. 50.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Summary Judgment Standard

    Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of

Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect the

outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248,

106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute

"if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

11

judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").[6]

### B.  Eleventh Amendment Immunity

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against them in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief

---

[6]

Although plaintiff has opposed defendants' motion, he has failed to submit a responding statement of material facts in dispute as required by the court's local rules. The consequences of this failure are potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3).  Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).  Based upon plaintiff's failure to submit a proper response to Defendants' Rule 7.1(a)(3) Statement, I recommend that the court accept as true defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement.

sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity that states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[7] *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[8] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985);  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Although it appears from plaintiff's motion response that his claims against the defendants are brought against them solely in their individual

_____

[7]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[8]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

capacities, to the extent his complaint can be interpreted otherwise, defendants are correct that since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damages claim against the defendants in their official capacities be dismissed.

### C.   Verbal Harassment

Included within plaintiff's complaint are allegations of threats and harassment on the part of prison officials which seem to form the basis, at least in part, for plaintiff's Eighth Amendment claim. Plaintiff alleges that defendants Guerin and Eastern, called him an "asshole", and Eastern is alleged to have said to plaintiff "welcome home", a statement that plaintiff interpreted as a threat. Brown is alleged to have called plaintiff a "stupid nigger", and plaintiff alleges that Kiernan threatened to set plaintiff up by planting drugs or weapons in his cell if he did not withdraw the grievance he filed regarding the alleged assault. Defendants assert that those

14

allegations fail to give rise to a plausible Eighth Amendment claim.

As the defendants correctly note, 42 U.S.C. § 1983 is not designed to remedy harassment or verbal abuse. *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996) (citations omitted). As a general matter, verbal harassment, including profanity, without any associated physical injury, does not give rise to a claim cognizable under section 1983. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995). Accordingly plaintiff's claims of verbal abuse, alleging conduct which, if true, is both unprofessional and reprehensible, do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J. ) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it

might seem, does not rise to the level of an Eighth Amendment violation").[9]

While implicitly acknowledging these well-established principles, plaintiff appears to claim that as a result of defendants' harassment he was emotionally and psychologically injured, making the defendants' conduct actionable under section 1983.[10]  While under extreme circumstances the Eighth Amendment's prohibition against cruel and unusual punishment may encompass intentionally inflicted psychological injury, necessarily excluded from this protection is conduct causing only *de minimis* psychological harm.  *St. Germain v. Goord*, No. 96-CV-1560, 1997 WL 627552, at *4 (N.D.N.Y. Oct. 8, 2007) (Pooler J. and Homer, M.J.)*; Jermosen v. Coughlin*, No. 87 Civ. 6267,1993 WL 267357, at * 6 (S.D.N.Y. Jul. 9, 1993).  Plaintiff's allegations in this case, even if true, would not rise to the level of malevolent conduct falling within the Eighth Amendment's protection.  *Shabazz*, 994 F. Supp. at 475.

The comments allegedly made to the plaintiff amount to nothing more than name calling and an unrealized threat of retaliation, and plaintiff has

---

[9]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[10]   To the extent the plaintiff contends that the name calling accompanied the alleged assault, plaintiff may have plausibly alleged an Eighth Amendment violation; as will be seen, however, plaintiff's excessive force claim fails on the merits.  *See* pp. 20 - 33, *post.*

failed to come forward with evidence to substantiate that he suffered anything more than minimal psychological consequences as a result of that conduct.  Indeed, plaintiff admits that even though defendant Kiernan threatened to issue him a false misbehavior report, he never did.  As to his alleged injuries, plaintiff contends that as a result of defendants' conduct he has had difficultly sleeping, but admits that it is a problem that he has always had when around corrections officers.  Additionally, plaintiff claims that he saw a psychologist for treatment, but when questioned regarding the details of that alleged treatment, he was unable to identify the psychologist by name, and conceded that he consulted with her "maybe three times", and that he is not currently undergoing any psychological treatment or taking any medication.  Tr. (Dkt. No. 34-10) pp. 14-16, 67.

Under these circumstances, I have concluded that no reasonable factfinder could find that plaintiff's allegations of verbal harassment and threats establish that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, and therefore recommend that the portion of defendants' motion challenging that component of plaintiff's Eighth Amendment claim be granted.

      D.    <u>Retaliation</u>

Plaintiff's claim of retaliation fares no better than his allegations of verbal harassment.  In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  *Headley v. Fisher*, No. 06 Civ. 6331, 2010 WL 2595091, at *3 (S.D.N.Y. June 28, 2010).  In the prison context, "adverse action" is objectively defined as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.), *superseded by* 320

F.3d 346 (2d Cir. 2003)).

Based on the record now before the court, plaintiff cannot satisfy the second prong of the retaliation test.  Plaintiff's complaint alleges retaliation in only a conclusory manner, merely stating that after he filed a grievance complaining of the alleged assault defendants threatened to set him up with weapons or drugs in his cell and to subject him to further beatings.  In response to defendants' motion, plaintiff claims that it was Sergeant Kiernan who threatened to set him up, and with future assaults.

Plaintiff's filing of a grievance clearly represented protected activity, as it was an exercise of his right to petition the government for redress of grievances under the First Amendment.  *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003) (citation omitted).  Kiernan's alleged verbal threats, however, which plaintiff admits never came to fruition, are patently insufficient to establish adverse action and support a plausible retaliation claim.  *Bartley v. Collins*, No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *6 (S.D.N.Y. 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002)).

Plaintiff's failure to allege any specific adverse action taken by the other defendants is similarly fatal to this cause of action. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Because plaintiff has failed to adduce any evidence of adverse action taken against him as a result of the grievances he claims to have filed, I have concluded that he has failed to come forward with sufficient facts to support a plausible claim for retaliation, and I therefore recommend that defendants' motion for summary judgment dismissing that cause of action be granted.

E.    Excessive Force/ Failure To Intervene

At the heart of plaintiff's complaint is his claim that on September 29, 2008 he was subjected to an unprovoked attack by the defendants. Once again, in this regard plaintiff's complaint is conclusory, alleging only that six corrections officers, including those named in the complaint, beat him, and he has since alleged minimal additional facts to support this claim. Defendants argue for dismissal of this cause of action, relying up the Second Circuit's decision in *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), and asserting that based upon the record now before the court, no reasonable factfinder could credit plaintiff's version of the

20

relevant events.

1.   Excessive Force

Plaintiff's excessive force claim is alleged under the Eighth

Amendment, which proscribes punishments that involve the "unnecessary

and wanton infliction of pain" and are incompatible with "the evolving

standards of decency that mark the progress of a maturing society."

*Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976);

*see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084

(1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not

mandate comfortable prisons, neither does it tolerate inhumane treatment

of those in confinement; thus, the conditions of an inmate's confinement

are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S.

825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452

U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment

is violated by an "unnecessary and wanton infliction of pain."  *Whitley,* 475

U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen*

*v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in deciding

claims of excessive force against prison officials is "whether force was

applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial.  __ U.S. __, 130 S. Ct. 1175, 1178 (2010) (per curiam).  Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a

finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *Velasquez v.*

*O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see Romaine v. Rewson,* 140

F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use

of physical force can constitute cruel and unusual punishment if it is

"repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112

S. Ct. 1000 (citations omitted).

     With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000)

(internal quotations omitted)).  When addressing this component of an

excessive force claim under the Eighth Amendment calculus, the court can

consider the extent of the injury suffered by the inmate plaintiff.  While the

absence of significant injury is certainly relevant, it is not dispositive.

23

*Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated . . . .  This is true whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).  That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

    With regard to the objective prong of the Eighth Amendment analysis, Johnson has stated that he sustained a "busted lip", a black and blue eye, and blue and red spots all over his body.  Tr. (Dkt. No. 34-10) p.

56.  Plaintiff believes the bruise was over his left eye, and that it was about dime-sized.  *Id*. at p. 57.  Though admittedly minor, these injuries could potentially provide sufficient objective evidence to satisfy the first prong of the test.

Subjectively, if true, plaintiff's version of the events that transpired on the day in question would seem to establish that the actions of the corrections officers allegedly involved contravene contemporary standards of decency.  Plaintiff alleges that the attack was prompted by the verbal exchange that took place between him and Sergeant Guerin during transport to Watertown and Guerin's purported statement to Eastern that plaintiff was an "asshole" and/or a problem on the bus.  Thus, as a result of what appears to have been a relatively trivial outburst on the Watertown bus, plaintiff claims that he was brutally beaten by six corrections officers. In sum, the facts alleged by the plaintiff would appear to also satisfy the subjective prong of the governing Eighth Amendment test.

2.    Application of *Jeffreys v. City of New York*

What sets this case apart from many other excessive force cases is that the dispute is not limited to specific facts surrounding the alleged incident, but instead defendants deny that any incident involving the use of

force upon the plaintiff even occurred on the day in question.  In light of plaintiff's claims and the defendants' denial of the use of any force against Johnson on September 29, 2008, it would appear that the court is squarely presented with an issue of credibility.  It is well-established that credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on motion for summary judgment.  *Rule v. Brine*, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia*, *Anderson*, 477 U.S. at 255, 106 S. Ct. 2513).

However, in *Jeffreys*, 426 F.3d 549, a case now relied upon by defendants, the Second Circuit created a very narrow exception to this rule.  *Slacks v. Gray*, No. 9:07-CV-510, 2009 WL 3164782, at * 13 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.).  In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the plaintiff's testimony.  *Jeffrey*s, 426 F.3d at 54-55.  The *Jeffreys* court cited with approval the district court's opinion in *Shabazz*, 994 F. Supp. at 468-71,

26

which granted summary judgment in an excessive force case based upon the absence of any evidence in the record to corroborate the plaintiff's version of the events, highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." *Slacks*, 2009 WL 3164782, at *13 (citing *Jeffreys*, 426 F.3d at 555 and quoting *Shabazz*, 994 F. Supp. at 470).[11]

In this district, it appears that in order to qualify for application of the *Jeffreys* exception a defendant must meet the following three requirements: 1) the plaintiff must rely "almost exclusively on his own testimony"; 2) the plaintiff's testimony must be "contradictory or incomplete"; and 3) the plaintiff's testimony must be contradicted by evidence produced by the defense.  *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, C.J. and

---

[11]   The court in *Shabazz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim."  *Shabazz*, 994 F. Supp. at 470.  While approving of the lower court's reasoning in *Shabazz*, the *Jeffreys* court was careful to distinguish *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir.1997), another case it had previously decided, wherein it reversed the grant of summary judgment in an excessive force case.  *Jeffreys*, 426 F.3d at 554-55.  In doing so, the court emphasized that in *Fischl* the plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted.  *Id.*

Lowe, M.J.) (citing and quoting *Jeffreys*).  Based upon a careful review of

the entire record before the court, I have concluded that this case presents

one of those rare exceptions to the rule that credibility determinations are

inappropriately made when ruling on a summary judgment motion, given

that the plaintiff's allegations are conclusory and inconsistent; there is an

utter absence of medical evidence to corroborate plaintiff's version of the

events; and a review of the record as a whole shows that no reasonable

person could believe plaintiff's version.

The only evidence supporting plaintiff's claim that the defendants

used excessive force is his own deposition testimony, during which he was

decidedly vague, and at times inconsistent.  When questioned at his

deposition about the details of the assault, plaintiff could provide few.

Plaintiff merely surmised that the motivation for the attack was the verbal

exchange between him and Sergeant Guerin.  Johnson admitted that he

was not aware of what, if anything, Sergeant Guerin communicated to

Corrections Officer Eastern when his bus arrived at Watertown, but instead

just assumed that Guerin told Eastern what occurred on the bus.  Tr. (Dkt.

No. 34-10) pp. 26, 30.  During his deposition, plaintiff asserted that even

before he "got jumped", another inmate, named Earl, told him that the

officers said they were going to do something to him.  Tr. (Dkt. No. 34-10)

p. 33.  When asked to identify exactly what "Earl" – whose last name

Johnson did not know – reported, the plaintiff testified, "[h]e just told me

that the officers said that they were going to try to get me sent to the box

and they're going to try to jump me, something like that."  *Id.*  According to

plaintiff, Earl could not identify which officers made those statements.  *Id.*

Ultimately, plaintiff never received a misbehavior report relating to what

ever occurred on September 29, 2009.  *Id.* at pp. 60, 68.

     Plaintiff further testified that after Eastern escorted him to the holding

cell, "all of the officers came in"; he then identified the other corrections

officers present as defendants Brown and Boulter, but was unable to name

any others.  *Id.* at p. 35.  He apparently guessed at the number of

corrections officers who participated in the alleged attack, stating that he

was just "rounding it off to six.  It could have been more."  *Id.*  Johnson

could not state what role Eastern–who he claims escorted him into the

cell–played, but testified that Eastern had to have been hitting him, and

that Eastern later taunted him and withheld his personal property for over a

week.  *Id*. at pp. 46-47.

     Plaintiff stated that the attack began with Brown inviting Johnson to

hit him, stating, "you want to be a problem on the bus . . .hit me."  Tr. (Dkt.

No. 34-10) p. 36.  At the time, Johnson was sitting on a bench in the back

of a cell; after he let Brown hit him a couple of times he got up, and the

officers then took Johnson down to the floor, kicking him and calling him

"stupid nigger."  *Id.* at p. 37.  When asked, plaintiff first said that he could

not identify the corrections officers that took him down to the floor, but then

said that they all helped.  *Id.* at p. 48.   Plaintiff testified that Brown kicked

him in the ribs and hit him "probably in [the] head", swinging over the top of

another corrections officer to reach Johnson; Boulter had his nose pushed

up, and another corrections officer was choking him.  Tr. (Dkt. No. 34-10)

pp. 38-46.  Although he alleges to have been kicked, punched, and

slapped about the head and body by six corrections officers for five

minutes, *see id.* at p. 37, plaintiff does not claim that immediately

afterwards he was bleeding, exhibited signs of swelling, sustained any

broken bones, or had any other obvious signs of injury, and he admits that

he did not request medical attention at the time.

Johnson did go to emergency sick call on the day after the alleged

incident; the record of the nurse's examination of plaintiff on that date,

however, reveals that despite plaintiff's complaints of pain in the left rib and

30

flank areas, nose, Adam's apple, and right lower lip, she only observed a dime-sized bruise over his left eye, *see* Plaintiff's Opposition(Dkt. No. 48) Attachments (Inmate Injury Report), and provided plaintiff with only ibuprofen for pain, a fact which plaintiff admits.  Plaintiff returned to sick call on October 2, 2008 with the same complaints, and on that date the nurse similarly noted that a physical examination revealed no redness, swelling, or broken skin; nonetheless, the nurse ordered x-rays and provided plaintiff with more ibuprofen.  *See id.*  Johnson went to sick call again four days later, and while reiterating that he had been "jumped by officers" the week before, he stated that the pain in his ribs was improving, though they were still tender to touch; no other complaints were noted.  Chest and rib X-rays performed sixteen days after the alleged beating were negative for any abnormality.[12]  *See id.*

In their defense, each of the named defendants has submitted a sworn affidavit denying plaintiff's claim of excessive use of force.  Indeed, defendant Boulter has testified, and submitted unrefuted documentary evidence confirming, that he took a vacation day and was not even at the

---

[12]   The photocopied incident photos attached to the injury report, which plaintiff has submitted as an attachment to his papers in opposition to defendants' motion, are of extremely poor quality such that it is impossible to determine what they purport to show.  *See* Dkt. No. 48.

facility on September 29, 2008, the day in question.  Similarly, defendant Brown has sworn that he was not working the draft area that day, but was assigned to work as a roundsman in a housing unit.  Defendant Kiernan states that he does not recall seeing or speaking with Johnson at any time on September 29, 2008, and that if he had the slightest suspicion that an altercation had occurred as alleged by Johnson, he would have followed standard operating procedure and would have immediately taken Johnson to Watertown's medical unit for medical attention and reported the incident for investigation.  Notably, all of these statements are included within Defendants' Rule 7.1(a)(3) Statement, which plaintiff has failed to oppose, and are therefore deemed admitted.

It should be noted that plaintiff made a complaint regarding the alleged incident to the DOCS Inspector General's office.  After conducting an investigation, that agency concluded in a written report that Johnson's allegations were without merit, expressly noting that there were no witnesses to the alleged assault and that Johnson's lack of any significant injury is inconsistent with his statement that he was beaten by six corrections workers.  *See* Plaintiff's Opposition (Dkt. No. 48) Attachment.

In sum, when considering the record as whole against plaintiff's

vague and inconsistent assertions, it seems clear that no reasonable juror could credit plaintiff's testimony that he was brutally beaten for five minutes by six corrections officers in a draft holding cell at Watertown as a result of a seemingly insignificant exchange of words that he had on a transport bus with Sergeant Guerin.  Accordingly, I recommend invoking the *Jeffreys* standard and granting defendants summary judgment dismissing plaintiff's excessive use of force claim.

### 3.   Failure to Intervene

Although not alleged in plaintiff's complaint or addressed by the defendants in their motion, at various points in plaintiff's opposition papers he alleges that Sergeant Kiernan is liable for failure to intervene and protect him from the assault by other corrections personnel.  A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers.  *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30,

33

2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)

("Failure to intercede results in [section 1983] liability where an officer

observes excessive force being used or has reason to know that it will be.")

(citations omitted).

In order to establish liability on the part of a defendant under this

theory, a plaintiff must prove the use of excessive force by someone other

than the individual, and that the defendant under consideration 1)

possessed actual knowledge of the use by another corrections officer of

excessive force; 2) had a realistic opportunity to intervene and prevent the

harm from occurring; and 3) nonetheless disregarded that risk by

intentionally refusing or failing to take reasonable measures to end the use

of excessive force. *See Curley*, 268 F.3d at 72; *see also Espada v.

Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007).  Mere inattention or

inadvertence, it should be noted, does not rise to a level of deliberate

indifference sufficient to support liability for failure to intervene.  *See, e.g.,*

*Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (noting that

"liability in a § 1983 'excessive force' action cannot be founded on mere

negligence") (citing, *inter alia*, *Daniels v. Williams*, 474 U.S. 327, 335-36,

106 S. Ct. 662, 667 (1986)).

In this instance, plaintiff testified at his deposition that Kiernan did not enter the draft holding cell until after the beating was over and the corrections officers involved had left, Tr. (Dkt. No. 34-10) p. 51, and has come forward no evidence that the Kiernan was either aware that the assault would take place, or that while it was occurring, he had the opportunity to stop it.  Moreover, since I have already concluded that plaintiff's excessive force claim is not supported by any credible evidence in the record and should be dismissed, it follows that Kiernan cannot be held responsible on this theory.

F.    Medical Indifference

Defendants also seek dismissal of plaintiff's claims that following the beating defendants were deliberately indifferent to his medical needs by failing to provide treatment for his injuries.  As will become evident, for essentially the same reasons, plaintiff's medical indifference claim is not viable.

Like the plaintiff's excessive use of force claim, his assertion that prison officials intentionally disregarded his medical needs must be analyzed within the framework of the Eighth Amendment's prohibition of cruel and unusual punishment.  *Estelle*, 429 U.S. at 104, 97 S. Ct. at 291

(1976).  To satisfy their obligations under the Eighth Amendment, prison

officials must "ensure that inmates receive adequate food, shelter, and

medical care, and must take reasonable measures to guarantee the safety

of inmates."  *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson*

*v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal

quotations omitted).

Claims of medical indifference are subject to analysis utilizing the

Eighth Amendment paradigm.  *See Salahuddin v. Goord,* 467 F.3d 263,

279-81 (2d Cir. 2006).  Thus, plaintiff's medical indifference claim, like his

excessive use of force claim, must satisfy both objective and subjective

requirements.  *Wright*, 554 F.3d at 268; *Price v. Reilly*, No. 07-CV-2634

(JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).

### 1.    Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . . .",

and centers upon whether prison officials acted reasonably in treating the

plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the objective

test addresses whether the inadequacy in medical treatment was

36

sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical

37

treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

     2.    <u>Subjective Element</u>

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)).  Deliberate

indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S. Ct. at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle,* 429 U.S. at 106, 97 S. Ct. at 292.  Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of

risks and costs" does not exhibit the mental state necessary for deliberate indifference.  *Harrison,* 219 F.3d at 139.   If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5  (S.D.N.Y. Sep. 1, 2005).

The basis for plaintiff's medical indifference claim against the named defendants is unclear.  Plaintiff seems to fault Sergeant Kiernan for failing to take action after the alleged assault when plaintiff purportedly told Kiernan that he feared for his life.  In any event, the record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of.  Plaintiff alleges that during the incident he suffered from a busted lip, a dime-sized bruise, and general complaints of pain.  The record, including plaintiff's deposition testimony and his submission in opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration.  Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a

serious medical need of constitutional proportions.  *Ford v. Phillips*, No. 05 Civ. 6646 (NRB), 2007 WL 946703, at * 12 (S.D.N.Y. Mar. 27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

Moreover, plaintiff first indicated a need for medical attention when he attended sick call on the day after the alleged assault.  At that time, the nurse conducted an examination, completed an injury report based upon plaintiff's account of the events of the previous day, and provided plaintiff with ibuprofen for the pain.  Two days later when plaintiff went to sick call again, he was again examined and given ibuprofen, and x-rays were ordered, even though no objective sign of injury was observed.  Contrary to plaintiff's assertions, he was not denied medical attention for his claimed injuries.

Finally, turning to the subjective element as it relates to plaintiff's claim against Sergeant Kiernan, plaintiff admits that he did not inform the sergeant that he had been beaten, was injured, or that he needed medical assistance, nor is there any evidence in the record suggesting that there were obvious signs of serious injury to plaintiff.  There is no claim that at

the time that Kiernan entered the holding cell the plaintiff was bleeding from any part of his body, suffered from obvious swelling on any part of his body, or was otherwise in such a dire physical condition that Kiernan should have known that plaintiff's health was seriously at risk.  Succinctly stated, the record is devoid of any evidence upon which a reasonable factfinder could conclude that Kiernan acted with deliberate indifference to Johnson's serious medical needs.

      G.    <u>Personal Involvement</u>

As an additional basis for dismissal of plaintiff's claims, including his allegation of medical indifference, defendants assert that they cannot be held responsible for alleged unconstitutional acts in which they did not participate.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the

constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

As defendants correctly contend, they cannot be held responsible for any alleged misconduct in which they were not personally involved.  The only allegations against Brown and Boulter relate to the alleged assault.  Accordingly, the only claim for which those defendants may be held responsible are those relating to the alleged use of force in violation of the Eighth Amendment, which I have already determined fails on the merits.

For the reasons stated above, there is no evidentiary support for the medical indifference claim against Kiernan.  Plaintiff apparently seeks to additionally hold Sergeant Kiernan responsible for the alleged beating based upon his supervisory role.  Notwithstanding that I have recommended a finding in favor of defendants on plaintiff's excessive force cause of action, defendant Kiernan could not be liable for damages under section 1983 solely by virtue of his position; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  In order for liability to attach in the case of Sergeant Kiernan, plaintiff must establish that he 1) directly participated in the challenged conduct; 2) after learning of the violation

through a report or appeal, failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Plaintiff has adduced no evidence supporting any of these showings. As a result, his attempt to hold Kiernan responsible for the alleged assault should be rejected.

H.    Request for Transfer

The final allegation in plaintiff's complaint is that he was denied a transfer to another facility in retaliation for his grievances, a claim defendants correctly contend has no constitutional significance.  It is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure."  *Halloway v.*

44

*Goord*, No. 9:03-CV-01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005))  (other citation omitted); *see also*, *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998).  While the denial of a transfer could ostensibly be actionable under section 1983 if based upon retaliatory animus*, see Van Gorder v. Workman*, No. 03-CV-6409, 2006 WL 3149360, at *2 (W.D.N.Y. Nov. 01, 2006), plaintiff has offered no evidence to establish the required nexus between his grievances and the denial, nor has he shown that as corrections sergeants and officers, the defendants held the power to make such a decision.[13]

In view of the foregoing, to the extent plaintiff asserts a violation of his constitutional rights based upon any delay in his transfer, I recommend that defendants' motion in this regard be granted and the claim dismissed.

I.    Defendant Eastern

Although defendants' motion does not explicitly request this relief, I have of my own initiative chosen to raise the question of whether plaintiff's

_____

[13]    It should be noted that plaintiff conceded at his deposition he was ultimately transferred out of Watertown in January of 2009.  Tr. (Dkt. No. 34-10) p. 62.

45

claims should proceed as against the defendant Eastern, who was never

served with the summons and complaint and who, if this report and

recommendation is adopted, would be the sole remaining defendant in the

case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that

service of a summons and complaint be made within 120 days of issuance

of the summons.[14]   "[W]here good cause is shown, the court has no

choice but to extend the time for service, and the inquiry is ended."

*Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996).

"If, however, good cause does not exist, the court may, in its discretion,

either dismiss the action without prejudice or direct that service be effected

within a specified time."  *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata v. City of*

*New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts have

_____

[14]   That rule provides that

> [i]f a defendant is not served within 120 days after the
> complaint is filed, the court–on motion or on its own after
> notice to the plaintiff–must dismiss the action without
> prejudice against that defendant or order that service be
> made within a specified time.  But if the plaintiff shows
> good cause for the failure, the court must extend the
> time for service for an appropriate period.

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the
120 day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

discretion to grant extensions even in the absence of good cause.");

*Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986).

When examining whether to extend the specified 120 day period for

service, a district court is afforded ample discretion to weigh the

"overlapping equitable considerations" involved in determining whether

good cause exists and whether an extension may be granted in the

absence of good cause.  *See Zapata*, 502 F.3d at 197.

A plaintiff's *pro se* status entitles him or her to a certain degree of

leniency insofar as service of process is concerned; courts generally favor

resolution of such a case on its merits, rather than on the basis of a

procedural technicality.  *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill.

1991).  When a plaintiff proceeds *in forma pauperis*, such as is the case

here, the court is obligated to issue the plaintiff's process to the United

States Marshal, who must in turn effect service upon the defendants,

"thereby relieving [the] plaintiff of the burden to serve process once

reasonable steps have been taken to identify for the court the defendants

named in the complaint."  *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996).

I am mindful of the Second Circuit's recent decision in *Murray v.*

*Pataki*, in which the court cautioned that

47

> [a] *pro se* prisoner proceeding *in forma pauperis* is only
> required to provide the information necessary to identify the
> defendant, *see, e.g. Sellers*, 902 F.2d at 602, and it is
> "unreasonable to expect incarcerated and unrepresented
> prisoner-litigants to provide the current business addresses of
> prison-guard defendants who no longer work at the prison,"
> *Richardson v. Johnson*, 598 F.3d 734, 739-40 (11th Cir. 2010).

*Murray v. Pataki*, No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R. App. Proc. 32.1).

In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon defendant Eastern and, to the extent necessary, eliciting the court's assistance.  Plaintiff's original complaint in this action was filed on January 5, 2009.  A summons was issued for defendant Eastern on January 13, 2009 and was returned as unexecuted on January 28, 2009.  *See* Dkt. Nos. 5, 8.  Thereafter, on February 13, 2009, plaintiff sought the court's assistance in identifying Eastern and was advised that this information could be obtained through discovery after one or more of the defendants had answered the complaint. Dkt. No. 15.  Despite the passage of nearly a year, completion of discovery, and the expiration of the discovery deadlines, plaintiff has failed to request any further assist assistance from the court in locating and this defendant, nor has he provided the clerk with the additional information

48

regarding Eastern's identity so that additional attempts at service could be made. Because plaintiff has not diligently attempt to discern the identity and pursue service upon the defendant identified as "Eastern", I recommend dismissal of plaintiff's claims against him, without prejudice.[15]

IV.    SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendants on September 29, 2008 by an unprovoked attack, or that defendant Kiernan failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of the alleged incident or that any defendant was subjectively indifferent to his serious medical needs. Additionally, plaintiff's damage claims against the defendants in their official capacities should be dismissed as barred by the Eleventh Amendment, and those claims against defendants for which they had no

---

[15]    Plaintiff's claim against this defendant seems to be that he participated in the use of excessive force. Since I have already determined, as to the other defendants, that plaintiff has failed to establish a violation of his constitutional rights, for the same reasons I could recommend dismissal of plaintiff's claim against Eastern on the merits as well.

personal involvement are subject to dismissal on this independent basis.[16]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety, with prejudice as to defendants Brown, Boulter, Kiernan and Guerin, and without prejudice as against defendant Eastern.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

---

[16]   In light of my determinations on the merits of plaintiff's claims, I have found it unnecessary to address the issue of qualified immunity.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:        September 3, 2010
              Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
ELMA RT and NAGYKOROS CANNING FACTORY
RT, Plaintiffs,
v.
LANDESMANN INTERNATIONAL MARKETING
CORPORATION, Landesmann International Marketing
Services GmbH, Mark Landesmann, individually, and
Tamas Batizi, individually, Defendants.
**No. 98 CIV. 3662 LMM.**

March 22, 2000.

MEMORANDUM AND ORDER

MCKENNA, D.J.

***1** Plaintiffs Elma RT ("Elma") and Nagykoros Canning
Factory RT ("Nagykoros"), both Hungarian companies,
brought this suit against defendants Landesmann
International Marketing Corporation ("LIMC"), Mark
Landesmann ("Landesmann"), Landesmann International
Marketing Services GmbH ("LIMS") and Tamas Batizi
("Batizi"), based on contracts for the sale of apple juice
concentrate by plaintiffs to defendants. LIMC is a
Delaware corporation with its principal place of business
in New York, and Landesmann is LIMC's sole owner and
CEO. LIMS is an Austrian corporation with a place of
business in the United States, and Batizi is LIMS's
managing director. The citizenship of Landesmann and
Batizi is not specifically alleged, but the former is alleged
to have been born in Austria but to reside in the United
States, while the latter is alleged to be located in Austria.

Plaintiffs assert both federal question and diversity subject
matter jurisdiction. Federal question subject matter
jurisdiction is supplied by a claim under the Racketeer and
Corrupt Organizations Act ("RICO"). On the face of the
amended complaint, however, diversity subject matter
jurisdiction is not available, since both of the plaintiffs are
alien corporations and at least one of the defendants,
LIMS, is an alien as well. *Lloyds Bank PLC v. Norkin,* 817
F.Supp. 414, 417 (S.D.N.Y.1993) (collecting cases).

In their amended complaint, plaintiffs allege that LIMC
committed breach of contract, fraud, and conversion.
Plaintiff Nagykoros also seeks consequential damages
against LIMC. In addition, plaintiffs jointly claim that
defendants violated RICO, 18 U.S.C. § 1962(c).

Defendants move to dismiss plaintiffs' amended complaint
on three grounds. First, they argue it is actually a
supplemental complaint, which was served without leave
of the court, in violation of Fed.R.Civ.P. 15(d) ("Rule
15(d)"). Second, they claim the RICO and conversion
counts fail to state a claim under Fed.R.Civ.P. 12(b)(6)
("Rule 12(b)(6)"). Finally, they argue that the RICO count
fails to plead fraud with particularity under Fed.R.Civ.P.
9(b) ("Rule 9(b)"). For the reasons set forth below, the
Court denies defendants' motion to dismiss the complaint
under Rule 15(d), but grants the motion to dismiss the
conversion and RICO claims under Rule 12(b)(6).
Because the RICO count is dismissed, the Court need not
address whether that claim is pleaded with sufficient
particularity under Rule 9(b).

*I. Background*

A. Plaintiff Elma

The following background is based upon plaintiffs'
amended complaint, which is based partially on
information and belief.

On November 14, 1997, Landesmann entered into a
contract with Elma whereby Elma agreed to provide
LIMC with thirty containers (approximately six hundred
tons) of apple juice concentrate. Landesmann agreed to
pay fifty percent of the contract price upon dispatch, and
the remaining fifty percent within thirty-five days of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

Bill of Lading.

**\*2** Pursuant to the contract, Elma delivered thirty containers of concentrate to LIMC, which accepted them without objection. LIMC made the initial payment for one-half the total amount owed. However, LIMC made no further payments to Elma. Instead, on February 9, 1998 (approximately the day on which the remaining payments were due) Landesmann informed Elma that LIMC was rejecting all thirty containers on quality grounds. Landesmann further demanded replacement of the concentrate and immediate reimbursement for all payments already made by LIMC, including shipping costs.

In response, Elma directed LIMC not to dispose of the concentrate. In addition, Elma requested: 1) an independent laboratory be named for testing of the concentrate, with costs to be split equally between ELMA and LIMC; 2) proof that the concentrate was handled properly in transit and subsequent storage; and 3) that LIMC disclose the location of the concentrate.

Landesmann, however, agreed to permit inspection only under the following conditions: 1) LIMC retain the sole right to name any testing facility; 2) Elma bear sole responsibility for payment of the testing costs; 3) the testing facility be allowed to disclose the results only to LIMC; and 4) the identity and location of the inventory not be disclosed to Elma. Elma objected to these demands, but agreed to replace the concentrate. Landesmann notified Elma by letter that he would accept replacement only if it was tendered in the New York/New Jersey area, instead of in Hungary, the location specified in the contract. In addition, Landesmann demanded full reimbursement for all expenses and costs, including financing. Finally, he demanded that Elma arrange, test, and send a substantial portion of the replacement cargo within three business days of receiving Landesmann's letter. When Elma refused these demands, Landesmann resold the concentrate.

B. Plaintiff Nagykoros

The facts alleged by Nagykoros are similar to those

alleged by Elma. In November of 1997, LIMC entered into three separate contracts with Nagykoros whereby Nagykoros agreed to provide LIMC with fifty containers of apple juice concentrate. Fifty percent of the contract price was to be paid after dispatch and transfer of possession, and the remaining fifty percent was to be paid within forty-five days after arrival. Pursuant to the agreement, Nagykoros delivered the fifty containers to LIMC, which received them without objection. LIMC then paid for one-half of the amount due on the first ten containers delivered. On February 4, 1998, however, Landesmann notified Nagykoros that LIMC was rejecting all fifty containers of concentrate on quality grounds.

Nagykoros directed Landesmann not to dispose of the concentrate, and informed him that, under Hungarian law, Nagykoros would suffer severe consequential damages if the contract was not fulfilled. Nagykoros also requested information to enable the stock of concentrate to be properly examined, suggested a neutral quality control agency for testing, and offered to pay for the testing if Landesmann's claim proved justified. Landesmann refused to permit inspection and testing of the apple juice concentrate unless: 1) the quality control agency be ordered that it was working on defendants' behalf; 2) Nagykoros prepay the control agency; and 3) the control agency keep the location of the inventory confidential.

**\*3** After weeks of inconclusive attempts between the parties to negotiate, Nagykoros informed Landesmann that if the parties did not reach a settlement of some kind, the Hungarian Ministry of Agriculture would fine Nagykoros approximately $150,000, and Nagykoros would possibly default on bank loans. Landesmann, however, proceeded to resell the concentrate.

*II. Discussion*

A. Rule 15(d)

Defendants argue that plaintiffs' amended complaint alleges events which occurred after the original complaint was filed, and therefore is actually a supplemental complaint which, to be filed, requires leave of the Court under Rule 15(d). While plaintiffs dispute that theirs is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

supplemental complaint, the Court need not decide which party is correct. Even assuming the complaint is properly labeled "supplemental," there is no compelling reason why this mislabeling should be fatal. Absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility, motions to serve a supplemental pleading will be freely granted. *See Forman v. Davis,* 371 U.S. 178, 182 (1962). The fact that a complaint is improperly labeled as "amended" instead of "supplemental" should not prevent the Court from considering the merits of the pleading. *See Sorel v. G & U, Inc.,* 103 F.R.D. 69, 73 (S.D.N.Y.1984). Thus, plaintiffs' motion to dismiss on this ground is denied.

B. Rule 12(b)(6) Standards

On a motion to dismiss under Rule 12(b)(6), a court must accept the truth of and draw all reasonable inferences from the well-pleaded factual allegations. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). The Court's task is to "assess the legal feasibility of the complaint [and] not ... assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see also Riccuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991). A complaint should only be dismissed "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994)(quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

C. Conversion

Plaintiffs allege that defendants committed conversion by refusing to pay the balance due for the concentrate, not accepting replacement, not allowing return of the rejected concentrate, and proceeding to re-sell the concentrate without plaintiffs' consent. Defendants in turn move under Rule 12(b)(6) to dismiss plaintiffs' conversion claim, arguing that it merely reasserts their breach of contract claim. This motion is granted.

Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to

the exclusion of the owner's rights. *Vigilant Ins. Co. of America v. Housing Auth. of El Paso, Texas,* 87 N.Y.2d 36, 44 (1995). Under New York law, it is well established that an action for conversion cannot be validly maintained where a plaintiff seeks damages merely for breach of contract. *See Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1288 (S.D.N.Y.1984). To sustain a conversion claim, a plaintiff must allege acts that constitute unlawful or wrongful behavior separate from a violation of contractual rights. *See id.; see also In re Chateaugay Corp.,* 10 F.3d 944, 958 (2d Cir.1993) (holding that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316 (1995) (holding that a defendant may be liable in tort where it breaches a duty of reasonable care distinct from its contractual obligations, and where it engages in tortious conduct separate and apart from its failure to fulfill its contractual obligations).

**\*4** To determine whether an action for conversion (or any other tort) exists in addition to an action for breach of contract, a court must first ask whether "the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent." W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 92 (5th ed.1984). In other words, the Court must determine whether defendants had a duty separate from any duties imposed by defendants' contractual obligations. If no such duty exists, then contract is the only theory upon which liability can rest. *Id.*

In the present case, defendants' duty to return the concentrate, accept replacement, and refrain from resale exists solely because of the contract between the parties. Outside the contract, there was no pre-existing obligation imposed by law which required defendants to honor plaintiffs' requests. This is apparent by the fact that if plaintiffs are successful on their breach of contract claim, they will be fully compensated for the balance due on the concentrate delivered to defendants, and therefore, no additional damages would be available to them under a theory of conversion.[FN1] *See Fraser,* 587 F.Supp. at 1288. Plaintiffs' argument that defendants' conduct amounted to conversion because it violated the Uniform Commercial Code ("U.C.C.") does not sway the Court otherwise. Indeed, this argument actually lends credence to the conclusion that any remedies they may be owed exist

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

under a breach of contract claim alone, since the U.C.C. governs contract, not tort, disputes.

> FN1. Punitive damages may be awarded for conversion, but the defendants must allege that defendants acted with malice or reckless disregard of plaintiffs' rights. *See Ashare v. Mirkin, Barre, Saltzstein & Gordon,* 435 N.Y.S.2d 438, 441 (Sup.Ct.1980), *modified on appeal to delete punitive damages,* 441 N.Y.S.2d 408 (2d Dep't.1981), *aff'd,* 54 N.Y.2d 891 (1981). Plaintiffs have failed to allege malice or reckless disregard of their rights.

For the reasons stated above, plaintiffs' conversion claim is dismissed.

D. RICO

Plaintiffs also allege that defendants' conduct violated RICO. To state a claim for damages under 18 U.S.C. § 1962(c), a complaint must specifically allege:

(1) the existence of an enterprise which affects interstate or foreign commerce;

(2) that the defendants were "employed by" or "associated with" the enterprise;

(3) that the defendants participated in the conduct of the enterprise's affairs; and

(4) that the participation was through a pattern of racketeering activity.

> *Clifford v. Hughson,* 992 F.Supp. 661, 665 (S.D.N.Y.1998) (quoting *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990)).

Defendants argue that plaintiffs have failed to properly allege the existence of an "enterprise." Additionally, defendants argue that the amended complaint fails to allege the predicate acts [FN2] and "continuity" needed to show a "pattern of racketeering activity." They therefore move to dismiss plaintiffs' RICO claim under Rule 12(b)(6). Since the Court finds that plaintiffs have failed to allege "continuity," the RICO claim is dismissed.

> FN2. The predicate acts alleged in this case are mail and wire fraud.

Plaintiffs must allege "continuity" as a prerequisite for the existence of a "pattern of racketeering activity." *See H.J Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 230 (1989). In other words, the predicate acts must be related, and must constitute or threaten long-term criminal activity. *Id.* Such continuity can be either "closed" or "open-ended." *Id.* Plaintiffs apparently concede that closed-ended continuity is not present in this case. [FN3] Therefore, the issue before the Court is whether the requirements of open-ended continuity have been satisfied.

> FN3. Closed-ended continuity is established by proving a series of related predicate acts extending over a substantial period of time. *H.J Inc.,* 492 U.S. at 230 (holding that predicate acts extending over a few weeks or months and threatening no future criminal conduct did not satisfy the requirement of continuity). The time period involved here, four months, clearly cannot be called "substantial."

*5 Open-ended continuity requires the threat of long-term racketeering activity. *Id.* This threat is indicated when the predicate acts themselves involve a distinct threat of such future racketeering activity, are part of the regular way of doing business for an ongoing entity (be it a criminal association or legitimate business), or are a regular means of conducting or participating in an ongoing RICO enterprise. *Id.* Ordinarily, however, courts will not find a threat of future racketeering in "cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property ...." *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)
(Cite as: 2000 WL 297197 (S.D.N.Y.))

In the present case, plaintiffs have inadequately pleaded open-ended continuity. In conclusory fashion, they allege only that "the fraudulent activities of the Enterprise continue to this day." (Compl.¶ 250). However, they offer no specificity as to what the fraudulent activities involve. Moreover, they have not claimed that the alleged "enterprise" depends on the commission of fraudulent acts "in the conduct of its day to day affairs," a factor courts have often looked to in determining whether fraudulent activity constitutes an entity's "regular way of doing business." *See, e.g., Mead v. Schaub,* 757 F.Supp. 319, 323 (S.D.N.Y.1991). Furthermore, plaintiffs fail to allege that defendants pursued an "inherently unlawful" goal. Under the facts alleged in the complaint, the only endeavor that could be attributed to defendants' actions is the desire to resell goods for a profit, which is the lawful goal of nearly every business. As noted above, unless an "inherently unlawful" pursuit is involved, continuity is not ordinarily inferred.

For all the above reasons, the Court dismisses plaintiffs' RICO claim. [FN4]

> **FN4.** Because the Court grants defendants' motion to dismiss the RICO claim for lack of "continuity," it is unnecessary to decide whether plaintiffs have alleged the existence of an "enterprise" distinct from defendants or the predicate acts needed to establish a "pattern of racketeering activity." It is also unnecessary to decide whether the alleged predicate acts were pleaded with sufficient particularity under Rule 9(b). While the Court declines to opine as to the validity of these arguments, it appears likely that, in addition to the complaint's shortcomings in alleging continuity, it is also deficient in the other areas challenged by defendants.

*III. Conclusion*

For the foregoing reasons, defendants' motion to dismiss the amended complaint pursuant to Rule 15(d) is denied. However, defendants motion to dismiss plaintiffs' conversion and RICO claims under Rule 12(b)(6) is granted.

With the dismissal of the RICO claim, the Court does not have federal subject matter jurisdiction, and, for the reason set forth above, it does not have diversity subject matter jurisdiction. The Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over plaintiffs' remaining claims. Accordingly, the amended complaint is dismissed.

The Court grants plaintiffs leave to file a second amended complaint within 30 days of the date hereof.

SO ORDERED

S.D.N.Y.,2000.
Elma RT v. Landesmann Intern. Marketing Corp.
Not Reported in F.Supp.2d, 2000 WL 297197 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated
December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See* *Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

### DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

> [FN2.] This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

> [FN3.] There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely **solely** upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was **returning** to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

## 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

## 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)
(Cite as: 1997 WL 627552 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
William ST. GERMAIN, Plaintiff,
v.
G. GOORD, Commissioner, Department of Corrections;
Hans Walker, Superintendent, Auburn Correctional
Facility; J. Manzer, Corrections Officer, Auburn
Correctional Facility; John Knox, Corrections Officer,
Auburn Correctional Facility; A. Volpe, Corrections
Officer, and James Fasce, Corrections Officer, Auburn
Correctional Facility, Defendants.
**No. 96-CV-1560 (RSP/DRH)**

Oct. 8, 1997.

William St. Germain, Clinton Correctional Facility,
Dannemora, New York, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

DAVID R. HOMER, MAGISTRATE J.

**\*1** The above matter comes to me following an order and
report-recommendation by Magistrate Judge David R.
Homer, duly filed on the 9th day of September, 1997. Dkt.
No. 27. Following ten days from the service thereof, the
clerk has sent me the entire file, including any and all
objections. Plaintiff William St. Germain filed objections,
and I therefore examine the magistrate judge's
report-recommendation utilizing the de novo of review.

Dkt. No. 28. *See* 28 U.S.C. § 636(b)(1)(C).

In his report-recommendation, the magistrate judge
recommended that I largely deny defendants' motion to
dismiss plaintiff's complaint, which St. Germain brought
pursuant to 42 U.S.C. § 1983 regarding defendants'
alleged retaliatory verbal harassment and threats.
However, the magistrate judge recommended that I grant
the motion to dismiss the complaint against individual
defendants Goord and Walker because plaintiff failed to
allege their personal involvement in the retaliatory acts.
The magistrate judge based his determination both upon
plaintiff's complaint and allegations contained in plaintiff's
opposition papers. Report-recommendation at 5 & n. 3.

In his objections, St. Germain does not dispute that his
action should be dismissed as against defendant Goord.
Dkt. No. 28, at 2. However, plaintiff argues that defendant
Walker is a proper defendant to his lawsuit because "it
will be shown during the course of this action that
defendant Walker knew of the actions of the officer
defendants behavior over the course of several months and
perhaps years yet failed to remedy or modify the
conditions on the unit." *Id.* at 1-2. This argument and
allegation is nearly identical to the one that Magistrate
Judge Homer considered. *See* Report-recommendation at
5 n. 3. Plaintiff still has failed to allege that defendant
Walker was present or otherwise involved in the actions of
which plaintiff complains. Plaintiff also failed to allege
any facts from which I could infer that Walker actually
knew of the actions that are the subject of this lawsuit.
Because plaintiff did not allege Walker's personal
involvement in the alleged constitutional deprivations, the
complaint against Walker is dismissed. *See Wright v.
Smith,* 21 F.3d 496, 501 (2d Cir.1994).

I note that St. Germain in his objections also argues that
defendants' actions were calculated to cause him physical
injury. Objections, Dkt. No. 28, at 2. This argument is in
response to the magistrate judge's discussion of the
physical injury requirement in 42 U.S.C. § 1997e(e).
Report-recommendation at 7 n. 4. However, the magistrate
judge expressly did not base his decision on this issue, and
the magistrate judge in any event denied defendants'
motion to dismiss St. Germain's claims. Therefore, I do

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)
(Cite as: 1997 WL 627552 (N.D.N.Y.))

not consider plaintiff's inapposite arguments regarding physical injury because the issue is not before me.

Therefore, after reviewing the entire file in this matter, it is

**\*2** ORDERED that the report-recommendation is approved, and

ORDERED that defendants' motion to dismiss the complaint against defendants Goord and Walker is granted,

ORDERED that defendants' motion to dismiss is otherwise denied, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff, an **inmate** in the custody of the New York State Department of Correctional Services (DOCS), brings this pro se action pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that the defendants verbally harassed and threatened him in retaliation for sending a letter to their supervisor in violation of plaintiff's Eighth and Fourteenth Amendment rights. Plaintiff seeks compensatory damages as well as declaratory and injunctive relief. Presently pending is defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b). Docket No. 11. Plaintiff has responded in opposition to the motion. Docket No. 20.

For the reasons which follow, it is recommended that defendants' motion to dismiss be granted in part and denied in part.

**I. Background**

Viewed in the light most favorable to plaintiff, the complaint alleges as follows.

On August 21, 1996, while plaintiff was in the Auburn Correctional Facility (Auburn) protective custody unit, defendants Manzer and Knox, and an **inmate** porter, called plaintiff a "rat" in front of other **inmates**. Manzer and Knox believed that plaintiff had written an anonymous letter to their supervisor which accused the officers of committing a security violation. On the same day, defendant Volpe told plaintiff that the defendants and other **inmates** would be allowed to assault him.

On August 22, 1996, defendants Manzer, Volpe and Fasce told plaintiff that they would inform other **inmates** of the nature of his conviction and then allow plaintiff to be assaulted by other **inmates**, and that the officers would "beat the hell out of plaintiff." On August 27, 1996, other **inmates** told plaintiff that officers informed them of plaintiff's conviction. On September 12, 1996, defendant Volpe threw away plaintiff's commissary sheet and verbally harassed him.[FN2]

> FN2. In a supplemental filing (Docket No. 5), plaintiff wrote that he's "had officers open my cell door to an **inmate** and I've been raped and I've had to go as far as slitting my wrist to get off a protective custody unit." Judge Pooler (Docket No. 6) and the undersigned (Docket No. 22) ordered defendants to investigate these allegations and submit a report. Defendants submitted an affidavit and attachments which indicated that while plaintiff was incarcerated at Auburn (August 21, 1995 until October 16, 1996), he filed no grievance or letters regarding the allegations made in his supplemental filing. Harris, Aff., ¶ 5 (Docket No. 23). Plaintiff was transferred to protective custody at Shawangunk on October 16, 1996. *Id.* ¶ 7. Plaintiff wrote to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)
(Cite as: 1997 WL 627552 (N.D.N.Y.))

the Deputy Superintendent, Shawangunk, requesting that his protective custody status be continued. He did not complain that he was being sexually assaulted at that time. *Id.* ¶ 8; *see also* Ex. D. Medical reports from September through October, 1996 make no reference to plaintiff slitting his wrists. *Id.*, Ex. C.

> Plaintiff responded to defendants' affirmation and clarified that the assault and wrist-slitting were not "fresh events". Docket No. 25. He explained that he had been physically abused when he was incarcerated at Wende and Attica Correctional Facilities. Since that time he has feared for his safety due to pervasive verbal harassment. He has been transferred to five other correctional facilities since the alleged physical abuse.

Plaintiff filed the present action on September 23, 1996.

## II. Motion to Dismiss

In reviewing a motion to dismiss, a court must accept the material facts alleged in the complaint as true and the complaint may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995); *Green v. Maraio,* 722 F.2d 1013, 1015-16 (2d Cir.1983) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Pro se plaintiffs are often unfamiliar with the formalities of pleading requirements; therefore, the Second Circuit has instructed that pro se complaints be construed liberally, using a more flexible standard to determine the sufficiency of a complaint. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991); *see also Hughes v. Rowe,* 449 U.S. 5, 9-10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980).

## III. Discussion

**\*3** The defendants move to dismiss the complaint on the grounds that (1) plaintiff failed to allege any personal involvement of the part of defendants Goord and Walker, (2) plaintiff's allegations of verbal harassment and threats fail to state a constitutional cause of action, and (3) plaintiff has failed to allege any injury and, therefore, is not entitled to compensatory damages.

### A. Personal Involvement

The defendants contend that plaintiff failed to allege any personal involvement by defendants Goord or Walker to support a claim under section 1983.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *see also Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) ( " '[T]he general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' ").

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or an appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted); *see also Wright,* 21 F.3d at 501; *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991).

A review of the complaint reveals no allegations of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)
(Cite as: 1997 WL 627552 (N.D.N.Y.))

personal involvement by either Goord or Walker. At Point three of his response to defendants' motion, plaintiff appears to confirm that the liability of Goord and Walker rests on their positions as administrators and supervisors rather than on their personal conduct. Docket No. 20. Their official positions, however, do not suffice to impose liability. Accordingly, defendants' motion to dismiss on this ground should be granted.[FN3]

> FN3. Plaintiff states in his reply in opposition to defendants' motion, that defendants Walker and Goord were conducting three separate investigations into the actions of the named corrections officer defendants, and that "the conduct of these officers would certainly be known" to Walker and Goord. Docket No. 19, p. 2. This statement is conclusory, and plaintiff has not alleged that either defendant was present during these incidents or involved in any other way. *See Davis v. Patrick,* No. 92 Civ. 0548(LLM), 1992 WL 183729, at * 3-4 (S.D.N.Y. July 21, 1992). Therefore, construing this document as a supplement to the complaint, plaintiff still has failed to allege the requisite personal involvement of defendants Goord or Walker.

**B. Allegations of Verbal and Threats**

The defendants contend that plaintiff's allegations of verbal harassment and threats alone do not support a claim under section 1983. Plaintiff contends that defendants caused him misery, anguish, psychological pain and fear for his safety in retaliation for sending an anonymous letter criticizing their behavior.

Verbal threats and harassment alone are not sufficient to support a claim under section 1983. *See Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *see also Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995). Verbal threats will not violate the Fourteenth Amendment unless accompanied by physical force or the present ability to effectuate the threat. *Jermosen v. Coughlin,* 878 F.Supp. at 449. The protection afforded by section 1983 is not as extensive as that afforded by the common law tort action for assault and,

even at common law, "mere words, however violent, are held not to amount to an assault." *Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *see also Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996).

*4 A review of the complaint and plaintiff's response to defendants' motion (Docket No. 20) make clear that plaintiff's claims in this case rest solely on the **verbal** statements and **threats** of the defendants and not on any actual **assault.** However, intentional infliction of psychological pain may also constitute a violation of the **Eighth Amendment** as long as such pain is not de minimus. *Compare Jermosen v. Coughlin,* No. 87 Civ. 6267(RJW), 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (officers approaching **inmate** with nightsticks raised in a threatening position caused only de minimus psychological pain), *and Show v. Patterson,* 955 F.Supp. 182, 192 (S.D.N.Y.1997) ( **inmate** failed to establish **Eighth Amendment** claim of humiliation, psychological pain and distress due to strip search), *with Robinson v. City of Mt. Vernon,* 654 F.Supp. 170, 173 (S.D.N.Y.1987) (claim that **inmate** suffered humiliation, ridicule and embarrassment from being forced to walk without shoes in the snow survived motion to dismiss), and *Garcia v. Torreggiani,* No. 84 CIV 9125(LBS), 1985 WL 3957, at * 2 (S.D.N.Y. Nov.26, 1985) (an unacceptably high number of incidents that constitute a pattern of intimidation may be actionable).

Construing plaintiff's allegations liberally and in the light most favorable to him, plaintiff has alleged a pattern of threats and intimidation which, if proved, may establish an Eighth Amendment violation. Accordingly, defendants' motion on this ground should be denied.[FN4]

> FN4. It must be noted that 42 U.S.C. § 1997e(e), codified on April 26, 1996, five months prior to the filing of the present complaint, states that "[n]o federal civil action may be brought by a **prisoner** confined in a ... correctional facility, for mental or emotional injury while in custody without a prior showing of physical injury." In light of the results of the defendants' report and investigation, filed subsequent to their motion to dismiss, it is clear that plaintiff has not alleged

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)
(Cite as: 1997 WL 627552 (N.D.N.Y.))

any prior physical injury. However, because neither party has addressed this issue, it will not be considered at this time. *Cf. Brazeau v. Travis,* 96-CV-0783 (RSP) (RWS), 1996 WL 391701 (N.D.N.Y. July 9, 1996) (case dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1) because plaintiff did not allege any prior physical injury in conjunction with allegations of mental injury, as required in 42 U.S.C. § 1997e).

### C. Compensatory Damages

Defendants contend that because plaintiff has not alleged actual injury, he is not entitled to compensatory damages. "It is well established that to collect compensatory damages in an action pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury." *McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983); *see also* Morgan v. Ward, 699 F.Supp. 1025, 1043-44 (N.D.N.Y.1988). Furthermore, defendants note that plaintiff is no longer incarcerated at Auburn, and is, therefore, no longer entitled to injunctive relief.

As noted above in subsection B, plaintiff has alleged a pattern of conduct which, if proved, may establish the psychological and emotional injuries which he alleges. Liberally construed, then, the complaint suffices to allege a basis for compensatory damages. *But see* footnote 4 *supra.*

### III. Conclusion

**WHEREFORE,** for the reasons stated above, it is

**RECOMMENDED** that defendant's motion to dismiss be **GRANTED** as to defendants Goord and Walker, and **DENIED** in all other respects; and

**\*5 IT IS FURTHER ORDERED** that the Clerk of the Court serve a copy of this Report-Recommendation, by

regular mail, upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
St. Germain v. Goord
Not Reported in F.Supp., 1997 WL 627552 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Donald R. JERMOSEN, Plaintiff,
v.
Thomas A. COUGHLIN, et al., Defendants.
**No. 87 Civ. 6267 (RJW).**

July 9, 1993.

MEMORANDUM DECISION

ROBERT J. WARD, District Judge.

**\*1** Donald R. Jermosen, appearing *pro se,* has moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment. Defendants have cross-moved for summary judgment. By order dated December 14, 1990, the motions were referred to the Honorable Naomi Reice Buchwald, United States Magistrate Judge, to hear and report pursuant to 28 U.S.C. § 636(b)(1)(B).

On March 30, 1993, Magistrate Judge Buchwald filed a Report and Recommendation ("the Report"), which recommended that plaintiff's motion be denied and defendants' cross-motion be granted. Plaintiff filed a timely objection ("the Objection") to the Report. For the reasons that follow, the Court modifies the magistrate judge's findings and recommendations in accordance with this decision; denies plaintiff's summary judgment motion in part and grants it in part; and denies defendants' summary judgment motion in part and grants it in part.

BACKGROUND

In his Amended Complaint, Jermosen claims that defendants have: (1) violated the terms of the *Hurley*

Consent Decree [FN1] ("the *Hurley* Decree") and (2) deprived him of his rights under the United States Constitution, in violation of 42 U.S.C. § 1983.

Jermosen was an inmate in the New York State Department of Correctional Services ("DOCS") Shawangunk Correctional Facility ("Shawangunk") during July 1987. On July 23, 1987, a facility-wide strip frisk was conducted. The strip frisk was initiated by First Deputy Superintendent Christopher Artuz, following receipt of information that an extortion ring was operating within Shawangunk. Artuz also noted a rise in the number of assaults, requests for protective custody, confiscation of weapons and drugs, and other manifestations of a potential security problem. Following a discussion with Superintendent Louis Mann, Artuz recommended a lock-down of the facility and a strip frisk of the inmates. Mann then requested and received permission from Deputy Commissioner Philip Coombe to conduct the lock-down and strip frisk during the week of July 20, 1987. DOCS Commissioner Thomas Coughlin subsequently granted final approval for the lock-down and strip frisk.

On July 23, 1987, Corrections Officers Nuttall and O'Connor, with their nightsticks raised, approached plaintiff to strip frisk him and search his cell. Jermosen objected to the frisk as illegal and demanded to see the sergeant responsible for supervising the search and frisk. As a result, Correction Sergeant Valleau, accompanied by Corrections Officer Sperry, joined Nuttall and O'Connor. Following this, Nuttall and O'Connor proceeded with the strip frisk.

The procedure for a strip frisk required Jermosen to: remove his clothes, open his mouth and move his tongue in all directions, remove dentures, if any, run his hands through his hair, allow his ears to be visually examined, lift his arms, spread his fingers, lift his feet, lift his testicles, and bend over to spread the cheeks of his buttocks.

Plaintiff then filed the instant action, asserting that defendants violated the terms of the *Hurley* Decree by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

conducting a strip frisk without probable cause and in the absence of a major threat to the facility. Jermosen claims he is entitled to a finding of civil contempt as a matter of law. In his § 1983 claim, Jermosen asserts that his rights under Article One of the New York State Constitution, as well as the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, were violated. Plaintiff also claims that defendants subjected him to visual rape and sodomy.

**\*2** Defendants argue that the language of the *Hurley* Decree sanctioned the strip frisk that is the subject of this action and that plaintiff is estopped from bringing a separate § 1983 action challenging the events associated with the frisk because the decree governs the administration of strip frisks. Defendants assert that summary judgment is warranted inasmuch as plaintiff has failed to establish a prima facie case. Finally, defendants contend that they are entitled to qualified immunity on plaintiff's § 1983 claims.

DISCUSSION

A. *Standards for Reviewing a Magistrate Judge's Report and Recommendation*

To accept the Report and Recommendation of a magistrate judge to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., notes of Advisory Committee on Rules (citing *Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879 (1974)). 28 U.S.C. § 636(b)(1) affords the district court broad latitude in considering a magistrate judge's recommendation, even if no party objects to it. *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989).

When timely objection has been made to a portion or portions of a magistrate judge's report, however, the district judge must "make a de novo determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P. *See also,* 28 U.S.C. 636(b)(1). The judge may then accept, reject, or modify, in whole or in part, the

magistrate judge's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

The district court's obligation to make a *de novo* determination of properly contested portions of a magistrate judge's report does not require that the judge conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676 (1980). It is sufficient for the District Court "arrive at its own, independent conclusion about those portions of the [magistrate judge's] report to which objection is made." *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983). To this end, the court must "exercise ... sound judicial discretion with respect to whether reliance should be placed on [the magistrate judge's] findings." *American Express Int'l Banking Corp. v. Sabet,* 512 F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd without opinion,* 697 F.2d 287 (2nd Cir.), *cert. denied,* 459 U.S. 858 (1982).

Plaintiff has objected to all recommendations contained in the Report. Accordingly, the Court has conducted a *de novo* review of the entire Report.

B. *Standards for Granting Summary Judgment*

Summary judgment may be granted when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). If no rational fact-finder could find in the nonmovant's favor, there is no genuine issue of material fact and [ ]summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). In making this determination, the court should not resolve disputed issues of fact, but rather, while " 'resolving ambiguities and drawing reasonable inferences against the moving party,' " must assess whether material factual issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932 (1987)).

C. *Plaintiff's Objections*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

1. *Violation of the Hurley Decree*

**\*3** Jermosen claims that defendants violated the *Hurley* Decree in four ways: (a) by conducting a strip frisk under conditions not authorized by the terms of the decree; (b) by strip frisking plaintiff without individual probable cause; (c) by having four corrections officers present during plaintiff's strip frisk; and (d) by failing to post the *Hurley* Decree in the facility.

With respect to the first three parts of this claim, all of which arise from the events surrounding the July 23, 1987 strip frisk, Jermosen has not established a violation of the *Hurley* Decree. After a *de novo* review of Jermosen's objections, the Court accepts the magistrate judge's proposed findings and recommendations on these parts of Jermosen's claim.

However, in connection with the fourth part of his claim, concerning the posting of the *Hurley* Decree, Jermosen has alleged a violation which, except for a general denial in their answer, has not been refuted by defendants. Accordingly, this part of plaintiff's motion will be granted.

a. *Appropriate Conditions for a Facility-Wide Strip Frisk*

Under the terms of the *Hurley* Decree, facility-wide strip frisks are permissible only if DOCS officials perceive a "major threat" to the security of the facility:

strip frisks and strip searches shall not be conducted as a part of a general search of any facility or portion of a facility except as follows:

....

2. During a search undertaken in response to a major threat to the security of the facility and such search having been duly authorized by the Commissioner or a Deputy Commissioner, a strip frisk of an inmate may, if necessary, be conducted.

*Hurley* Decree at 7.

Plaintiff contends that, because no major threat existed at the time of the July 1987 lock-down, the strip frisk violated the *Hurley* Decree. This contention rests on two grounds. First, he asserts that, contrary to Artuz's information, an extortion ring did not exist at Shawangunk. Jermosen bases this assertion on his lack of awareness of the existence of an extortion ring. Second, plaintiff notes that the facility was equipped with television cameras to monitor inmate activity. Plaintiff contends that if an extortion ring existed, the cameras would have recorded activity documenting its existence. Objection at 2.

Prison officials are entitled to "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). "In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts." *Hurley v. Ward,* 549 F.Supp. 174, 184 (S.D.N.Y.1982) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977); *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

**\*4** With this principle of deference in mind, the Court finds that the DOCS officials held a reasonable belief that a major threat to the security of Shawangunk existed which warranted a strip frisk of plaintiff and other inmates. In reaching this conclusion, the Court relies upon the affidavit of First Deputy Superintendent Artuz. This affidavit presents convincing evidence that the decision to conduct the strip frisk was based upon a reasonable belief that an extortion ring threatened the security of the facility. It catalogs the information and incidents upon which Artuz based his belief, including "the general increase in the number of inmate-on-inmate assaults, inmate requests for placement in protective custody, needless sick call reports, reports of inmates not wanting to go out to the exercise yard, and an increase in the number of weapons confiscated by corrections officers at the facility." Artuz Aff. ¶ 2.

The mere fact that plaintiff lacked personal knowledge

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

concerning the operation of an extortion ring is not evidence of its nonexistence. In addition, the presence of television monitors at the facility does not guarantee that they would consistently record any illegal activity related to the existence of an extortion ring.

In accordance with the principle set forth in *Bell,* and absent any convincing evidence from plaintiff to contradict Artuz' statement concerning the evidence of an extortion ring, this Court defers to the professional judgment and experience of the DOCS officials. The Court adopts the magistrate judge's finding that the decision to conduct the lock-down and strip frisk was based upon a reasonable belief that an extortion ring posed a major threat to the facility.

b. *Presence of Individual Probable Cause*

The Report found that the *Hurley* Decree authorizes a strip frisk when there is a major threat to a facility and that it is not necessary for DOCS to make an individual determination of probable cause for each inmate to be strip frisked. Plaintiff disagrees and interprets the terms of the decree as requiring that individual probable cause be ascertained prior to any strip frisk of an inmate. However plaintiff has not pointed this Court to any part of the *Hurley* Decree which requires an individual determination of probable cause. By the terms of the decree itself, if there is "a major threat" to the security of a facility, a strip frisk may be conducted as part of a duly authorized general search. *Hurley* Decree at 7. The Court adopts the Report's findings in this regard and holds that the strip frisk of Jermosen, which was conducted without individual probable cause, did not violate the terms of the *Hurley* decree.

c. *Presence of More than Two Officers at Strip-Frisk*

Plaintiff next claims that the presence of four corrections officers at his strip frisk violated the terms of the *Hurley* Decree, which provides, in relevant part, "every strip frisk or strip search shall be conducted with only the individual searching officer and, if necessary, a supervisor able to observe the search...." *Hurley* Decree at 8.

**\*5** Jermosen admits that the four officers were present at his strip frisk only because "plaintiff demanded to know the actual identity of the sergeant or person responsible for supervising the strip frisk." Plaintiff's Memorandum in Support at 3. Initially, plaintiff's strip frisk was to be conducted by two officers, Nuttall and O'Connor, in accordance with the terms of the decree. However, because plaintiff verbally resisted and demanded to see the sergeant in charge, Sergeant Valleau and Officer Sperry came to plaintiff's cell and were also present during the strip frisk.

It is undisputed that the four officers present in Jermosen's cell exceeded the number of officers authorized at strip frisks by the decree. Nevertheless, it was Jermosen who requested this deviation from the terms of the *Hurley* Decree and he has therefore waived his right to use the presence of additional officers as a basis for relief. The Court adopts the Report's findings in this regard and holds that the presence of four officers, in response to a request by Jermosen, did not violate the terms of the *Hurley* decree.

d. *Failure to Post Hurley Decree*

Plaintiff asserts that a copy of the *Hurley* Decree was not posted at Shawangunk, in violation of the terms of the decree, which provides, in relevant part, "a copy of this decree shall be posted in each housing unit and each law library located in a correctional facility operated by the New York State Department of Correctional Services...." *Hurley* Decree at 8-9. In particular, plaintiff claims that defendants failed to make "this Consent Decree/Order to be posted at the Facility Law Library and other required areas." Amended Complaint ¶ 6; *see also* Plaintiff's Rule 3(g) Statement ¶¶ 10-11. Defendants deny this allegation only in general terms. Answer to the Amended Complaint ¶ 5.

Other than in their amended answer, defendants have not refuted plaintiff's allegations. Thus, plaintiff is entitled to summary judgment on this issue.

However, by virtue of Jermosen's response to the strip frisk on July 23, 1987 and his assertion of this claim in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

instant lawsuit, it is apparent that plaintiff had personal notice of the *Hurley* Decree and has failed to demonstrate any injury incurred in connection with the failure to post. Accordingly, the appropriate relief is an order requiring compliance by defendants with the posting requirements of the *Hurley* Decree.

2. *Plaintiff's § 1983 Claim*

Plaintiff alleges that the strip frisk deprived him of his rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution,[FN2] in violation of 42 U.S.C. § 1983.[FN3] Amended Complaint ¶ 12.

a. *Fourth Amendment Claim*

Plaintiff asserts that the strip frisk deprived him of his constitutionally protected right to privacy under the Fourth Amendment. As the magistrate judge noted, however, prisoners do not enjoy the same privacy rights as non-prisoners because, "[l]oss of ... privacy [is an] inherent incident[ ] of confinement." Report at 11 (quoting *Bell v. Wolfish*, 441 U.S. at 537). In addition, prison administrators are accorded a high level of deference when dealing with threats to institutional security and internal order. *Bell v. Wolfish*, 441 U.S. at 546-48.

**\*6** Having found that the strip frisk at issue was conducted in accordance with the terms of the *Hurley* Decree, the Court defers to the judgment of the DOCS administrators and rejects plaintiff's claim that his right to privacy has been violated. The strip frisk was justified in view of defendants' reasonable concern for maintaining the security of the facility. Accordingly, plaintiff's Fourth Amendment claim cannot withstand defendants' motion for summary judgment on this issue.

b. *Eighth Amendment Claim*

Plaintiff alleges that defendants used excessive force during the strip frisk, in violation of the Eighth Amendment prohibition on cruel and unusual punishment.

For the reasons that follow, the Court finds plaintiff's claim to be meritless.

As the Supreme Court has recently held, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 112 S.Ct. 995, 999 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

Plaintiff does not allege that any officer or any object came into physical contact with him. Rather, he asserts that the officers approached his cell with their nightsticks raised in a threatening position and "deliberately inflicted mental pain, anguish, embarrassment and humiliation." Objection at 5. Jermosen further claims that this is tantamount to visual rape and sodomy. *Id.* at 3.

The Report states that, "[w]ith respect to defendants' threatening stance, the plaintiff has not shown that this conduct constituted a use of force that caused him *physical* pain." Report at 13 (emphasis added). While this is indisputably true, it does not carry the analysis far enough, because the infliction of *psychological* pain may also be a violation of the Eighth Amendment. *See Hudson v. McMillian*, 112 S.Ct. at 1004 (Blackmun, J., concurring) ("[T]he Eighth Amendment prohibits the unnecessary and wanton infliction of 'pain,' rather than 'injury.' 'Pain' in its ordinary meaning surely includes a notion of psychological harm. I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes.")

In the instant matter, however, the Court finds that any psychological pain caused to Jermosen was *de minimus*. As the Supreme Court has indicated, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Id.* at 1000 (quoting *Whitley v. Albers*, 475 U.S. at 327).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

The same reasoning applies to any infliction of psychological pain. The officers in the instant matter conducted a constitutionally permitted strip frisk. The fact that they approached Jermosen with their nightsticks raised in a threatening position was not enough to cause the degree of psychological pain which rises to the level of a constitutional violation. Moreover, plaintiff has not introduced any evidence that the incident left him with significant psychological scars. Based on the undisputed facts, the Court finds that any force was applied in a good-faith effort to maintain discipline during the facility-wide lock-down and strip frisks and any psychological harm to Jermosen caused by the incident was *de minimus*. Therefore, plaintiff's Eighth Amendment rights were not violated.

c. *Fourteenth Amendment Claim*

**\*7** Jermosen contends that the strip frisk deprived him of his liberty without due process of law, in violation of the Fourteenth Amendment. While prisoners do retain their Fourteenth Amendment due process rights, these rights are also subject to restrictions and limitations, particularly in order to maintain institutional security. *Bell v. Wolfish,* 441 U.S. at 545-46. Thus, "even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547 (citations omitted).

In light of these principles, the Court finds that the strip frisk did not deprive Jermosen of his liberty interest without due process of law. As noted above, the strip frisk was conducted in response to a perceived "major threat" to the security at Shawangunk. The strip frisk was duly authorized by a procedure established in the *Hurley* Decree and was conducted in accordance with the terms of that decree. Finally strip frisks of prison inmates have passed constitutional muster. *See, e.g., id.* at 558-60. For these reasons, the Court finds that plaintiff's Fourteenth Amendment due process rights were not violated.

d. *Qualified Immunity for Defendants*

Defendants assert they are entitled to qualified immunity

on the § 1983 claim. Because the Report found that defendants did not violate plaintiff's constitutional rights, it did not reach this issue. Inasmuch as this Court has found that all of plaintiff's § 1983 claims should be dismissed, it need not decide this issue either.

3. *Plaintiff's Discovery Request*

Jermosen seeks discovery pertaining to defendants' knowledge of the existence of an extortion ring at Shawangunk. He argues that Artuz's affidavit is not proof of the existence of the extortion ring and is based on "pretext and false information." Objection at 4.

The Court finds Artuz's affidavit was submitted in good faith and accepts it as evidence of the reasonableness of the DOCS officials' decision to conduct the strip frisk. There is no indication that Artuz has attempted to mislead this Court concerning facts involving the existence of the extortion ring.

As such, the Court finds that further discovery on this issue would be unduly cumulative or duplicative, as well as unduly burdensome and expensive. Rule 26(b)(1), Fed.R.Civ.P. Accordingly, the Court denies plaintiff's discovery request.

CONCLUSION

For the foregoing reasons, Magistrate Judge Buchwald's Report and Recommendation is adopted in part and modified in part. Plaintiff's summary judgment motion is granted in part and denied in part. Defendants' summary judgment motion is likewise granted in part and denied in part.

Defendants are directed to serve and file, with the undersigned, an affidavit, on or before August 20, 1993, indicating compliance with the posting requirements of the *Hurley* Decree. Accordingly, the complaint is dismissed without prejudice to an application to the Hon. Robert L. Carter to enforce the posting requirements of the *Hurley* Decree.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)
(Cite as: 1993 WL 267357 (S.D.N.Y.))

**\*8** It is so ordered.

FN1. The *Hurley* Consent Decree was entered on July 21, 1983 in *Hurley v. Coughlin,* 77 Civ. 3847 (RLC) (S.D.N.Y.), a class action suit brought on behalf of all inmates in the custody of the New York State Department of Correctional Services seeking to enjoin certain strip frisk and strip search policies of the department. The decree sets forth the specific procedures that prison officials must follow during a strip frisk or strip search of any prisoner or group of prisoners. *See* Artuz Aff.Ex.K at 7.

FN2. In the Amended Complaint, plaintiff also alleges that his rights under the First and Fifth Amendments were denied by defendants. *Id.* at ¶ 12. However, nowhere in his submissions in support of the instant motion or in the Objection does plaintiff discuss these additional claims or present any argument as to precisely how he suffered a deprivation under the First or Fifth Amendment. For this reason, the Court finds that plaintiff has failed to state a colorable claim in connection with these amendments.

In addition, plaintiff asserts that he was deprived of his rights under the New York state constitution, in violation of § 1983. This claim must be rejected, inasmuch as § 1983 does not apply to the deprivation of rights, privileges or immunities independently created by state statutes or state constitutions. *Stiltner v. Rhay,* 322 F.2d 314, 315 (9th Cir.1963), *cert. denied,* 376 U.S. 920 (1964); *Newcomer v. Coleman,* 323 F.Supp. 1363, 1365 n. 4 (D.Conn.1970).

FN3. Section 1983, provides, in relevant part,

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected,

any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or any other proper proceeding for redress.

42 U.S.C. § 1983.
S.D.N.Y.,1993.
Jermosen v. Coughlin
Not Reported in F.Supp., 1993 WL 267357 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2595091 (S.D.N.Y.)
(Cite as: 2010 WL 2595091 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Rogelio HEADLEY, Plaintiff,
v.
Superintendent Brian FISHER, Correctional Officer
Simpson, Correctional Officer B. Ellis, Correctional
Officer R. Bethea, Correctional Officer T. Rizzuto,
Correctional Officer K. Harris, Correctional Officer R.
Reyes, Correctional Officer K. Barrett, Defendants.
**No. 06 Civ. 6331(PAC)(KNF).**

June 28, 2010.

*ORDER*

Honorable PAUL A. CROTTY, District Judge.

**\*1** *Pro se* Plaintiff, Rogelio Headley ("Headley") brings
this action under 42 U.S.C. § 1983 against, among others,
Correction Officers Simpson ("Simpson") and Ellis
("Ellis," and, together with Simpson, "the Defendants").
Headley asserted claims for multiple violations of his
constitutional and statutory civil rights under 42 U.S.C. §
1983. In an Order dated May 7, 2008, the Court dismissed
Headley's claims against all defendants except Simpson
and Ellis. (Dkt.# 39.) As to Simpson and Ellis, the Court
dismissed all of Headley's claims except his: (i) First
Amendment retaliation claim against both Simpson and
Ellis, and (ii) a Fourteenth Amendment Due Process claim
against Simpson. (Dkt.# 39.)

The Court referred the case to Magistrate Judge Kevin
Nathaniel Fox on August 29, 2006. On October 23, 2009,
the Defendants filed a motion for summary judgment
under Fed.R.Civ.P. 56. On April 8, 2010, Magistrate
Judge Fox issued a Report and Recommendation ("R &
R") recommending that the Court grant Defendants'

motion as to the retaliation claim against Officer Simpson
but deny Defendant's motion as to all other claims (Dkt.#
81.). Both parties submitted timely objections to the R &
R (Dkt. # s 85-86.) After reviewing the objections of the
parties, the Court adopts Judge Fox's R & R in its entirety.
It thus GRANTS the defendants' motion as to the
retaliation claim against Officer Simpson but DENIES the
motion as to all other claims.

**FACTS**[FN1]

FN1. The facts in this section are taken from the
R & R.

Headley is an **inmate** at the Sing Sing Correctional
Facility ("Sing Sing") in the custody of the New York
State Department of Correctional Services ("DOCS"). On
April 29, 2004, Headley exited his cell and headed for the
bathhouse run, believing his gallery had been called.
Simpson, however, informed Headley that his gallery had
not been called and ordered Headley to return to his cell.
Headley refused to return to his cell and called for a
sergeant. Headley alleges that Simpson then grabbed his
shirt and dragged him back to his cell, slapping him and
yelling profanities. Headley further alleges that Simpson
threatened to punish him if Headley filed a grievance
against Simpson. Headley nevertheless filed a grievance
report against Simpson for these actions. Headley's
grievance report was denied.

Following this incident, Simpson filed a misbehavior
report against Headley, stating that Headley had been out
of place and had disobeyed a direct order to return to his
cell. On the evening of April 29, 2004, as a result of the
report filed by Simpson, Headley was placed in keep-lock
status for 16 days, until May 15, 2004. Headley alleges
that he never received Simpson's misbehavior report and
that he was denied an opportunity to be heard prior to his
keep-lock confinement. It is undisputed that Simpson did
not have the authority to place Headley on keep-lock
status.

While under keep-lock status, **prisoners** receive three

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2595091 (S.D.N.Y.)
(Cite as: 2010 WL 2595091 (S.D.N.Y.))

meals a day and may go to recreation and take showers when permitted. Headley alleges that, while in keep-lock, he was not offered meals and was denied opportunities to take showers and go to recreation. Defendants dispute these assertions and point to the Sing Sing Logbook (the "Logbook"), which indicates that Headley was, in fact, offered opportunities for recreation or showers. *See,* Reznik Decl. Ex. F. at 320, 343, 374.

**\*2** On May 22, 2004, Headley filed a second grievance report, this one against Ellis, a female officer. In this grievance report, Headley alleged that he was strip searched in front of Ellis, who made derogatory comments about his private parts and slapped him in the face. Headley alleged that Ellis used profanity and said, "that's what you get for writing up C.O. Simpson." *See* Headley Tr. at 103, Reznik Decl. Ex. B., at 103. Ellis denies these allegations.

### DISCUSSION

### I. Standard of Review for a Report and Recommendation

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When the parties make timely objections to the recommendations of the magistrate judge, the Court must review the contested portions de novo. *Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). The Court, however, "may adopt those portions of the [R & R] to which no objections have been made and which are not facially erroneous." *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000).

### II. Analysis

### a. Summary Judgment Standard

Summary judgment is appropriate where "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c) (2).* In evaluating the evidence in a summary judgment motion, all "justifiable inferences" must be made in favor of the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment motion will not stand where the evidence would allow a reasonable jury to find for the nonmoving party, thus indicating a "genuine" issue of fact. *Id.* at 248.

The moving party bears the burden of demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party facing a movant who has carried its burden must do more than simply indicating some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must show that a rational fact finder could find for him when taking the record as a whole. *Id.* at 587.

Specifically in the context of a *pro se* plaintiff, the Court should interpret the pleadings liberally and construe them as " 'to raise the strongest arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). However, a *pro se* plaintiff, like all plaintiffs opposing a summary judgment motion, cannot rely solely upon the allegations set forth in his complaint. *Champion v. Artuz,* 76 F.3d 483, 485 (2d. Cir.1996). The nonmovant must "set out specific facts showing a genuine issue for trial." *Fed.R.Civ.P. 56(e).*

### b. First Amendment Retaliation Claims

To state a First Amendment retaliation claim, a plaintiff must show that: (1) the speech or conduct in question is constitutionally protected, (2) the defendant took adverse action, and (3) a causal connection exists between the adverse action and the protected speech or conduct. *See* *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

**\*3** Headley has stated a *prima facia* retaliation claim against Ellis but not against Simpson. Headley testified at his deposition that Ellis slapped him and stated "that's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2595091 (S.D.N.Y.)
(Cite as: 2010 WL 2595091 (S.D.N.Y.))

what you get for writing up C.O. Simpson." *See* Headley Tr. at 103, Reznik Decl. Ex. B., at 103. This testimony creates a *prima facia* retaliation claim against Ellis since Headley alleges that (a) he filed a grievance report (constitutionally-protected speech), and that (b) Ellis abused him (adverse action), (c) because of his grievance report (causal connection). Ellis denies Headley's allegations. Ex. E to Dec. of Inna Renzick, at 16. Thus a genuine issue of material fact exists as to Headley's retaliation claim against Ellis, and the Court denies Ellis' summary judgment motion, as Magistrate Judge Fox recommended.

The Court, however, grants Defendants' motion as to the **retaliation** claim against Simpson. The adverse action constituting the basis for this claim is either (i) placing Headley in keep-lock in **retaliation** for filing a grievance, or (ii) filing a misbehavior report against Headley in **retaliation** for calling for a sergeant when Simpson issued his order. Each of these grounds is insufficient. Simpson cannot be liable for placing Headley in keep-lock since it is undisputed that Simpson lacked the authority to place Headley there. Nor can Simpson be liable for filing a misbehavior report against Headley since it is undisputed that Headley challenged Simpson's direct order and refused to return to his cell. Headley's overt disobedience formed a legitimate basis for Simpson's misbehavior report, and there is thus no causal **link** between Simpson's grievance report ( **adverse action**) and his call for a sergeant (constitutionally-protected speech).

Headley argues that the temporal proximity between his request to see a sergeant and Simpson's misbehavior report creates a nexus and defeats a summary judgment motion. This, however, is insufficient; a plaintiff must do more than raise a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. Accordingly, Magistrate Judge Fox properly recommended granting summary judgment as to Headley's retaliation claim against Simpson.

**c. Fourteenth Amendment Due Process Claims**

To establish a Fourteenth Amendment Due Process claim, a plaintiff must show that: (1) he possessed a liberty interest, and (2) he was deprived of this liberty interest

without adequate process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). When a **prisoner** asserts a due process claim for a violation of liberty rights, courts may consider extraordinary prison conditions, such as special confinement which imposes an "atypical and significant hardship" when compared with "ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that courts look for harsher than ordinary prison conditions or longer than ordinary confinement periods in finding liberty due process claims of **prisoners**).

**\*4** Defendants argue that Headleys' sixteen-day keep-lock confinement period does not constitute a deprivation of Headley's liberty rights. Defendants may be correct. Headley, however, also alleges that Simpson denied him regular amenities while in keep-lock, i.e., meals, showers, and recreation.

In considering these allegations, the Court recognizes that the "conditions of confinement are a distinct and equally important consideration" in deciding whether a **prisoner's** punishment amounts to an atypical and significant hardship. *Palmer,* 364 F.3d at 64. A claim for Due Process violations may stand where the deprivation of amenities took place over a brief time period. *Branham v. Meachum,* 77 F.3d 626, 629 (2d Cir.1996) (reversing a Rule 12(b)(6) dismissal of a due process claim where an **inmate** was deprived of outdoor recreation for 22 days and forced to shower in leg irons). "[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983).

Contemporaneous Logbook entries eliminate any genuine issue of material fact that Headley was not deprived of opportunities to shower and go to recreation while under keep-lock status. *See e.g* ., Reznik Decl. Ex. F at pp. 320, 333, 343, 374. Headley testified, however, that during his keep-lock confinement, another **inmate** provided him with only small amounts of food-not the meals to which he was entitled. *See* Headley Tr. at pp. 85-86, Reznik Decl. Ex. B. Headley further testified that Simpson warned of the deprivation, establishing a nexus between Simpson and Headley's cause of action. *See* Reznik Decl. Ex. B, at 76. While this is not the strongest case, it cannot be said that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2595091 (S.D.N.Y.)
(Cite as: 2010 WL 2595091 (S.D.N.Y.))

there is no genuine issue of material fact with regard to Headley's claim that he was deprived of his meals during his keep-lock status. Certainly Defendants have produced no evidence that Headley received regular meals.[FN2]

> FN2. Defendants also argue that they are immune from liability under the doctrine of qualified immunity, which protects state officials from liability for civil damages involving discretionary actions that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The doctrine of qualified immunity, however, is inapplicable. An **inmate** has a clearly established right not be abused and deprived of regular meals for sixteen days.

**d. Eighth Amendment Claim**

In addition to Headley's First and Fourteenth Amendment claims, Magistrate Judge Fox construed Headley's *pro se* Complaint liberally to also include an Eighth Amendment claim based on the alleged deprivation of amenities while under keep-lock status. (R & R at 11, n. 2). The complaints of *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers, especially when the plaintiff asserts a violation of his civil rights. *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008). The leniency with which courts treat *pro se* complaints protects litigants who may mistakenly forfeit essential rights simply because they lack a legal education. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006) (remanding case upon finding a new viable claim after the lower court had dismissed pro se litigant's complaint).

In order to state a valid claim for violation of the Eight Amendment, a plaintiff must show "(1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated contemporary standards of decency." *Benitez v. Locastro,* 2008 U.S. Dist. LEXIS 109914, at *14 (N.D.N.Y. Sept. 25, 2008). Deliberate and unnecessary withholding of food essential to normal health can violate the Eighth Amendment. *Cunningham v. Jones,* 567 F.2d 653, 656

(6th Cir.1977). A plaintiff may satisfy the objective prong of an Eighth Amendment claim based on food deprivation where the defendants fail to demonstrate that the amount of food provided meets an **inmate's** nutritional need. *Benitez,* 2008 U.S. Dist. LEXIS 109914, at *18.

**\*5** As to the subjective prong of his Eighth Amendment claim, Headley testified that Simpson warned him of the deprivation of amenities. *See* Reznik Decl. Ex. B, at 76. As to the objective prong of his Eighth Amendment claim, Headley asserts that he was deprived of full meals for sixteen days, resulting in weight loss. *See* Headley Tr. at pp. 86-87, Reznik Decl. Ex. B. Defendants have failed to demonstrate that they provided sufficient food to meet Headley's nutritional needs. A genuine issue of material fact thus exists whether Headley received sufficient food while under keep-lock status and whether that deprivation was a result of bad-faith on the part of Simpson. Accordingly, the Court adopts Magistrate Judge Fox's recommendation to also include an Eighth Amendment claim.

The Court recognizes that it is first construing Headley's Complaint to include an Eighth Amendment claim at a late stage of this litigation. It thus grants Defendants request to submit supplemental motion papers on the Eighth Amendment claim and adduce additional facts on this claim through limited discovery. *See Def. Br.,* at 10n. 1.

### CONCLUSION

The Court adopts Magistrate Judges Fox's R & R in its entirety. Defendants' summary judgment motion is GRANTED regarding the plaintiff's retaliation claim against Officer Simpson, and DENIED in all other respects. The order reference remains in effect throuth the sumission of the joint pretrial order. Any further submissions shall be transmitted to Magistrate Judge Fox.

SO ORDERED.

S.D.N.Y.,2010.
Headley v. Fisher
Slip Copy, 2010 WL 2595091 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2010 WL 2595091 (S.D.N.Y.)
(Cite as: 2010 WL 2595091 (S.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Mark BARTLEY, Plaintiff,
v.
Todd COLLINS; Christopher Pecore; and Timothy
Bates, Defendants.
**No. 95 Civ. 10161(RJH).**

May 10, 2006.

Mark Bartley, Stormville, NY, pro se.

Reid Anthony Muoio, Hughes Hubbard & Reed LLP, New
York, NY, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York,
NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

*1 Plaintiff Mark Bartley ("Bartley") brought claims
pursuant to 42 U.S.C. § 1983 in his third amended
complaint against several defendants employed by the
New York State Department of Corrections ("DOCS"),
alleging violations of his First and Fourteenth Amendment
rights not to be retaliated against for the exercise of his
right of access to the courts. Defendants now move for
summary judgment on all claims. For the reasons set forth
below, the Court grants defendants' motion.

**BACKGROUND**

Unless otherwise indicated, the following facts are
undisputed.[FN1] Plaintiff Bartley was at all relevant times a
DOCS inmate at Green Haven Correctional Facility
("Green Haven") in New York. (Defs.' 56.1 ¶ 3.)
Defendants Todd Collins ("Collins"), Timothy Bates
("Bates"), and Christopher Pecore ("Pecore") were at all
relevant times correctional officers at Green Haven. (*Id.* ¶¶
8-10.)

> FN1. The facts as herein recited are drawn from
> defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶
> ___"), plaintiff's response to defendants' Rule
> 56.1 Statement ("Pl.'s 56.1 ¶ ___"), Bartley's
> deposition ("Bartley Dep."), and records of
> disciplinary hearings stemming from Todd
> Collins's April 19, 1995 misbehavior report
> against Bartley ("Schulman Decl. Ex. M" and
> "Schulman Decl. Ex. Q").

At about 2:45 a.m. on April 16, 1995, Scott Turrisi, a
mentally ill inmate at Green Haven, set a fire in his cell in
an apparent suicide attempt. (Defs.' 56.1 ¶ 12.) Bartley and
several other inmates were injured, one of whom died
three days later. (*Id.* at ¶¶ 12, 15; Pl.'s 56.1 ¶¶ 12, 15.)
Shortly after the fire, Bartley, together with another
inmate, Felix Diaz ("Diaz"), began to prepare lawsuits
against DOCS employees for their alleged failure to
properly care for inmates in the events leading up to and
after the fire. (Defs.' 56.1 ¶ 42.)

Bartley, who was known as a jailhouse lawyer, asserts that
prior to the fire, he had a "relatively clean" disciplinary
record. (Pl.'s 56.1 ¶ 60; Bartley Dep. at 99-100.) On the
morning of April 16, 1995, the day of the fire, Bartley and
Diaz circulated a petition among inmates at the prison
clinic in preparation for a lawsuit. (Defs.' 56.1 ¶¶ 42-43.)
In his complaint, Bartley alleged that following that
action, he was retaliated against by defendants. (Third
Am. Compl. ¶¶ 41-49.)

A. *Alleged Retaliation by Collins*

Bartley testified that in the days following the fire, Collins

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

made false charges against him on two occasions for minor infractions. (Bartley Dep. at 98-99.) Those misbehavior reports resulted in Bartley being put in "keeplock" confinement,[FN2] thereby denying him access to the law library for approximately ten days. *(Id.;* Schulman Decl. Ex. M at 247.) Bartley asserts that this was done to prevent him from seeking legal redress for injuries resulting from the prison fire. (Bartley Dep. at 100).

> FN2. When under keeplock confinement, an inmate is confined to his cell for 23 hours a day and loses various privileges. 7 N.Y. Comp.Codes R. & Regs. tit. 7, §§ 301.1-301.6.

Prior to April 18, Collins had counseled Bartley for not locking up properly, but had not, to his recollection, written a misbehavior report against him. (Defs.' 56.1 ¶ 45.) On April 18, Collins wrote a misbehavior report against Bartley for allegedly ignoring repeated orders to lock in for a count. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Collins claims that when ordered to return to his cell, Bartley stopped at two cells to talk to people, thereby delaying the count. (Defs.' 56.1 ¶ 47.) Bartley maintains that the charges were false and that any delay was the result of Bartley being in a wheelchair (Schulman Decl. Ex. Q at 5.) Collins put Bartley on keeplock status pending a disciplinary hearing on the charges. (Defs.' 56.1 ¶ 47.) After an April 20 hearing that Bartley did not attend, Bartley was found guilty of two of three charges against him and was given a fifteen-day loss of package, commissary, and phone privileges. (Defs.' 56.1 ¶ 46.)

**\*2** On April 19, after Bartley was informed that he was on keeplock, he and Collins had a heated exchange. According to Collins, plaintiff called him a "cocksucker" and a "punk faggot bitch" and threatened to "kick Collins' ass and make problems for him." (Schulman Decl. Ex. Q at 2.) Collins wrote another misbehavior report, and at an April 24th hearing, Bartley admitted to using a hostile tone and calling Collins names, including "cocksucker." *(Id.* at 5.) However, Bartley denied making any threats and alleged that Collins told him he had a "big mouth" because Bartley had told Diaz to bring a lawsuit about the fire. *(Id.* at 6.) Ultimately, Bartley plead guilty to harassment, was found guilty of creating a disturbance, and was declared not guilty of charges of threats and violent conduct. *(Id.* at 3, 8; Schulman Decl. Ex. M at 247.) For the two

infractions, Bartley was given 10 days of keeplock. (Schulman Decl. Ex. Q at 8; Schulman Decl. Ex. M at 247.)

In his complaint, Bartley alleges that, in addition to having him placed in keeplock, Collins threatened him by saying that Bartley "better drop" his lawsuit. (Third Am. Compl. ¶ 48.) However, Bartley offers no evidence to support the allegation of a threat except for testimony that "all of these defendants ... [were] bothering me, saying little snide remarks, saying we going to get you, you better drop the suit, and all this other stuff," and that "they told me you better drop the lawsuit, Bartley," where Collins apparently was among the "they" to whom Bartley was referring. (Bartley Dep. at 104-07.)

B. *Alleged Retaliation by Bates*

In his complaint, Bartley alleges that in the days following the fire, Bates filed false charges of littering and other minor infractions against him to "punish and deter" him from filing a lawsuit. (Third Am. Compl. ¶ 46.) On April 19, Bates wrote a misbehavior report against Bartley for littering and for obstructing the view inside his cell with a sheet. (Defs.' 56.1 ¶ 57.) Bartley denies the charges but did not attend the resultant disciplinary hearing, where he was found guilty of three of the four charges against him and given a thirty-day loss of privileges. *(Id.;* Pl.'s 56.1 ¶ 57.)

C. *Alleged Retaliation by Pecore*

Also in his complaint, Bartley alleges that Pecore retaliated against him by telling him, after Bartley and Diaz began preparing lawsuits, "Pataki will have to foot the bill anyway, so he doesn't care what I do" and "you better drop the lawsuit Bartley." (Third Am. Compl. ¶ 47.) Bartley further alleges that Pecore threatened him with serious bodily harm, including death, if Bartley did not discontinue the lawsuit. *(Id.)* However, Bartley provides no evidence of the time, date, place, circumstances, or words employed in the alleged threats of physical violence, save for testimony that "two of the defendants in the present action," who Bartley does not identify, "approached me, accosted me and threatened me

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

physically and verbally of what they would do." (Bartley Dep. at 104.) Pecore affirmatively denies having had any discussions with Bartley after the fire. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

## DISCUSSION

### A. *The Summary Judgment Standard*

**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998)* (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case")

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir.1994); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).* But an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material* fact." *Anderson, 477 U.S. at 247-48* (emphasis in original). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir.2003)* (quoting *Anderson, 477 U.S. at 248).* "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson, 477 U.S. at 248).*

Moreover, to survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *Anderson, 477 U .S. at 256-57; Gross v. Nat'l Broad.*

*Co., Inc., 232 F.Supp.2d 58, 67 (S.D.N.Y.2002).* Where, as here, a plaintiff's case depends in part on his own statements and observations, such statements must " 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir.2004)* (quoting Fed.R.Civ.P. 56(e)).

Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 123-24 (2d Cir.2001); Quinn v. Syracuse Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980).* Neither will "unsubstantiated speculation" suffice. *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998)* (citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With these principles in mind, the Court turns to the merits of the defendants' motion.

### B. *Bartley's Retaliation Claims*

**\*4** Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right. *Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir.2002)* (prisoner stated a valid claim under § 1983 by alleging that a prison official filed false disciplinary charges against him in retaliation for his exercise of a constitutional right to file a grievance); *Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996)* ("[F]iling of a grievance and attempt to find inmates to represent the grievants ... is constitutionally protected."); *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995)* (citing *Franco v. Kelly, 854 F.2d 584, 589 (2d Cir.1988)*) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord, No. Civ. 9:02CV00915, 2005 WL 3531464, at \*7 (N.D.N.Y. Dec. 22, 2005)* ("[P]laintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

However, courts are to "approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act."); *see also Gill v. Pidlypchack,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.J ., concurring).

In order to sustain a First Amendment retaliation claim, "a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill,* 389 F.3d at 380 (quoting *Dawes,* 239 F.3d at 492). If each of the three elements of a *prima facie* case of retaliation is established, the burden shifts to the defendants "to show that the plaintiff would have received the same punishment even absent the retaliatory motivation," in which case the plaintiff's claim must fail. *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Freeman v. Goord,* 2005 WL 3333465, at *4 (S.D.N.Y. Dec. 10, 2005) ("Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment ... if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone," as courts "employ a presumption that a prison official's acts to maintain order are done for a proper purpose.") (citations and quotations omitted).

*1. Constitutionally Protected Conduct*

**\*5** Plaintiff asserts that he was retaliated against for engaging in the constitutionally protected activity of circulating a petition in preparation for legal proceedings. Defendants counter that under the Second Circuit's decision in *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996), circulating a petition is not protected conduct.

The circulation of a petition by a prisoner is generally protected by the First Amendment. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967 (1977). However, that right "must be weighed against legitimate safety interests of the prison." *Duamutef,* 98 F.3d at 24 (reiterating the multi-factor test to determine the validity of a regulation that impinges on inmates' constitutional rights as set forth in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).). The *Duamutef* court held that where there was an official grievance procedure available to prisoners and a plaintiff did not claim that his petition contained requests that could not be addressed through that procedure, it was "permissible for prison officials to bar the circulation of petitions." *Id.* at 24 (citing *Nickens v. White,* 622 F.2d 967, 971 (8th Cir.1980), *cert. denied,* 449 U.S. 1018 (1980); *Edwards v. White,* 501 F.Supp. 8, 11-13 (M.D.Pa.1979), *af'd,* 633 F.2d 209, 212 (3d Cir.1980). The *Nickens* court ruled similarly, relying on the affidavit of a prison superintendent who explained that petitions were banned for security concerns and that alternative means were available for communicating grievances. 622 F.2d at 970.

Courts have noted that even though *Duamutef* held that petitions *could* be banned, the ruling did not forbid petitions. *Farid v. Goord,* 200 F.Supp.2d 220, 236 (W.D.N.Y.2002). Where the defendant asserted that the plaintiff "does not have a right to circulate a petition" but did not reference a rule or regulation that prohibited petitioning, the *Farid* court held that the plaintiff, in circulating a petition, had engaged in protected conduct. *Id.* Defendants here similarly do not identify a prison regulation prohibiting petitioning by prisoners that justifies a limitation of plaintiff's First Amendment rights. In the absence of penitentiary rules proscribing petitioning, plaintiff's activity was constitutionally protected and as such, plaintiff satisfies the first element of his prima facie case of retaliation with respect to all three defendants.

*2. Adverse Action*

Plaintiff alleges that all three defendants took adverse action against him: Collins by verbally pressuring him to not bring legal action and filing misbehavior reports that put him in keeplock and caused him to lose privileges, Bates by filing false charges that cost him privileges, and

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

Pecore by threatening him with physical violence. Defendants maintain that plaintiff's claims are conclusory and do not rise to the level of severity required for the actions to be characterized as adverse.

**\*6** In evaluating what constitutes adverse action, a court should be mindful that " 'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Dawes,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)).

In the prison context, adverse action is defined objectively as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). A subjective definition is not adopted because "it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* If the retaliatory conduct would not deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights, it " 'is simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493).

With respect to his claims that Collins and Pecore issued verbal threats against him, plaintiff does not survive summary judgment. His deposition testimony that multiple defendants threatened him and encouraged him to abandon his lawsuit is conclusory because it is insufficiently specific with regard to the identification of any one defendant, and does not adequately provide the time, date, place, or circumstances of the alleged remarks. *See, e.g., Gaines v. Artus,* No. 9:04-CV-76, 2006 WL 721618, at \*5 (N.D.N.Y. Mar. 20, 2006) (prisoner's § 1983 claim for denial of proper medical care dismissed on summary judgment in part because "[d]uring plaintiff's deposition, he ... could never be specific regarding the individuals allegedly responsible for this substandard care" and therefore "makes only conclusory claims"); *Jasmin v. New York State Dept. of Labor,* No. 98 Civ. 7569, 2000 WL 194774, at \*2 (S.D .N.Y. Feb. 17, 2000) (plaintiff's "conclusory deposition testimony that co-worker 'has

constantly been harassing me until last week' is utterly insufficient to create an issue of fact for the jury"); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1995) (plaintiff "cannot defeat [a summary judgment] motion by relying on the allegations in his pleading, ... or on conclusory statements") (citations omitted).

Even if plaintiff's deposition testimony were deemed sufficiently specific, verbal threats such as "we going to get you, you better drop the suit," [FN3] do not rise to the level of adverse action. *See Dawes,* 239 F.3d at 493 (2d. Cir.2001) ("Not every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at \*4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at \*7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' insufficient to state a retaliation claim).

FN3. Because plaintiff did not testify to it in his deposition, the Court excludes from consideration the allegation made only in plaintiff's unverified complaint that Pecore "on at least one occasion, threatened to kill [Bartley] if he did not discontinue this lawsuit." (Third Am. Cmpl. ¶¶ 47.) *See* discussion *infra.*

**\*7** Plaintiff's complaint, although more particular than his testimony with regard to what each defendant allegedly said, does not defeat defendants' motion for summary judgment. Not only does the complaint, like plaintiff's testimony, inadequately plead the time, date, place, or circumstances of the alleged remarks, but because it is unverified, it cannot be relied on as evidence in opposing a summary judgment motion. *Trinidad v. New York City*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

*Dept. of Correction,* ---F.Supp.2d ----, 2006 WL 704163, at *6 (S.D.N.Y. Mar. 21, 2006) (Unsworn materials are "an insufficient basis for opposing a motion for summary judgment"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("Unsworn statements are not admissible to controvert a summary judgment motion."); *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991) (to survive summary judgment, "the nonmovant may not rest upon mere allegations in, say, an unverified complaint or lawyer's brief, but must produce evidence which would be admissible at trial to make out the requisite issue of material fact") (citing Fed.R.Civ.P. 56(e)); *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 165 (5th Cir.1991) ("Given that [defendant] has filed a properly supported motion for summary judgment, [plaintiff] cannot rely on the facts in its unverified complaint, but must point to evidence in the record sufficient to establish the alleged facts to avoid summary judgment.")

Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights. *Compare Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (correction officer's issuance of an unfavorable evaluation of prisoner and threat to place him in a Special Housing Unit did not meet the standard of adverse action), *with Gill,* 389 F.3d at 384 (plaintiff's allegation that defendants filed false misbehavior reports against him, resulting in his being sentenced to three weeks of keeplock, constituted a claim of adverse action), *and Wheeler v.. Beard,* No. Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug. 3, 2005) (prisoner plaintiffs alleged adverse action in retaliation claim by claiming that defendants, among other things, denying medical treatment and prison-issued undergarments, destroying legal mail and other legal materials, planting contraband in cell to serve as basis for bogus misconduct report, and caused one plaintiff to lose his job).

However, Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days. *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402

(N.D.N.Y.2002) ( "Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging an adverse action"); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (noting holdings in other cases that nine days' keeplock confinement does not necessarily as a matter of law constitute *de minimis* alleged retaliation).

*3. Causal Connection*

*8 Plaintiff alleges that the actions taken by defendants were in retaliation against his engagement in the protected conduct of circulating a petition, while defendants assert that the events were unrelated. To show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations. *See Dawes,* 239 F.3d at 491 ("bald allegations of retaliation" will not suffice; the causal connection must be "sufficient to support the inference that the speech played a substantial part in the adverse action"). Evidence of improper motive may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 WL 2452150, at *16 (N .D.N.Y. Sept. 30, 2005) (citing *Colon,* 58 F.3d at 872-73).

In *Gayle,* the Second Circuit overruled a district court's grant of summary judgment for defendants in a case in which the plaintiff proffered sufficient evidence to "create a genuine issue of material fact as to whether retaliation was a substantial factor in the DOCS officials' decision to charge and punish" him. 313 F.3d at 683. The *Gayle* court came to its conclusion based on circumstances involving, *inter alia,* the prisoner's receipt of a misbehavior report shortly after filing a grievance; the report's relationship to a discussion the prisoner and a guard held regarding the grievance, the fact that the prisoner and a guard offered conflicting testimony at a disciplinary hearing regarding what prompted the report; a guard's lack of credibility when testifying at the hearing; and the fact that the hearing (at which the prisoner was found guilty of violating a rule) was administratively reversed. *Id.* at 683-84.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)
(Cite as: 2006 WL 1289256 (S.D.N.Y.))

Plaintiff's allegation of a causal connection between his protected act and Collins' second misbehavior report is sufficient, although weaker than that in *Gayle.* The report, which caused plaintiff to be placed in keeplock, came just three days after the date of the prison fire and plaintiff's circulation of a petition, a temporal proximity that may suggest causality. *Colon,* 58 F.3d at 872 ("[T]emporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation.") (citations omitted). Plaintiff's assertion that he had a relatively clean disciplinary record prior to the fire also suggests the possibility of improper motive. *Id.* ("[E]vidence of prior good behavior also may be circumstantial evidence of retaliation.") (citation omitted). However, at the disciplinary hearing regarding the second report, plaintiff was not only found guilty of two of the charges against him but also pled guilty to one of them. In *Pledger,* the court granted a defendant's motion for summary judgment where a plaintiff did not deny the factual foundation of the criticisms made in an allegedly retaliatory negative evaluation by a prison official. 2005 WL 736228, at *4. Here, plaintiff's acknowledgement of the factual basis of one of the charges made in Collins's second report weakens his claim that the report was retaliatory, but plaintiff did contest the other three charges in the report and was found not guilty of two of them. On balance, the Court concludes that a material issue of fact has been created on the issue of causation.

*4. Defendants' Justifications for Their Actions*

**\*9** Defendants claim that even if plaintiff satisfies the three elements of a prima facie case of retaliation, as plaintiff does with respect to Collins's second misbehavior report, their actions were not unlawful because they would have engaged in them even absent the plaintiff's protected conduct.

Summary judgment should be granted for the defendants if they can show that there is no genuine issue that they would have taken the same action-here, writing a misbehavior report that caused plaintiff to be put in keeplock for ten days-even without retaliatory motivation. *See, e.g., Gayle,* 313 F.3d at 682; *Graham,* 89 F.3d at 79. In making this determination, the court should employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143

F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995), *cert. denied,* 525 U.S. 907 (1998)). "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle,* 313 F.3d at 682 (quoting *Hynes,* 143 F.3d at 657).

Collins wrote his second misbehavior report against plaintiff after plaintiff called him various epithets, which plaintiff later admitted to at a disciplinary hearing. Although Bartley was found not guilty of charges of threats and violent conduct, those charges stemmed from the same behavior for which Bartley was found guilty on two other charges. Between the presumption that Collins acted with a proper purpose and the fact that plaintiff acknowledged engaging in the conduct underlying the charges, Collins satisfies his burden of showing that he would have written the report even if plaintiff had not earlier circulated a petition.

*C. Qualified Immunity*

Because the claims against defendants are otherwise dismissed, the Court need not address defendants' assertion of qualified immunity.

SO ORDERED.

S.D.N.Y.,2006.
Bartley v. Collins
Not Reported in F.Supp.2d, 2006 WL 1289256 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

▷ Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Ruben SLACKS, Plaintiff,
v.
GRAY, Correctional Officer, Eastern N.Y. Correctional
Facility; C.O. Farrell; C.O. Hauck; Sgt. Fischer; R.N.
Anthony, Defendants.
No. 9:07-CV-510 (NAM/GJD).

Sept. 29, 2009.

West KeySummary
Prisons 310 🔑 192

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases

Sentencing and Punishment 350H 🔑 1546

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
A prison staff nurse was not deliberately indifferent to an
inmate's medical needs as there was no evidence that his
medical needs were serious. The prison record stated that
the inmate would not answer any of the nurse's questions,
and that she did not observe any abrasions, contusions, or
lacerations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §
1983.

Ruben Slacks, Napanoch, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Shoshanah V. Bewlay, Christina L. Roberts-Ryba,
Asst. Attorneys General, Albany, NY, for Defendants.

MEMORANDUM-DECISION AND ORDER

Hon. NORMAN A. MORDUE, Chief Judge.

*1 Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983 for civil rights violations
stemming from an alleged assault by defendants Gray,
Farrell, and Fischer. Plaintiff claims that defendant Hauck
was present during the assault but failed to intervene.
Plaintiff also claims he was denied medical care by
defendant Nurse Anthony, was deprived of clothing and
toilet paper overnight, and was later improperly charged
with misbehavior to cover up the assault.

Defendants moved (Dkt. No. 48) for summary judgment
dismissing the action. Upon referral pursuant to 28 U.S.C.
§ 636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge Gustave J. DiBianco issued a Report and
Recommendation (Dkt. No. 52) recommending that the
motion be granted in its entirety.

Plaintiff has submitted an objection (Dkt. No. 53). In view
of the breadth of plaintiff's objections, the Court conducts
a *de novo* review of all issues pursuant to 28 U.S.C. §
636(b)(1)(C).

A party moving for summary judgment bears the initial
burden of demonstrating that there is no genuine issue of
material fact and that it is entitled to judgment as a matter
of law. Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett,
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986). If the Court, viewing the evidence in the light most
favorable to the nonmovant and drawing all reasonable
inferences in nonmovant's favor, determines that the
movant has satisfied this burden, the burden then shifts to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

the nonmovant to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248. If the nonmovant fails to carry this burden, summary judgment is appropriate. *See Celotex,* 477 U.S. at 323-24.

Through consistent evidence, including medical records and defendants' declarations, defendants have carried their initial burden of showing that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Although plaintiff disputes some of defendants' evidence, the Court agrees with Magistrate Judge DiBianco that this is one of the rare cases in which plaintiff's allegations throughout the record are so inconsistent that no reasonable factfinder could find in his favor. Plaintiff gives multiple versions of the events-in his disciplinary hearing testimony, his grievance, his interview in connection with the grievance investigation, his complaint in the instant action, his deposition in the instant action, and his interview with a psychologist from the Office of Mental Health-which are so inconsistent and contradictory that no reasonable juror could believe them. Further, plaintiff's allegations are contradicted by the portions of the medical records that plaintiff does not dispute. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court determines that no reasonable juror could return a verdict for plaintiff. Thus, plaintiff has failed to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial.

**\*2** It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Judge Gustave J. DiBianco (Dkt. No. 52) is adopted in full; and it is further

ORDERED that defendants' motion (Dkt. No. 48) for summary judgment is granted and the action is dismissed with prejudice.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he was assaulted by defendants Gray, Farrell, and Fischer, while defendant Hauck watched, but failed to intervene. Plaintiff also claims that he was denied medical care by defendant Nurse Anthony, and that plaintiff was deprived of clothing and toilet paper over night. Plaintiff also alleges that he was later improperly charged with misbehavior to cover up the assault. Compl. (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.49, 51). For the following reasons, this court will recommend granting the summary judgment motion and dismissing plaintiff's complaint in its entirety as against all defendants.

### DISCUSSION

**1.** *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

**\*3** The Local Rules of the Northern District of New York provide that a motion for summary judgment shall include a Statement of Material Facts, "containing each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." LOCAL RULES NDNY 7.1(a)(3). The "record" for purposes of the Statement of Material Facts includes the "pleadings, depositions, answers to interrogatories, admissions, and affidavits." *Id.* The Second Circuit has held, however, that in determining whether the moving party has met its burden, the court may not rely solely on the statement of undisputed facts, it must be satisfied that the citation to evidence in the record supports the assertion. *Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the moving party fails to meet its burden, the court must deny summary judgment even if the opposing party does not present any opposing evidentiary matter. *Id.* (citation omitted).

However, if the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the movant's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

**2. Facts**[FN1]

> FN1. On August 27, 2008, Chief Judge Mordue denied plaintiff's motion for summary judgment. (Dkt. No. 47). This court has adopted the facts as stated in Judge Mordue's order and has added the evidence that has been presented in the defendants' papers.

Plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), claims that on December 3, 2006, he was on his way to the yard at Eastern Correctional Facility (Eastern), when Corrections Officer (CO) True stopped plaintiff and told him that he was going to be "pat-frisked." Compl. ¶ 1. Plaintiff states that after the frisk was completed by Officers True and Olszewski, plaintiff noticed that one of his bags was not returned to him. Compl. ¶ 2. When plaintiff inquired about the bag, CO True told plaintiff that the bag was contraband. *Id.* Plaintiff states that when he questioned CO True's statement, plaintiff was told that he had "too much of an attitude" and was going to be sent back to his cell. *Id.* Plaintiff states that he was escorted back to his cell by CO True. *Id.* Plaintiff claims that when they got back to the cell block, CO True told plaintiff that he was going to be keeplocked,[FN2] however, the block officer told CO True that he was going to have to "lock

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

[plaintiff] in himself because there were no other officers on the block to do so." Compl. ¶ 3. As a result, plaintiff states that he was taken "up the stairs" to a different area and "locked in" by CO True. *Id.* Plaintiff claims that at approximately 10:20 a.m., the cell door opened, he was handcuffed, and escorted to the Special Housing Unit (SHU) by defendant Fisher and three other officers who have not been named as defendants. *Id.*

> FN2. The term "keeplock" refers to disciplinary or administrative confinement in which an inmate is confined to his own cell. *Gittens v. LeFevre, 891 F.2d 38, 39 (2d Cir.1989).*

**\*4** Plaintiff claims that when they arrived at SHU, he saw various officers, including defendants Gray, Farrell, and Hauck. *Id.* Plaintiff states that he noticed that defendant Gray was putting on, what appeared to be, leather gloves. *Id.* Plaintiff states he was then told to follow defendant Gray into the "frisk room," accompanied by defendants Fisher and Farrell while defendant Hauck stood in the doorway. *Id.* Once inside the "frisk room," plaintiff claims that he was told to place his hands up against the wall, and his glasses were taken away from him by defendant Gray. Compl. ¶ 4. Plaintiff then describes how defendant Gray began punching plaintiff until plaintiff fell to the ground, where plaintiff was "slapped in [the] head and kicked in [the] back, buttocks, and leg area" by defendants Fisher and Farrell. *Id.* Defendant Hauck allegedly stood by and watched the assault without intervening to stop the abuse.

Plaintiff claims that when the beating stopped, defendant Fisher told plaintiff to get up, but plaintiff could not comply with the order because the beating aggravated plaintiff's back injury. Compl. ¶ 5. Plaintiff claims that defendant Fisher stated that defendant Nurse Anthony told him that there was nothing wrong with plaintiff's back, and then defendant Fisher kicked plaintiff in the back again. *Id.* Plaintiff claims that the abuse continued as defendant Farrell dragged plaintiff on the floor and then picked plaintiff up and "slammed" him against the wall. *Id.* Plaintiff claims that defendant Nurse Anthony was called, but that she did not give plaintiff any medical care, rather, she just looked at him and stated "that's a refusal." *Id.*

Plaintiff states that ultimately his clothes were taken away

from him and he was forced to spend the night with no clothes and no toilet paper. Plaintiff states that after the incident on December 3, 2006, Nurse Nordé visited plaintiff and asked if he was injured. Compl. ¶ 4. Plaintiff claims that he told Nurse Nordé that he was injured, and although she asked if he wanted medication for the pain, plaintiff told the nurse that he already had a prescription for pain medication, so she only gave him Bacitracin for the laceration on his elbow. *Id.*

Plaintiff states that the next day, someone from "Mental Health" came to visit plaintiff to interview him. Compl. ¶ 6. Plaintiff claims that this individual told plaintiff that defendant Fisher reported that plaintiff was going to kill himself. *Id.* Plaintiff claims that when he told the mental health professional that the statement was a lie, the clinician told the officer to immediately give plaintiff back his clothes. *Id.* Plaintiff states that despite this order, he did not get his clothes, mattress, sheets, and blanket back until approximately five hours later. *Id.* Plaintiff also claims that he told Superintendent Brown about the incident, but that Superintendent Brown told plaintiff that his officers did not "beat up on inmates." Compl. ¶ 7.

**\*5** Plaintiff states that Sergeant Green came to take photographs of his injuries. Plaintiff claims that he was given two fabricated misbehavior reports, one of which alleged that plaintiff banged his own head against the wall during the frisk. *Id.* Plaintiff names CO George Gray; CO Thomas Farrell; Sergeant Ronald D. Fisher; Lt. Raymond Hauck; and Nurse Nancy Anthony as defendants.

Defendants' description of the events of December 3, 2006 is very different than plaintiff's statement. The defendants all agree that plaintiff was escorted to the SHU on December 3, 2006 [FN3]. (Fisher Decl. ¶ 7; Farrell Decl. ¶ 4; Gray Decl. ¶ 7). Defendant Gray states that when inmates are admitted to SHU, they are "strip frisked" and searched with a metal detector. (Gray Decl. ¶ 6). Defendant Gray explains that the

> FN3. Defendant Gray's declaration states that plaintiff was escorted to the SHU on December 3, 2008. (Gray Decl. ¶ 7). This incorrect date appears to be a typographical error. There is no debate that plaintiff's allegations relate to events

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

that occurred on December 3, 2006.

purpose of the strip frisk is to maintain security and insure that there are no weapons or contraband on the inmate. A strip frisk involves the inmate placing their hands on the wall and then following the directions to remove clothing. After the strip frisk is conducted, a nurse is called into the room in order to examine the inmate.
*Id*. Defendant Fisher states that when inmates are admitted to SHU, they are also screened for Suicide Prevention. (Fisher Decl. ¶ 6). The screening consists of asking the inmate a series of questions. (Fisher Decl. ¶ 6).

**A. Defendant Gray**

Defendant Gray states that upon plaintiff's arrival in SHU, plaintiff was taken to the SHU frisk room, and his restraints were removed. (Gray Decl. ¶ 8). Plaintiff was then ordered to place his hands on the wall. *Id*. Plaintiff refused to comply with the order, claiming that he could not comply because of a back injury. (Gray Decl. ¶ 9; Fisher Decl. ¶ 8). Plaintiff was again ordered to place his hands on the wall, but instead, he started to bang his head on the wall and fell to the floor. (Gray Decl. ¶ 10). Plaintiff was ordered to stand up and comply with the frisk procedure, but he refused. (Gray Decl. ¶ 11). Defendant Gray states that defendant Hauck then ordered the plaintiff to comply with the order to get up and place his hands on the wall, and plaintiff complied. (Gray Decl. ¶ 12). Defendant Gray states that defendant Nurse Anthony came to SHU to examine the plaintiff, but the plaintiff refused to speak to her. (Gray Decl. ¶ 13).

Defendant Gray states that he did not kick or hit plaintiff at any time during the incident. (Gray Decl. ¶ 16). Defendant Gray also states that if he had witnessed "any sort of assault on the plaintiff," an unusual incident report would have been filed. (Gray Decl. ¶ 17). Defendant Gray states that "there was no assault on the plaintiff whatsoever." (Gray Decl. ¶ 18).

**B. Defendant Fisher**

Defendant Fisher states that he heard plaintiff refuse to comply with the strip frisk because of a "bad back." (Fisher Decl. ¶ 8). Plaintiff "continued to refuse the strip frisk and he began to bang his head against the wall." (Fisher Decl. ¶ 9). Defendant Fisher states that he observed plaintiff fall to the floor, and then refuse several orders to comply with the frisk procedures. (Fisher Decl. ¶ 10). Defendant Fisher then ordered plaintiff to comply with proper procedures, while the other officers attempted to help plaintiff get on his feet. (Fisher Decl. ¶ 11). Defendant Fisher observed defendant Hauck order the plaintiff to stand up, and plaintiff complied. (Fisher Decl. ¶ 12-13). Defendant Fisher then questioned the plaintiff about whether he had any injuries "from banging his head on the fall to the floor." (Fisher Decl. ¶ 14). Defendant Fisher claims that plaintiff stated that he had no injuries. (Fisher Decl. ¶ 15).

**\*6** Defendant Fisher then completed the "Suicide Prevention Screening Guidelines-SHU Admission Form." (Fisher Decl. ¶ 17 & Ex. A). Defendant Fisher states that "[i]n response to questions such as, 'Are you feeling suicidal' or 'Do you feel there is nothing to look forward to in the future', plaintiff responded, 'Yes.' " (Fisher Decl. ¶ 18). Defendant Fisher noted on the form "that plaintiff appeared to be under the influence of alcohol or drugs, was incoherent or otherwise acting in an abnormal manner." (Fisher Decl. ¶ 19). Plaintiff was placed on suicide watch "due to his claims of possible harm," and that the Mental Health Unit was notified. (Fisher Decl. ¶ 20). Plaintiff remained on suicide watch until December 4, 2006. (Fisher Decl. ¶ 21(a) [FN4]). Defendant Fisher states plaintiff continued to behave abnormally throughout the evening. (Fisher Decl. ¶ 21(b)).

> [FN4.] Defendant Fisher's Declaration includes two paragraphs labeled Number 21. For purposes of this Order, the court labels the first one "(a)", and the second one "(b)".

Plaintiff reported injuries to a nurse at approximately 7:30 p.m. on December 3, 2006. (Fisher Decl. ¶ 22). Plaintiff claimed that he had injuries to his right rib cage and right elbow, inflicted by C.O. Gray.[FN5] (Fisher Decl. ¶ 23). Defendant Fisher states that he notified another corrections officer, who then attempted to photograph plaintiff's injuries, but plaintiff refused to leave his cell.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

(Fisher Decl.¶¶ 25, 26). The photographs were taken the following day. (Fisher Decl. ¶ 27). Defendant Fisher states that he was present for the entire strip frisk procedure on December 3, 2006, and that plaintiff was never hit by defendant Gray or any other corrections officer. (Fisher Decl. ¶ 29).

> FN5. In his declaration, defendant Fisher states that plaintiff complained of injuries "sustained *by* C.O. Gray," (Fisher Decl. ¶ 23), however, it is clear that plaintiff was complaining about his own injuries. There is no indication that defendant Gray suffered any injuries.

**C. Defendant Farrell**

Defendant Farrell states that plaintiff was taken to the strip frisk room, and that plaintiff refused to place his hands on the wall after the restraints were removed. (Farrell Decl. ¶ 5-6). Defendant Farrell states that plaintiff stated he could not put his hands on the wall because of a back injury. (Farrell Decl. ¶ 6). Defendant Farrell agrees with the other defendants that plaintiff refused a second order to comply, began banging his head on the wall, fell to the floor, and then began banging his head on the floor. (Farrell Decl. ¶ 7). Plaintiff continued to refuse orders to stand up until defendant Hauck gave the order to do so. (Farrell Decl. ¶ 8-9). Defendant Farrell states that plaintiff refused to speak with defendant Nurse Anthony when she arrived to examine plaintiff. (Farrell Decl. ¶ 10).

Defendant Farrell wrote a misbehavior report against plaintiff, charging him with "violating direct orders and frisk procedures." (Farrell Decl. ¶ 11). At the Tier III disciplinary hearing, plaintiff admitted that he banged his head on the floor and the wall. (Farrell Decl. ¶ 15). Defendant Farrell states that he never hit or kicked the plaintiff during the incident, and that "there was no assault on the plaintiff whatsoever." (Farrell Decl. ¶¶ 21, 22).

**D. Defendant Hauck**

*7 Defendant Hauck has been a Corrections Lieutenant at Eastern Correctional Facility since 2003 and has been employed by DOCS for over 25 years. (Hauck Decl. ¶¶ 2, 3). Defendant Hauck's duties include supervising all lower-ranking uniformed officers, serving as a Watch Commander, and supervising all Sergeants and Officers on a given shift. (Hauck Decl. ¶ 4). On December 3, 2006, defendant Hauck was working the day-shift at the facility. (Hauck Decl. ¶ 6). Defendant Hauck states that in order to refresh his recollection regarding this incident, he reviewed a memorandum he wrote to Captain Leghorn regarding plaintiff. *Id.* & Ex. B.[FN6] Defendant Hauck recalls that on arrival at the SHU, plaintiff "was very argumentative, [and] refused to comply with the strip frisk claiming he had back problems." (Hauck Decl. ¶ 8). Defendant Hauck states that

> FN6. Exhibit B to defendant Hauck's declaration is a copy of the memorandum that he wrote to Captain Leghorn.

At the time the plaintiff was admitted to SHU, no staff struck him. In fact the staff stopped the plaintiff from banging his head on the wall. The plaintiff then let himself fall to the floor, claiming his back went out. Once on the floor he began banging his head on the floor. The Officers attempted to stop him from doing this.

(Hauck Decl. ¶ 9). Defendant Hauck states that if he witnessed an assault on an inmate, he would immediately intervene to stop the assault. (Hauck Decl. ¶ 10). Defendant Hauck states that "at no time was the plaintiff assaulted by Correction Officers." (Hauck Decl. ¶ 11). Defendant Hauck asserts that any injuries that the plaintiff sustained on December 3, 2006 were related to his own "destructive behavior." (Hauck Decl. ¶ 12).

**E. Defendant Nurse Anthony**

Defendant Anthony is a registered nurse, who has been employed by DOCS for 18 years. (Anthony Decl. ¶ 2). Some of defendant Anthony's duties include examining inmates when they are admitted to SHU if requested to do so by the security staff. (Anthony Decl. ¶ 4). Defendant Anthony states when an inmate is being admitted to SHU, he is first strip-frisked by the officers, and then if there is no incident, the inmate is routinely examined by a nurse

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

that is working the evening shift. (Anthony Decl. ¶¶ 5-6). Sometimes, however, a nurse is called into SHU during the day in order to examine an inmate. *Id.* ¶ 6.

When defendant Anthony examines an inmate admitted to SHU, she asks a series of questions regarding the inmate's general health, whether the inmate has allergies, whether he is taking any medications, and whether he has any injuries. (Anthony Decl. ¶ 7). Defendant Anthony states that if she notices that an inmate has injuries or claims that he has been physically assaulted, she notes the injuries in the inmate's Ambulatory Health Record (AHR). *Id.* ¶ 8.

In this case, defendant Anthony states that she examined plaintiff on December 3, 2006 at approximately 11:05 a.m. (Anthony Decl. ¶ 10). Defendant Anthony states that plaintiff refused to answer any of her questions. (Anthony Decl. ¶ 11). The excerpt of plaintiff's AHR submitted with defendant Anthony's declaration shows that defendant Anthony documented plaintiff's examination, noting "no abrasions, contusions, or lacerations." (Anthony Decl. ¶¶ 11-12 & Ex. A) (AHR entry dated 12/3/06 at 11:05 a.m.). The AHR shows that Nurse Nordé examined plaintiff at approximately 7:10 p .m. (Anthony Decl. ¶ 13 & Ex. A) (AHR entry of 12/3/06 at 7:10 p.m.). Nurse Nordé documented a "small laceration R elbow," and stated that plaintiff complained of pain in his right ribs. *Id.* Nurse Nordé cleansed the laceration with iodine and issued plaintiff some bacitracin ointment. *Id.* She also wrote that she would order an x-ray for plaintiff the following morning. *Id.* She noted that although plaintiff had no history of hypertension, his blood pressure was 140/102, and she would be checking the blood pressure two times per week while he was in SHU. *Id.*

**\*8** On December 4, 2006, a DOCS employee photographed plaintiff. (Fisher Decl. Ex. C at 1). The first four photographs show plaintiff standing in boxer shorts. (Fisher Decl. Ex. C at 2). The last two photographs are close-up photographs of the small laceration on plaintiff's left elbow, and a view of plaintiff's right side. (Fisher Decl. Ex. C at 3). The photograph of plaintiff's right side show plaintiff pointing at some red marks on his upper right rib cage. *Id.*

A form titled "X-Ray Requisition and Report" shows that

Nurse Nordé ordered an x-ray of plaintiff's right ribs. (Anthony Decl. Ex. C). On December 12, 2006, the radiologist wrote that three views of the right rib cage "show[ ] no recent displaced right rib fracture. Right lung expanded & no right pleural effusion. IMP: NO RECENT DISPLACED RIGHT RIB FRACTURE SEEN." *Id.*

Defendant Anthony concludes that plaintiff caused his own injuries while he was in the SHU cell on December 3, 2006. (Anthony Decl. ¶ 18). Defendant Anthony bases her opinion on the fact that plaintiff had no injuries when defendant Anthony examined him at 11:05 a.m., but when Nurse Nordé examined him again at 7:10 p.m., he had a small laceration on his elbow. *Id.*

### 3. *Medical Care*

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*9** Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff's only claim against defendant

Anthony is that she did not give him any medical care after the alleged assault. Compl. ¶ 5. The entire claim consists of one sentence in the complaint, stating that when defendant Anthony finally arrived in the room, she looked at plaintiff, stated "that's a refusal," and left. *Id.* Defendant Anthony states that plaintiff refused to answer any questions regarding his condition which would be consistent with her making the comment that plaintiff attributes to her. The medical records are also consistent with defendant Anthony's statement. The AHR entry for 11:05 a.m. on December 3, 2006 merely states that defendant Anthony was asked by "security" to examine plaintiff, but he refused to answer any questions. (Anthony Decl. Ex. A). Her "assessment" was that she observed no abrasions, contusions, or lacerations. *Id.*

In his response to defendants' motion, plaintiff claims that to the extent that the medical records show that Nurse Anthony provided plaintiff medical attention on December 3, 2006, defendant Anthony must have falsified this information.[FN7] (Dkt. No. 49 at ¶ 5). It is unclear what plaintiff means by "medical attention," but defendant Anthony only recorded what she observed. Assuming that she made the observation that there were no abrasions, contusions, or lacerations, then no "medial attention" was required. There is no claim by defendant Anthony that she did anything else.[FN8] Thus, plaintiff's accusation that defendant Anthony must have falsified records is completely unfounded.

FN7. The court notes that in defendants' reply, they argue that plaintiff failed to properly respond to the defendants' motion. (Dkt. No. 51). They argue that plaintiff did not match his numbered paragraphs to the paragraphs in defendants' statements, and that plaintiff did not cite to specific portions of the record. *Id.* Defendants stated that for this reason, the defendants' Statement of Material Facts" should be deemed admitted. *Id.* The court need not decide this issue, particularly since plaintiff is *pro se,* the court has considered plaintiff's response, and finds that even considering his response, he has not raised a genuine issue of material fact.

FN8. Plaintiff seizes upon one of the statements

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

in defendant Anthony's declaration that plaintiff believes indicates that defendant Anthony claims to have visited plaintiff again at 7:10 p.m. (Anthony Decl. ¶ 18). Defendant Anthony states that "[d]ue to the fact that when I examined plaintiff at 11:05 AM on December 3, 2006, the plaintiff had no injuries and *subsequent to my examination the same day at 7:10 PM,* the record indicates that plaintiff had a small laceration to his elbow...." Plaintiff interprets the highlighted words as defendant Anthony's claim that *she* examined plaintiff at 7:10 p.m. Although the sentence could be interpreted this way because the sentence itself is unclear, *there is no claim by defendant Anthony that she examined plaintiff at 7:10 p.m.* Nurse Anthony has stated, and the documents attached to her declaration confirm, that it was Nurse Nordé who examined plaintiff at 7:10 p.m. (Anthony Decl. ¶ 13 & Ex. A).

In his response to defendants' motion, plaintiff also states that defendant Anthony's behavior was "way below professional" and was in violation of DOCS regulations governing the administration of treatment to inmates. *Id.* ¶ 11. Even assuming that defendant Anthony's behavior was "unprofessional," negligent, or in violation of DOCS rules,[FN9] this would not rise to the level of a constitutional claim. As stated above, negligence is not actionable under section 1983. *Estelle,* 429 U.S. at 107.

FN9. This court makes no such finding.

*10 Based on the evidence in plaintiff's medical records and by plaintiff's own testimony, this court does not find that there was any "serious medical need" to satisfy the first prong of the Eighth Amendment analysis. During his deposition, plaintiff stated that his claim against defendant Anthony is that she denied him medical attention because "she come there, look at me, didn't ask me any questions and leave." Deposition Transcript (DT) at 103 (Dkt. No. 48, Roberts-Ryba Aff. Ex. A). Plaintiff stated that as far as he was concerned, the cut on his elbow was a "serious medical need" because he was bleeding. (DT at 103). Plaintiff later stated that he believed that his elbow laceration was serious because "if a person stay bleeding, he die." (DT at 105).

Although plaintiff claims that defendant Anthony did not give him "medical attention" when she saw him at 11:05 a.m. on December 3, 2006, he admitted during his deposition that at 7:10 p.m. the same day, Nurse Nordé gave him proper medical care. (DT at 104). This "proper medical care" consisted of cleansing a "small laceration" with iodine, issuing plaintiff some bacitracin ointment, and ordering x-rays[FN10] based on plaintiff's complaint of pain in his right rib area. (Anthony Decl. Ex. A). There is no notation by Nurse Nordé that plaintiff had been bleeding extensively or bleeding at all. The laceration was *small* and required only cleansing and antibiotic ointment.

FN10. The x-ray requisition report shows that the x-rays were ordered on "12/3/06," the same date as the incident. (Anthony Aff. Ex. C).

The SHU Entrance Form, completed by Nurse Nordé shows that plaintiff had a history of back pain, and he was already receiving prescription pain medication for his back. (Anthony Decl. Ex. B). Plaintiff testified that Nurse Nordé asked him whether he needed some pain medication for the pain in his rib, but plaintiff refused, stating that he did not need any more pain medication since he already had some for his preexisting "back problem." (DT at 104). Plaintiff had x-rays taken on December 12, 2006, and the x-ray report stated that there were no fractures, the right lung was expanded, and there was no right pleural effusion.[FN11] (Anthony Decl. Ex. C).

FN11. Pleural effusion is an accumulation of excess liquid in the lung, which can be caused by trauma. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 489-93 (18th Ed.2006).

While plaintiff argues that x-rays would not show if the consistent punching had bruised plaintiff, he stated at his deposition that did not sustain any internal injuries. (DT at 105). Plaintiff stated that he knew that his ribs were "bruised" because there was a "red mark." (DT at 112). However, he also stated that although the red mark lasted two to three days, it never "bruised" at all. (DT at 112). Photographs taken of plaintiff on December 4, 2006

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

confirm that there was no serious bruising. (Fisher Decl. Ex. C at 3).

In *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006), the Second Circuit held that the objective prong of the Eighth Amendment standard requires the court to examine how the defendant's conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the plaintiff. In this case, there is no evidence that defendant Anthony's conduct was "inadequate." However, it is also clear that a condition of urgency did *not* exist for which the denial of medical treatment could have resulted in further significant injury or the unnecessary and wanton infliction of pain.

*11 Despite plaintiff's statement that if one continues to bleed, one will die, there is no indication that plaintiff's bleeding, if any, was so severe. Neither the painful rib area, for which plaintiff himself admits he had sufficient pain medication, nor the laceration on his elbow were conditions that could produce death, degeneration or extreme pain. The medical records and plaintiff's own testimony support this finding. Plaintiff testified that after the x-rays, he did not request any follow-up medical care for his injuries, his "red mark" lasted only a couple of days. (DT at 95, 112).

Thus, plaintiff has failed to produce any evidence to contradict the sworn statement of defendant Anthony, corroborated by the clear medical evidence showing that plaintiff did not sustain more than a *de minimis* injury. The medical evidence includes the report of Nurse Nordé, who plaintiff admits gave plaintiff "proper medical care." If the "proper medical care" consisted of cleansing the minor laceration on plaintiff's elbow and issuing some bacitracin ointment, then plaintiff did not have a "serious medical need" within the meaning of the Eighth Amendment.

Finally, regarding the alleged rib injury, the most that Nurse Anthony could have done was schedule x-rays, which were still scheduled for plaintiff the same day by Nurse Nordé. The x-rays confirmed that plaintiff had no rib injury, and no injury to his lung. Plaintiff testified that he had no internal injuries, and the "red mark" disappeared in approximately two days. There is absolutely no evidence to show that plaintiff had a

"serious medical need" to which defendant Anthony could have been "deliberately indifferent." Because the court has determined that plaintiff did not have a serious medical need, it need not reach the second prong FN12 of the Eighth Amendment analysis, and the complaint may be dismissed as against defendant Anthony.

FN12. Defendant Anthony's alleged actions, consisting of her statement that plaintiff's behavior constituted a "refusal" of care, justifying her failure to afford him proper medical care, would be part of the second prong of the Eighth Amendment test. If plaintiff had no "serious medical need," then defendant Anthony's attitude is no longer relevant to the analysis. Having said this, however, the court would point out that at plaintiff's disciplinary hearing, he testified that after the incident, the defendant officers told plaintiff that they had called the nurse, and plaintiff said "nothing's wrong. *I refuse.*" (Farrell Decl. Ex. B at 10) (Transcript of Disciplinary Hearing of Dec. 14, 2006) (emphasis added). Plaintiff then stated that when the nurse entered, "she just looked at me and said I refuse to talk to him and walked off." *Id.* It is clear from plaintiff's own testimony that shortly before defendant Anthony came into the room, plaintiff was telling the guards that "nothing" was wrong, and he did not need to see the nurse. It is thus, possible that when defendant Anthony came into the room, plaintiff did refuse to speak with her or answer her questions.

**4. Excessive Force**

The Second Circuit has recently discussed the analysis of a claim for use of excessive force. *Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at 268 (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham,* 490 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

at 394)) (internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.* The subjective component focuses on the *motive* for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.* (citing *inter alia Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 7; *Whitely v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*12** The objective component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327. The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8) (internal quotation marks omitted). However, where the defendants' use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson,* 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.* at 269. The court in *Wright* emphasized that the prohibition against cruel and unusual punishment does *not* extend to *de minimis* uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson,* 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson,* 503 U.S. at 7. The extent of the injury must be considered "in context." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003). The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321.

In this case, plaintiff has alleged an excessive use of force in the SHU on December 3, 2006 by defendants Gray, Fisher, and Farrell, while defendant Hauck stood by and watched the assault. Defendants admit that they were present during plaintiff's admission to the SHU, but they deny that they used any force whatsoever against plaintiff.

**A. Defendant Hauck**

Defendants first argue that the case should be dismissed against defendant Hauck because plaintiff has not shown that this defendant was "personally involved" in the alleged incident, even though plaintiff claims that defendant Hauck stood at the doorway and watched the alleged assault. (Def. Memorandum of Law at 12-13) (Dkt .No. 48). Defendants argue that plaintiff has failed to show that defendant Hauck participated in, encouraged, condoned, or was even present during the alleged assault. *Id.* at 12. Defendants cite plaintiff's deposition testimony during which he stated that defendant Hauck watched the assault, but when asked whether defendant Hauck left the doorway at any time, plaintiff stated that he did not "think" that defendant Hauck left. *Id.* (citing DT at 102).

Plaintiff has not accused defendant Hauck of participating in the alleged beating. Plaintiff claims that defendant Hauck watched the assault from the door of the strip-frisk room. However, plaintiff does not need to "establish" that defendant Hauck was present during plaintiff's admission to SHU because defendant Hauck himself *admits* that he was present. (*See* Hauck Dec'l). Defendant Hauck describes in detail observing plaintiff bang his head on the wall, fall to the floor, and bang his head on the floor. (Hauck Decl. ¶ 9). The other defendants state that plaintiff did not get up until defendant Hauck ordered him to do so. (Farrell Decl. ¶¶ 8-9; Gray Decl. ¶ 12; Fisher Decl. ¶¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

12-13). Thus, it is clear that defendant Hauck was present throughout the incident.

**\*13** While plaintiff does not claim that defendant Hauck participated in the alleged excessive use of force, he claims that defendant Hauck failed to intervene while the other officers were using excessive force. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Riccuiti v. N. Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997); *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988) (citations omitted).

An officer who fails to intervene is liable for the harm that could have been prevented, caused by the actions of the other officers, where that officer observes or has reason to know that excessive force is being used. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Liability attaches where there was "a realistic opportunity to intervene to prevent the harm from occurring." *Id.* This rule for law enforcement officers extends to corrections officers. *Parker v. Fogg,* 85-CV-0177, 1994 U.S. Dist. LEXIS 1696, at \*8 (N.D.N.Y. Feb. 17,1994) (McCurn, J.). An officer is excused from liability, despite his presence, if the assault is "sudden and brief," such that there is no real opportunity to prevent it. *Riccuiti,* 124 F.3d at 129; *Fogg,* 1994 U.S. Dist. LEXIS 1696, at \*8.

Because plaintiff alleges that defendant Hauck was at the door of the strip-frisk room during the incident, and defendant Hauck admits being present during the incident, *if* excessive force had been used against plaintiff, then defendant Hauck would have been responsible for failure to intervene. Thus, this court will not recommend dismissal based on the lack of personal involvement of defendant Hauck and will proceed to consider the merits of the plaintiff's excessive force claim.

**B. Defendants Gray, Farrell, and Fisher**

As stated above, the defendants' version of the incidents of December 3, 2006 is very different from plaintiff's description. Credibility determinations and choices between conflicting versions of the events are matters for a jury and not for the court on summary judgment. *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citing *inter alia Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255). There is a very narrow exception to the rule as stated by the Second Circuit in *Jeffreys v. City of New York,* 426 F.3d 549, 553-55 (2d Cir.2005). In *Jeffreys,* the court held that a court may grant summary judgment in the rare circumstance where there is nothing in the record to support plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could believe the plaintiff's testimony. *Id.* at 554-55.

In *Jeffreys,* the Second Circuit cited with approval the district court's opinion in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998). *Jeffreys,* 426 F.3d at 555. In *Aziz,* then-District Judge Sonia Sotomayor granted summary judgment in an excessive force case, relying upon the absence of any evidence in the record that corroborated the plaintiff's version of the events, and highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." 994 F.Supp. at 470. The court in *Aziz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Id.*

**\*14** The court in *Jeffreys* also distinguished a case in which the Second Circuit reversed the grant of summary judgment in a case in which plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Jeffreys,* 426 F.3d at 554-55 (distinguishing *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997)).

This court finds that this case is one of those rare exceptions in which plaintiff's allegations are inconsistent throughout the record; there is absolutely no medical evidence to corroborate plaintiff's multiple versions of the events; and a review of the entire record shows that no reasonable person could believe plaintiff's allegations. Plaintiff's multiple versions of the events include his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

disciplinary hearing testimony, during which he states that defendant Gray punched plaintiff once, causing plaintiff to fall to the floor, and then defendant Gray punched plaintiff once more after plaintiff got up off the floor, causing plaintiff to fall again. (Farrell Decl. Ex. B at 9). However, plaintiff states that when he got up the second time, he complied with the frisk procedure, and that is when defendant Anthony was called. *Id.* at 10. There were no claims of any additional beating.

During the December 14, 2006 disciplinary hearing, plaintiff also admitted banging his head against the wall and on the floor. *Id.* He did state, however, that he engaged in this behavior so that the defendants would stop beating him. In his response to defendants' motion for summary judgment, plaintiff strenuously denies that he ever banged his head on the wall or the floor, stating that if he had done so, there would have been swelling or bruising to his head. (Dkt. No. 49-2 ¶ 3; 49-3 ¶ 5; 49-4 ¶ 4; 49-6 ¶ 3; 49-7 ¶ 3.)[FN13] Plaintiff now claims that the tape of the disciplinary hearing was "erroneously" transcribed to the extent that it contradicts his statement that he did not bang his head on the wall or the floor. (Dkt. No. 49-3 ¶ 5).

> [FN13.] Plaintiff has responded in opposition to each defendant's declaration. These citations are to plaintiff's affidavits in response that are all filed under docket number 49.

The court notes, however, that plaintiff's claim that the disciplinary hearing was "erroneously" transcribed is completely implausible because his testimony at the hearing regarding the issue of him banging his head is not simply one sentence that could have been misheard. (Farrell Decl. Ex. B at 10-11). Plaintiff told the hearing officer an entire story regarding the reason that plaintiff banged his head, and even stated that "it didn't hurt because they stopped beating on me and then took me back to my cell." *Id.* at 11. Defendant Farrell testified at the disciplinary hearing, and plaintiff simply asked him "wasn't [sic] you the one that slapped me on my head when I was on the wall." *Id.* at 22. Defendant Farrell denied slapping plaintiff, but plaintiff never asked about any another conduct by defendant Farrell.

**\*15** By the time that plaintiff filed his grievance on December 15, 2006, he alleged that defendant Gray physically attacked plaintiff and defendants Farrell and Fisher kicked and slapped plaintiff while he was "on the floor." (Farrell Decl. Ex. C at 5).[FN14] However, when plaintiff was interviewed by Lieutenant Schaller for the grievance investigation, plaintiff stated that he was struck once in the rib area by defendant Gray, but "he was not struck by any other staff members however Sgt. Fisher and Officer Farrell were also present in the room and ... Lt. Hauck was located in the doorway...." (Farrell Decl. Ex. D at 16) (grievance materials). The grievance was denied by the Superintendent because no evidence of physical force was found.[FN15] *Id.* at 6.

> [FN14.] Defendants have not numbered the pages of Exhibit C of the Farrell Declaration. Thus, the page referred to by the court is simply the fifth page of the exhibit, not counting the certification of the documents.

> [FN15.] In a memorandum from Captain Leghorn to K. Lucas, the Inmate Grievance Resolution Committee Supervisor, Captain Leghorn points out the inconsistency between plaintiff's written grievance and his interview with Lieutenant Schaller. (Farrell Decl. Ex. D at 15).

By the time that plaintiff filed his complaint in this federal action, he stated that before the alleged assault, defendant Gray put on a pair of leather gloves, plaintiff was punched twice by defendant Gray, and that after plaintiff fell to the floor, he was slapped in the head and kicked in his back, buttocks and leg area by defendants Farrell and Fisher. Compl. ¶ 4. In the complaint, plaintiff added that when defendant Fisher told plaintiff to get up, plaintiff stated that he could not get up because of his back injury, but that defendant Fisher told plaintiff he did not have a back injury and kicked plaintiff again. Comp. ¶ 5. Defendant Fisher told defendant Farrell to make plaintiff stand up, and defendant Farrell dragged plaintiff across the floor causing his elbow to be bruised and "slammed" plaintiff against the wall. *Id.* The complaint continues, stating that after plaintiff put on his SHU clothes, defendant Farrell "yanked my underpants ... up so hard that it bruised my tail bone and slapped me in the back of the head." *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

By the time that plaintiff was deposed in this action, plaintiff claimed that defendant Gray also had kicked plaintiff. (DT at 60, 66). Plaintiff testified that "other people" started kicking him, and that they kicked him in his back and shoulders. (DT at 62-63). Plaintiff stated that defendants Gray, Farrell, and Fisher kicked and punched plaintiff while he was on the floor. (DT at 64). Plaintiff testified that defendant Gray kicked plaintiff more than five times. (DT at 65). Plaintiff stated that defendant Fisher hit plaintiff on the head while he was down on the floor, and that the defendants kicked plaintiff hard for "two or three minutes." (DT at 68). Defendant Fisher also slapped plaintiff on the head and told him to get up. (DT at 69).

At plaintiff's deposition, he did not mention the bruised tail bone. He simply stated that defendant Farrell dragged plaintiff out of the corner, lifted him up by the waist of his pants and his shirt, and pushed plaintiff up against the wall. (DT at 71). At his deposition, plaintiff also elaborated further on the beginning of the story. (DT at 52-56). Plaintiff testified that after defendant Gray punched plaintiff the first time, defendant Farrell told plaintiff to put his hands back up on the wall, and plaintiff told defendant Farrell that "if CO Gray hit me again, I'm going to take my hands back off the wall." (DT at 54-55). Plaintiff stated that he was coming back off the wall and that he was not going to "be on the wall while he keep [sic] punching me like I'm a punching bag." (DT at 55). Plaintiff stated that he intended to defend himself, with his fists if necessary. *Id.* Then plaintiff states that he put his hands back up on the wall, and defendant Gray punched him again. *Id.* Plaintiff did not make any of these statements earlier.

**\*16** As an exhibit, defendants have also included the confidential testimony of the psychologist from the Office of Mental Health (OMH), Ed Rudder, who recommended placing plaintiff on the suicide watch on December 3, 2006 after he was told that plaintiff had told the officers that he would be attempting to commit suicide that night.[FN16] (Roberts-Ryba Aff. Ex. C). Psychologist Rudder interviewed plaintiff on December 4, 2006. *Id.* Plaintiff states in his complaint that when he was interviewed by Psychologist Rudder, plaintiff told him that the officers lied when they reported that plaintiff was threatening suicide. Compl. ¶ 6. Psychologist Rudder testified that plaintiff denied making the suicidal statements, said that

he was fine, but that "there must be *some misunderstanding* of some nature." *Id.* (emphasis added). Later plaintiff told Psychologist Rudder that the suicide statement was either a "misunderstanding" or "perhaps it was a fabrication." *Id.*

> [FN16.] Psychologist Rudder states that he was called at home on Sunday, December 3, 2006, and recommended one-on-one suicide watch until the next morning when Psychologist Rudder went to plaintiff's cell to interview him regarding plaintiff's alleged statement. (Roberts-Ryba Aff. Ex. C at 2).

Psychologist Rudder also testified that he asked the plaintiff about the notation in the log book, stating that plaintiff was banging his head and later that night, was hiding under his bed. *Id.* Psychologist Rudder testified that plaintiff "reported that he was probably feeling frustrated and wanted to get a little attention and stated he was probably just being a *little dramatic* with his behavior to get some attention...." *Id.* (emphasis added). Plaintiff also told Psychologist Rudder that plaintiff was annoyed that he had been placed in SHU and felt that the placement was unjust. *Id.*

There was absolutely no discussion of an assault or plaintiff being injured. In fact, based on the discussion that plaintiff had with Psychologist Rudder, it appears that plaintiff reacted with frustration and anger about being placed in SHU, but plaintiff attempted to make it clear that there was nothing wrong with him mentally. *Id.* Plaintiff appears to have adjusted his statements based upon the individual to whom he was speaking. Clearly, plaintiff no longer wished to be on suicide watch because that involved a deprivation of clothing and belongings, thus, when he spoke to Psychologist Rudder, he stated that everything was fine and that the "suicide" statement was either a "misunderstanding" or a "fabrication."[FN17] When Psychologist Rudder asked plaintiff why he was banging his head, plaintiff did not tell him that it was so that the defendants would stop beating him as he alleged during the disciplinary hearing, rather, plaintiff stated that he was feeling frustrated and annoyed that he had been placed in SHU unjustly.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

FN17. It is unclear from the testimony who plaintiff is stating fabricated the suicide allegation. However, for purposes of this motion, the court will assume that plaintiff was claiming that one of the defendants fabricated that statement, rather than as an admission that plaintiff fabricated the desire to commit suicide.

All of the above evidence, together with the fact that plaintiff had no injuries other than a scraped elbow, shows that this is one of those actions in which a reasonable jury could *not* find in plaintiff's favor. It is completely implausible that if the events happened as plaintiff currently states, that he would not have had more severe injuries or at least some bruising other than a red mark that disappeared in a few days.[FN18] At his deposition, plaintiff alleged that the defendants kicked him hard and punched him all over his body, from his legs to his back and shoulders, for a period of *two to three minutes.* (DT at 68). Plaintiff claimed that defendant Gray, alone, kicked him more than five times while plaintiff lay on the floor, a claim that plaintiff did not make in the complaint. (DT at 65).

FN18. The court notes that the SHU Log Book indicates that plaintiff refused to have his pictures taken at 7:50 p.m. on the day of the incident. (Fisher Decl. ¶¶ 24-26 & Ex. B at 7). Defendant Fisher states that after Nurse Nordé informed defendant Fisher that plaintiff was claiming to be injured, defendant Fisher immediately obtained the camera to take pictures, but plaintiff refused. (Fisher Decl. ¶ 24). The pictures were taken on December 4, 2006 at approximately 11:00 a.m. (Fisher Decl. ¶ 27 & Ex. C).

*17 Even assuming that plaintiff may have been treated roughly in an attempt to get him up off of the floor as he was hitting his head, causing the scrape on plaintiff's elbow,[FN19] rough treatment does not rise to the level of a constitutional violation. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 674-75 (S.D.N.Y.2000) (citing cases in which *de minimis* uses of force did not rise to the level of constitutional violations). It appears that any conduct that may have resulted in plaintiff's elbow injury was justifiable in an attempt to get plaintiff to stand. Plaintiff's

versions of the events are simply at odds with each other and at odds with the medical evidence. Plaintiff's statement to the psychologist is consistent with the statements made by the defendants, that plaintiff behaved the way he did because he was frustrated and angry over being placed in SHU for something that he did not think was justified.[FN20] Thus, based on all of the evidence, this court would recommend dismissal of the complaint as against defendants Gray, Farrell, Fisher, and Hauck.[FN21]

FN19. It is actually unclear how or when the scrape on plaintiff's elbow was caused, but the court will assume for purposes of this motion that plaintiff's elbow was somehow scraped during the incident.

FN20. Amazingly enough, plaintiff states in his complaint that the fact that he had no documented mental disorders poses the question why he would "allegedly" bang his head against the wall at numerous times during the pat frisk. Compl. ¶ 7. He refers to this allegation as "utterly ridiculous." *Id.* Plaintiff answered his own question at the disciplinary hearing and in his statement to the psychologist. The court understands that the psychologist testified "confidentially" at the disciplinary hearing, however, the plaintiff cannot use his confidential statements, yet not allow the rest of the statements to be discussed.

FN21. Since there was no excessive force, defendant Hauck cannot be found liable for failure to intervene.

**5. *Pattern of Civil Rights Violations***

Plaintiff states that his second cause of action is a "pattern of civil rights violations ..." Compl. at 5. Plaintiff argues that the defendants "made their own Rules on Procedures and Practices which involved a pattern of anti-civil rights activity in the Special housing unit are [sic] causing Plaintiff physical injury and denying Medical attention." *Id.* Defendants argue that the only civil rights violation plaintiff alleges is the incident on December 3, 2006, and

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

that "[b]y definition, on event cannot constitute a pattern." (Dkt. No. 48, Memo. at 24).

Plaintiff has not alleged any facts relating to any alleged constitutional violations other than the incident on December 3, 2006. Plaintiff's allegations of a pattern of civil rights abuses are merely conclusory allegations. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.). Since this court has recommended dismissal of the Eighth Amendment claims for denial of proper medical treatment and excessive force, plaintiff's conclusory claim of a "pattern" of civil rights violations must also be dismissed.

**7. *Conditions of Confinement***

It is unclear whether plaintiff is claiming that the conditions of his confinement during the suicide watch were unconstitutional. He states in his complaint that he was placed in a cell with a pad, but no mattress and the lights were very bright.[FN22] Compl. ¶ 5. Plaintiff states that he was given "something like padding" to wear and was refused any toilet paper. Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment standard for conditions of confinement is similar to that for medical care.

> **FN22.** Plaintiff states that they took his tinted glasses away, which made the bright light even more uncomfortable.

**\*18** As in the medical care and excessive force analyses, there is an objective and a subjective prong to the Eighth Amendment analysis with respect to conditions of confinement. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Under the objective prong, the plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* In

order to be sufficiently serious in a "conditions of confinement" case, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

In this case, plaintiff told defendant Fisher that plaintiff would be committing suicide, so plaintiff was placed on a one-on-one suicide watch.[FN23] The suicide watch involves depriving the inmate of his regular clothing and belongings. Even assuming that plaintiff's allegations regarding the conditions are completely true, the deprivation that he suffered would not rise to the level of a constitutional violation. Plaintiff was deprived of the regular mattress and his clothing overnight.[FN24] Plaintiff himself states that his belongings, including a mattress, sheets, and a blanket were returned to him the next day, although not as quickly as he would have liked. Compl. ¶ 7. The hours that plaintiff was without these materials simply did not deny plaintiff the "minimal civilized measure of life's necessities."[FN25] Thus, assuming plaintiff is attempting to make an Eighth Amendment claim regarding the conditions of his confinement for one day, any such claim may be dismissed.

> **FN23.** It should be noted that it was Psychologist Rudder that recommended the suicide watch, based upon the notification that plaintiff had indicated that he would commit suicide that night. (Fisher Decl. Ex. B at 2) (SHU Log Book for 10:55 a.m. 12/3/06). This is corroborated by the confidential testimony of Psychologist Rudder. (Roberts-Ryba Aff. Ex. C at 2).

> **FN24.** Plaintiff also alleges that he was denied toilet paper. Even if this were the case, the denial of toilet paper overnight for one night does not rise to the level of a constitutional violation. The SHU Log Book indicates that plaintiff was removed from the "special watch" at 9:00 a.m. on December 4, 2006. Fisher Aff. Ex. B at 4. The Log Book also indicates that "Mental Health" was on the unit to see plaintiff at 9:29 a.m., and that the one-on-one watch for plaintiff was "finished" at 10:28 a.m. on December 4th.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
(Cite as: 2009 WL 3164782 (N.D.N.Y.))

*Id.* at 9.

FN25. In fact, if plaintiff had actually been suicidal, it could have been a substantial risk to leave him in his cell with materials that he could use to harm himself.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

N.D.N.Y.,2009.
Slacks v. Gray
Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
**No. 9:04-CV-1159.**

Oct. 21, 2009.

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

case.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

*\*2* Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint.[FN1] Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two

years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of his injuries of his left hand and right foot." (Dkt. No. 1 ¶¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

> non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

> (Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

> Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus."

(Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this

as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would

review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed the interview was over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to

Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

motion for summary judgment, a district court may, *sua sponte*, address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

*8 Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizability 14 of the claim.[FN15]

FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972)

("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

   FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

   FN17. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

   FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores*

*v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* " [FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

   FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN25]

FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised,

not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113,

2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,*

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

408 F.3d 124, 128, 130 (2d Cir.2005)
(acknowledging that *pro se* plaintiff's complaint
could be dismissed for failing to comply with
Rules 8 and 10 if his mistakes either "undermine
the purpose of notice pleading [ ]or prejudice the
adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan
County.,* 499 F.Supp. 259, 262 & n. 9
(S.D.N.Y.1980).

### III. ANALYSIS

### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and
Richards violated his Eighth Amendment right to adequate
medical care by prescribing an ineffective medication for
his body itch, refusing to order an MRI of his left wrist
and right ankle, and refusing to refer him to an
orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for
summary judgment of these claims, arguing that (1)
Plaintiff did not suffer from a serious medical need; and
(2) Defendants were not deliberately indifferent. (Dkt. No.
92-10 at 13-14.)

#### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution
prohibits "cruel and unusual" punishments. The word
"punishment" refers not only to deprivations imposed as
a sanction for criminal wrongdoing, but also to
deprivations suffered during imprisonment. *Estelle v.
Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d
251 (1976). Punishment is "cruel and unusual" if it
involves the unnecessary and wanton infliction of pain or
if it is incompatible with "the evolving standards of
decency that mark the progress of a maturing society."
*Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment
imposes on jail officials the duty to "provide humane
conditions of confinement" for prisoners. *Farmer v.
Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d
811 (1994). Thus, prison officials must "ensure that
inmates receive adequate food, clothing, shelter, and

medical care, and must 'take reasonable measures to
guarantee the safety of the inmates.' " *Farmer,* 511 U.S.
at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27,
104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an
objective and a subjective component. *Farmer,* 511 U.S.
at 834. To satisfy the objective component, "the
deprivation alleged must be, objectively, 'sufficiently
serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294,
298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing
the objective element of an Eighth Amendment medical
care claim requires two inquiries. "The first inquiry is
whether the prisoner was actually deprived of adequate
medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279
(2d Cir.2006). The word "adequate" reflects the reality
that "[p]rison officials are not obligated to provide inmates
with whatever care the inmates desire. Rather, prison
officials fulfill their obligations under the Eighth
Amendment when the care provided is 'reasonable.' "
*Jones v. Westchester County Dept. of Corr. Med. Dept.,*
557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in
medical care is sufficiently serious. This inquiry requires
the court to examine how the offending conduct is
inadequate and what harm, if any, the inadequacy has
caused or will likely cause the prisoner." *Salahuddin,* 467
F.3d at 280. The focus of the second inquiry depends on
whether the prisoner claims to have been completely
deprived of treatment or whether he claims to have
received treatment that was inadequate. *Id.* If "the
unreasonable medical care is a failure to provide any
treatment for an inmate's medical condition, courts
examine whether the inmate's medical condition is
sufficiently serious." *Id.* A "serious medical need" is "a
condition of urgency, one that may produce death,
degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d
605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations
omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66
(2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct.
1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,*
143 F.3d 698, 702 (2d Cir.1998). Relevant factors to
consider when determining whether an alleged medical
condition is sufficiently serious include, but are not limited
to: (1) the existence of an injury that a reasonable doctor
or patient would find important and worthy of comment or
treatment; (2) the presence of a medical condition that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a

complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

[Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch is a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the

use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

> FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

> FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

### 3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> [FN33.] Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the

evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

*1. Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of

a

r

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

FN34. 42 U.S.C. § 1997e.

FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No.

00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> [FN39.] The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal

Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

> FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford.* *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

> FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN42. *Id.* (citations omitted).

> FN43. *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

> FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*17 *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370

(W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

1. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine. [FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants

Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

[you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

*19 Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

> [P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination

of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys, 426 F.3d at 554.* Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys, 426 F.3d at 551-52.* Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Defendants Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas, 533 F.Supp.2d 318 (W.D.N.Y.2008).* In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison

officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer, 533 F.Supp.2d at 323.* The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer, 533 F.Supp.2d at 330.* Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer, 533 F.Supp.2d at 330.*

**\*24** Third, because the prisoner in *Brewer* asserted a

retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygienic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

*25 The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygienic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support

that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

**5. Failure to Intervene**

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

§ 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

> FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No.

92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process."[FN53] (Dkt. No. 1 ¶ 35.)

> FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant

LaClair.[FN54]

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the

appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant

Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be *GRANTED IN PART AND DENIED IN PART;* and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v.*

*Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both
Noone and Dickenson deliberately denied him medical care
in violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

*2 Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at *3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by another. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003) (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:

(1) there was no evidence that administrative remedy was available to inmate;

(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;

(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;

(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;

(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🗝 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🗝 **25**

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts. Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🗝 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8 ; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A ☞ 657.5(1)**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45 ☞ 62**

45 Attorney and Client
   45II Retainer and Authority
      45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A ☞ 657.5(1)**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A ☞ 2546**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and sufficiency.

Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78 ☞ 1304**

78 Civil Rights
   78III Federal Remedies in General
      78k1304 k. Nature and elements of civil actions.

Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310 ☞ 317**

310 Prisons
   310II Prisoners and Inmates
      310II(H) Proceedings
         310k316 Exhaustion of Other Remedies
            310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310 ☞ 313**

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 ☞ 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 ☞ 192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ☞ **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞ **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ☞ **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H 🔑 1546

350H Sentencing and Punishment
 350HVII Cruel and Unusual Punishment in General
  350HVII(H) Conditions of Confinement
   350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
    170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 🔑 1355

78 Civil Rights
 78III Federal Remedies in General
  78k1353 Liability of Public Officials
   78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 🔑 1358

78 Civil Rights
 78III Federal Remedies in General
  78k1353 Liability of Public Officials
   78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
    170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ⊷    1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate,
that doctor is "personally involved" in alleged
constitutional violation for purposes of § 1983 liability.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ⊷    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in
general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied
medical treatment to inmate suffering from end stage renal
disease, precluded summary judgment in inmate's § 1983
action alleging prison officials' deliberate indifference to
his medical needs, in violation of Eighth Amendment.
U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy,
Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or
"plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that
Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal,
Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau
University Medical Center (hereinafter "defendants")
violated his Eighth Amendment rights by acting with
deliberate indifference to his serious medical needs while
plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically,
plaintiff alleges that defendants: (1) prescribed an
incorrect dosage of medication for his renal disease; (2)
failed to get him tested for a kidney transplant list; and (3)
failed to adequately treat him for shoulder pain.
Defendants have moved for summary judgment on all of
plaintiffs' claims. For the reasons set forth below,
defendants' motion is granted in part and denied in part.
Specifically, defendants' motion is granted with respect to
plaintiff's claim regarding the dosage of his prescription
medication and with respect to all of plaintiff's claims
against Sheriff Reilly. Defendants' motion is denied in all
other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below
from the parties' depositions, affidavits, and exhibits, and
from the defendants' Rule 56.1 statement of facts.[FN1] They
are not findings of fact by the Court, but rather are
assumed to be true for the purposes of deciding this
motion. Upon consideration of a motion for summary
judgment, the Court shall construe the facts in the light
most favorable to the non-moving party-here, the plaintiff.
*See Capobianco v. City of New York,* 422 F.3d 47, 50 n.
1 (2d Cir.2005). Unless otherwise noted, where a party's
56.1 statement or deposition is cited, that fact is
undisputed or the opposing party has pointed to no
evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file
and serve a response to defendants' Local Rule
56.1 Statement of Facts in violation of Local
Civil Rule 56.1. Generally, a "plaintiff['s] failure
to respond or contest the facts set forth by the
defendants in their Rule 56.1 statement as being
undisputed constitutes an admission of those
facts, and those facts are accepted as being
undisputed." *Jessamy v. City of New Rochelle,*
292 F.Supp.2d 498, 504 (S.D.N.Y.2003)
(quoting *NAS Elecs., Inc. v. Transtech Elecs.
PTE Ltd.,* 262 F.Supp.2d 134, 139
(S.D.N.Y.2003)). However, "[a] district court
has broad discretion to determine whether to
overlook a party's failure to comply with local
court rules." *Holtz v. Rockefeller & Co.,* 258
F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349 at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352 an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported **353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.FN11 For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See* *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**357** _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also* *Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

**2. Application**

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**a. Medication Dosage**

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **\*359** of medication for plaintiff's renal disease.

**i. Objective Prong**

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See* *Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See* *Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> **FN13.** Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> **FN14.** Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> **FN15.** In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> **FN16.** Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:09-cv-00002-GTS-DEP   Document 52   Filed 09/03/10   Page 165 of 216

Page 17

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle, 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital].")); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions ... do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve [plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437)*). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e)*; *see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)* (*quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)*).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society.' ' *Id.* (*quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (*quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)*).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def.* *['s] Ex. A, P. 4)* .

    FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def.* *['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

**2. Altona**

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
No. 99 Civ. 8646 DAB.

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.[FN1] For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose." Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see also *Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening." *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see *Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

*5 A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004)* ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven
Correctional Facility; Guiney, Deputy Superintendent;
Matthew Miller, Corrections Officer; Franklin W.
Middleton, Corrections Officer; S. Phillip, Corrections
Officer; D. McClenning, Corrections Officer, J. Erns,
Corrections Officer; D. Huttel, Corrections Officer; C.
Austin, Corrections Officer; L. Czyzewski, Corrections
Officer; R. Myers, Sergeant; D. Carey, Sergeant; John
Doe # 1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly, Deputy
Superintendent; Bipin Bhavsar, Medical Doctor;
Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca,
Inspector General, individually and in their official
capacities, Defendants.[FN1]

> **FN1.** This caption reflects the caption in
> plaintiff's Complaint. Defendants did not provide
> the Court with a full, corrected caption.

No. 05 Civ. 6646(NRB).

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of the
Department of Correctional Services ("DOCS"), pursuant
to 42 U.S.C. § 1983, alleging: (1) excessive force; (2)
denial of recreation, showers, special meals and property;
(3) deliberate indifference to a serious medical need; and
(4) mail interference, all in violation of his constitutional
rights. Ford moved for summary judgment on July 24,
2006 and defendants cross-moved for summary judgment
on December 22, 2006.[FN2] For the reasons stated below,
we deny Ford's motion for summary judgment and grant
defendants' motion for summary judgment in part.

> **FN2.** Although the title of Ford's motion is
> "Motion for Partial Summary Judgment", his
> papers clearly argue for judgment on all of the
> claims raised in his Complaint. Defendants'
> motion for summary judgment expressly applies
> to Ford's entire Complaint.

*BACKGROUND* [FN3]

> **FN3.** Unless otherwise noted, the following facts
> are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April and
May of 2004.[FN4] In the early afternoon of April 14, 2004,
at approximately 12:30 p.m., Ford exited his cell without
permission when a corrections officer unlocked the door
for Ford's cellmate.[FN5] After leaving his cell, Ford headed
directly for Officer Miller, who was writing passes for
inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot
oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!" [FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.,* Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ").

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

**B. Ford's Escort to Special Housing**

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[FN18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

> FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

> FN18. *Id.*

> FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

**C. Ford's Post-Incident Medical Treatment**

Upon his arrival at Special Housing, Ford was examined

by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

> FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

> FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis[FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

> FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

> FN23. *Id.*

> FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

> FN25. *Id.*

> FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. *Id.* (Ford's "renal parenchyma and

collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. *Id.,* Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. *Id.*

FN38. *Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

23, 2004. [FN42]

> FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

> FN40. *Id.*

> FN41. *Id.*

> FN42. *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days. [FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints. [FN45]

> FN43. *See e.g.* Complaint at 10.

> FN44. *Id.*

> FN45. *Id.* at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy. [FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [FN48]

> FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> FN47. *Id.,* Ex. E, FORD IG 316-324.

> FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [FN50]

> FN49. Compl. at 13-14.

> FN50. *Id.* at 15.

*DISCUSSION*

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).*

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir.1981); accord Abrams v. United States, 797 F.2d 100, 103 (2d Cir.1986).* However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble, 429 U.S. 97 (1976); Patrick v. LeFevre, 745 F.2d 153, 160 (2d Cir.1984).*

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989)* ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York, 316 F.3d 93 (2d Cir.2002); see also Kentucky v. Graham, 473 U.S. 159 (1985)* (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)* (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n. 1 (2d Cir.1991)* (department that is an agency of the state

is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo, 502 U.S. 21, 27-31 (1991)* (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wanton infliction of pain. *Hudson v. McMillian et al., 503 U.S. 1 (1992)* (citing *Whitley v. Albers, 475 U.S. 312 (1986)).* Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley, 475 U.S. at 320.* Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id. at 320-21; Hudson, 503 U.S. at 7* (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005) (citing *Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)* and *Estate of Kenneth Jackson v. Rochester, 705 F.Supp. 779, 783 (W.D.N.Y.1989)).*

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning,

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

> **FN51.** *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim[FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic.[FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris's sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

> **FN52.** Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

> **FN53.** Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal

knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

> **FN54.** Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

**\*6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

not accuse Officers Miller, McClenning and Erns of
punching and kicking him during the morning of April 14,
2004. On the contrary, Ford makes no mention of any
force used by Officers McClenning and Erns and only
alleges that Officer Miller used a *de minumus* amount of
force against him: "At this point, Miller slapped me on
each side of my face ..."[FN56] *Candelaria v. Coughlin,* 787
F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de
minumus* when officer "pushed his fist against [plaintiff's]
neck so that [he] couldn't move and was losing [his]
breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).


    FN55. *See supra* note 51.


    FN56. Parasidis Decl., Ex. E, FORD IG 26-28
    (quoting Ford's April 14, 2004 statement); *see
    also id.* at FORD IG 290-93 ("This is where he
    yells at me and slap me (sic) across my face"),
    dated April 15, 2004 at 9:00 a.m.


Third, given the different versions of the April 14 events
offered by Ford and the inconsistencies between the
affidavits submitted by Ford to support his Complaint, no
reasonable jury could credit Ford's latest allegations. *See
e.g. Trans-Orient Marine Corp. v. Star Trading & Marine,
Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not
"create a material issue of fact by submitting ... affidavit[s]
disputing his own prior sworn testimony" in order to
defeat defendants' summary judgment motion) (quoting
*Mack v. United States,* 814 F.2d 120, 124 (1987));
*Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming
district court's grant of summary judgment for defendants
in section 1983 case brought by *pro se* prisoner-where
plaintiff relied almost exclusively on his own testimony,
district court could make assessments about whether a
reasonable jury could credit plaintiff's testimony); *Shabazz
v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998)
(Sotomayor, J.) (granting summary judgment for
defendants where "plaintiffs allegations of the events at
issue [were] replete with inconsistent and contradictory
statements" and "plaintiff's version of the events ... [had]
undergone at least one significant revision"). Ford has
offered no fewer than four versions of what happened on
the morning of April 14, 2004 through his submissions to
the Court, at least three of which allege only a *de minumus*
use of force and many of which, as discussed, are
inconsistent with one another.[FN57] Moreover, Ford's signed

and personal version of the events, without any
explanation from Ford, has undergone at least one
significant and self-serving revision, changing from a story
about a *de minumus* use of force to one about a brutal,
unprovoked beating.


    FN57. *See supra* note 53. Versions of the events
    offered in Ford's submissions include: (1) Ford
    was pushed into his cell; (2) Ford was held up on
    a wall; (3) Ford was slapped in the face by
    Officer Miller; (4) Ford was punched and kicked
    by Officers Miller, McClenning and Erns; and
    (5) Ford was punched and kicked by Officers
    Miller and McClenning.


In sum, given the sheer lack of evidence to support Ford's
new version of the April 14 morning events, the
substantial evidence against that version, and the fact that
Ford's initial, signed statements contradict the allegations
in his Complaint and confirm defendants' position, no
reasonable jury could find in favor of Ford on this claim.
Accordingly, we deny Ford's motion for summary
judgment and grant summary judgment in favor of
defendants.


b. Attack on Officer Miller


**\*7** Regarding the afternoon of April 14, 2004, Ford
alleges that Officers Miller, Erns, Middleton and Phillips
kicked and punched him, and that Sgt. Carey watched this
happen without taking action. Having reviewed the parties'
submissions, we hold that, even accepting Ford's
allegations as true, no reasonable jury could find that
defendants responded with excessive force when
attempting to save Officer Miller.


The genesis of Ford's claim is his own brutal attack on
Officer Miller. As Ford admits, he rushed Officer Miller,
threw hot oil on his face and then stabbed him repeatedly
with a nine inch shank. Given this use of potentially lethal
force, and given that defendants had to react quickly to
save Officer Miller, defendants were legally authorized to
respond to Ford with significant force of their own,
perhaps including deadly force. *See e.g. Tennessee,* 471
U.S. at 11-12; *see also Diggs v. New York Police Dep't et*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

*al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

> FN58. *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

> FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

> FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> FN61. Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

> **FN62.** As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

> **FN63.** Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

> **FN64.** Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his

transfer to Special Housing. *See supra* note 59.

**d. Due Process**

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

**3. Deprivations**

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

**a. Cruel and Unusual Punishment**

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others.[FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

>    FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

*10 Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care.[FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

>    FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

(1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996)* (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin, 26 F.Supp.2d 615 (S.D.N.Y.1996)* (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin, 956 F .Supp. 454, 469 (S.D.N.Y.1997).*

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

*11 Third, although Ford does allege that defendants deprived him of privileges and Special Housing property

in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [FN67]

FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious);

*Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

*12 The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [FN70]

> FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [FN71]

> FN71. *Id.*

*13 As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [FN72]

> FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[FN73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[FN74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal trial and post-trial proceedings.[FN75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also*

Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[FN76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner")).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault. FN77 In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. FN78

FN77. *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

FN78. *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without

any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures, FN79 no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

FN79. *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

*15 Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it

found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Dashon [FN1] HALLOWAY, Plaintiff,

FN1. Upon information and belief, the correct
spelling of Plaintiff's name is "Deshon" as
reflected in both his Complaint, Dkt. No. 1, and
the Department of Correctional Services' Inmate
Locator Website, *available at*
http://nysdocslookup.docs.state.ny .us.

v.
Glenn S. GOORD, et al, Defendants.
**No. 9:03-CV-1524 (LEK/RFT).**

Sept. 24, 2007.

Deshon Holloway, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, New York State Department of Law, Stephen
M. Kerwin, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 29, 2007 by the
Honorable Randolph F. Treece, United States Magistrate
Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.
87). After ten days from the service thereof, the Clerk has

sent the entire file to the undersigned, including the
objections by Plaintiff Deshon Halloway, which were filed
on September 14, 2007. Objection (Dkt. No. 88).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
87) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that the defendants motion for summary
judgment (Dkt. No. 80) is **GRANTED** and the Complaint
(Dkt. No. 1) is **DISMISSED;** it is further **ORDERED,**
that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Deshon Holloway brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging the above
named Defendants violated his due process rights pursuant
to the Fourteenth Amendment when he was transferred
from Elmira Correctional Facility to Upstate Correctional
Facility without first receiving a hearing. According to
Plaintiff, when he was housed at Elmira, he was serving a

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

keeplock disciplinary sentence in his cell, whereas upon his transfer to Upstate, he served the remainder of that sentence in a Special Housing Unit (SHU). *See generally* Dkt. No. 1, Compl.

Presently before the Court is Defendants' Motion for Summary Judgment, to which, despite being granted multiple extensions of time, Plaintiff has failed to respond. Dkt. Nos. 80, Defs.' Mot. Summ. J., filed on Jan. 17, 2007; 81, Order, dated June 5, 2007 (*sua sponte* extending Plaintiff's time to respond to July 9, 2007); 83, Order, dated July 3, 2007 (granting Plaintiff's request and extending his response time to July 31, 2007).

Instead of submitting opposition to the Motion, Plaintiff filed a letter, dated July 15, 2007, seeking permission to withdraw his action. Dkt. No. 84. Court staff inquired whether Defendants would consent to Plaintiff's voluntary withdrawal, to which Defendants tendered consent only upon the proviso that such dismissal be with prejudice. Dkt. Nos. 85, Notice to Defs.' Counsel, dated July 20, 2007; 86, Defs.' Resp., dated Aug. 21, 2007. In light of the ample passage of time since the initiation of this lawsuit and the filing of Defendants' Motion, and in light of the Defendants' posture to withhold any consent to discontinue lest it be on the merits, the Court finds it prudent to address Defendants' Motion on the merits.

## I. FACTS

### A. Effect of Plaintiff's Failure to Respond

**\*2** Defendants filed their Motion for Summary Judgment on January 17, 2007, setting Plaintiff's response deadline for February 12, 2007. Dkt. No. 80. In accordance with the Local Rules of Practice for the Northern District of New York, Defendants provided Plaintiff with notice of the consequences that may befall him should he elect not to respond to such Motion.[FN2] Dkt. No. 80; N.D.N.Y.L.R. 56.2. Approximately six months later, on June 5, 2007, this Court, in view of the fact that Plaintiff had not filed a response, *sua sponte* extended his time to respond and further emphasized the consequences of his failure to do so.[FN3]

[FN2.] Specifically, Defendants included in their Notice of Motion the following warning:

> PLEASE NOTE that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, you may not simply rely upon your complaint, but you must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in the moving parties' affidavits will be accepted by the Magistrate-Judge as being true unless you submit affidavits or other documentary evidence contradicting defendants' assertions. If you do not so respond, summary judgment, if appropriate, may be entered against you. If summary judgment is granted against you, your case will be dismissed and there will be no trial.

Dkt. No. 80 (emphasis in original).

[FN3.] Specifically, the Court issued an Order stating:

> *Plaintiff is warned that failure to oppose Defendants' Motion will result in this Court accepting the facts set forth by Defendants as true. See* N.D.N.Y.L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* (emphasis in original)). *Plaintiff is further warned that failure to respond may, if appropriate, result in the granting of Defendants' Motion, in which there will be no trial. See* N.D .N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

as the case may be, unless good cause is shown.").

Dkt. No. 81 at pp. 1-2 (emphasis in original).

Pursuant to this District's Local Rules, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown ." N.D.N.Y.L.R. 7.1(b)(3); *see also* *Douglas v. New York State Div. of Parole,* 1998 WL 59459, at *1 (N.D.N.Y. Feb. 10, 1998) (noting that plaintiff's failure to oppose defendants' dispositive motion, and his failure to show good cause for the omission, may alone justify granting the motion). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c); N.D.N.Y.L.R. 7.1(b)(3). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Rule 7.1 Statement of Facts, supplemented by Plaintiffs' verified Complaint, as true. *See* Dkt. Nos. 1, Compl.; 80-9, Defs.' 7.1 Statement; *see also* *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Uncontested Facts**

At all times relevant to the Complaint, Plaintiff was an inmate in the custody of the New York State Department of Correctional Services (DOCS). On January 5, 2001, Holloway was transferred from Elmira Correctional Facility, a maximum security prison, to Upstate Correctional Facility, a maximum security prison. Defs.' 7.1 Statement at ¶ 2; Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History). This transfer is the subject of his civil rights claims.

As indicated on Holloway's Transfer History Report, the

reason for Plaintiff's transfer was his "unsuitable behavior." Selsky Decl., Ex. B. This is not the first time Plaintiff was transferred to another facility due to his unsuitable behavior.[FN4] In fact, Plaintiff's transfer to Elmira from Southport Correctional Facility was also due to his unsuitable behavior. *Id.* (Transfer, dated November 28, 2000). Upon his arrival at Elmira, Plaintiff had an aggregate disciplinary keeplock sentence of approximately 270 days, stemming from six Disciplinary Hearings Plaintiff previously received during a span of six months. Defs.' 7.1 Statement at ¶ 6. These disciplinary sentences were based on various Misbehavior Reports Plaintiff received while incarcerated at Marcy Correctional Facility and Mid-State Correctional Facility. *Id.* at ¶¶ 7-10. For each of the six Misbehavior Reports issued, Plaintiff received a separate Disciplinary Hearing resulting in six separate guilty determinations, each with its own separate sentence. *Id.* Plaintiff only filed appeals in three of these Hearings, all of which were affirmed. *Id.* at ¶¶ 8 & 11-12.[FN5] Plaintiff makes no allegations as to the inadequacy of any of these Hearings and none of the Hearing Officers who presided over the six Disciplinary Hearings is named as a Defendant.

FN4. In reviewing Plaintiff's Transfer History, we note at least four transfers due to his "unsuitable behavior" between May 1998 and December 2000. Dkt. No. 80-2, Donald Selsky Decl., dated Oct. 13, 2006, Ex. B (Pl.'s Transfer History).

FN5. Indeed Plaintiff's Disciplinary History is startling and certainly is not confined to the six instances noted above. Focusing only on the disciplinary sentences to be served upon his arrival at Upstate, we offer the following synopsis. Two of the sentences stem from Misbehavior Reports Plaintiff was issued while at Marcy, dated April 15, 1999, and May 14, 1999. Defs.' 7.1 Statement at ¶ 7; Selsky Decl., Ex. A (Holloway Disciplinary History). The Hearing determinations for these two Reports, which included, *inter alia,* an aggregate keeplock sentence of 180 days, were affirmed on appeal. Defs.' 7.1 Statement at ¶ 8. While at Mid-State, and again as relevant to the aggregate sentence to be served at Upstate, Plaintiff received four separate Misbehavior Reports on August 15,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

1999, September 2, 1999, October 12, 1999, and October 22, 1999. *Id.* at ¶ 9. On each, he was provided a Hearing, found guilty, and received a sentence of, *inter alia,* thirty days keeplock (per infraction); he only appealed the Hearing determination regarding the October 12th Misbehavior Report, and such was affirmed on appeal. *Id.* at ¶¶ 10-12.

**\*3** Prior to his transfer to Upstate, Holloway was held in long-term keeplock at Elmira for approximately one month and eight days. *Id .* at ¶ 14. The cell Plaintiff was confined in could also be used for a general population inmate or an inmate transitioning to general population from SHU. Dkt. No. 80-5, Dan Kress Decl., dated Jan. 11, 2007, at ¶ 2. Under the keeplock confinement, Plaintiff was locked in his cell for twenty-three hours a day. Dkt. No. 80-6, James Thompson Decl., dated Jan. 10, 2007, at ¶ 3. A cell-confined inmate in this circumstance requires additional services by prison staff such as meal delivery and cell visitation by medical staff. *Id.* Though use of a general population cell for such restricted confinement is feasible on a short-term basis, "[a]s a long-term proposition, ... it [is] an inefficient use of the department's resources[.]" *Id.* On the other hand, Upstate is a prison specially designed to handle cell-confined inmates and, given the length of Plaintiff's keeplock sentence of approximately 240 days, it was more practical for Plaintiff to be transferred to Upstate to serve out the remainder of that keeplock sentence. *Id.* at ¶ 4. For these reasons, on December 27, 2000, Defendant Dan Kress, Corrections Counselor at Elmira, recommended that Holloway be transferred to Upstate to serve his 240-day keeplock sentence. Defs. 7.1 Statement at ¶ 16. This recommendation was approved by Defendant James Thompson, Senior Counselor at Elmira and by John Carvill [FN6] in DOCS' Office of Classification and Movement, who issued the order that Plaintiff be transferred to Upstate from Elmira; as aforementioned, such transfer took place on January 5, 2001. *Id.* at ¶ 17. Defendants Glenn Goord, then-Commissioner of DOCS, Floyd Bennett, then-Superintendent of Elmira, Thomas Ricks, then-Superintendent of Upstate, and John Glasheen, then-Assistant Director of the Office of Classification and Movement, were not involved in the decision to transfer Plaintiff to Upstate. *Id.* at ¶ 33.

FN6. John Carvill is not a Defendant in this action.

While serving his sentence at Upstate, Plaintiff was treated the same as any other inmate sentenced to keeplock confinement at Upstate. *Id.* at ¶ 27. After his arrival at Upstate, Plaintiff incurred, in just four months, over a year's worth of additional keeplock for disciplinary violations. *Id.* at ¶ 18. He also accumulated seventy-four months of SHU time for more serious violations involving violent conduct on staff and an unhygienic act. *Id.* at ¶ 19. Pursuant to Department Regulations, Plaintiff began serving all of this additional SHU time at Upstate on May 5, 2001. *Id.* at ¶ 20.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Thomas v. Roach, 165 F.3d 137, 142 (2d Cir.1999).* "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir.2000)* (quoting FED. R. CIV. P. 56(e)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir.1994)* (alteration and emphasis in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.1999).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

**\*4** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

More specifically, this District's Local Rules provide that *"[a]ny facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Local Rule 7.1(a)(3) further requires that the non-movant shall file a Statement of Material Facts which mirrors the movant's statement in matching numbered paragraphs and which sets forth a specific reference to the record where the material fact is alleged to arise. *Id.* The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 2002 WL 368534, at \*2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 2001 WL 237218, at \*1 (N.D.N.Y. Mar. 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, as previously discussed, Holloway did not file a response to the Defendants' Motion for Summary Judgment. Consequently, this Court has accepted the properly supported facts contained in the Defendants' 7.1 Statement as true for purposes of this Motion. With this standard in mind, the Court now addresses the sufficiency of Holloway's claims.

**B. Due Process and Plaintiff's Intrastate Prison Transfer**

Holloway asserts he should have received a hearing prior to his transfer to Upstate and in the absence of such hearing, his due process rights were violated. Defendants Kress and Thompson were directly involved in the decision to transfer Plaintiff, thus we consider Plaintiff's due process claim to be asserted against them. Plaintiff's claim, however, is wholly without merit.

**\*5** To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

It is well-settled that an inmate has no right under the Due Process clause to be incarcerated in any particular correctional facility, and transfers among facilities do not need to be preceded by any particular due process procedure. *See Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005) (citing *Meachum v. Fano,* 427 U.S. 215, 224-25 (1976)) (noting that the Constitution does not "guarantee that [a] convicted prisoner will be placed in any particular prison" nor does "the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system[ ]")); *see also Fox v. Brown,* 2007 WL 586724, at *9-10 (N.D.N.Y. Feb. 21, 2007). Though Holloway complains that his restrictions at Upstate were much greater than that experienced at Elmira, the fact that "life in one prison is much more disagreeable than in another does not itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano,* 427 U.S. at 225; *see also Olim v. Wakinekona,* 461 U.S. 238, 244-45 (1983) (citing, *inter alia, Meachum v. Fano,* 427 U.S. 215 (1976) & *Monyanye v. Haymes,* 427 U.S. 236 (1976) for the proposition that inmates have no constitutional right to be housed in a particular prison or a particular dormitory within a prison) Thus, the Due Process Clause itself clearly does not afford Holloway the protection sought.

Our inquiry does not end there, however, since liberty interests may also arise under state statutes and regulations. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U .S. at 460). To assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Connor,* 515 U.S. at 484, *and* (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regardless of whether Plaintiff can establish that he was subjected to an atypical and significant hardship, it is patently clear that New York has **not** created, by regulation or statute, any liberty interest in remaining at one particular prison. Indeed, it is the DOCS who possesses sole discretion to determine "where a [state] inmate will be housed." *Grullon v. Reid,* 1999 WL 436457, at *10 (S.D.N.Y. Jun.

24, 1999) (citing *United States v. Williams,* 65 F.3d 301, 307 (2d Cir.1995)); *see also Smolen v. Lanier,* 2007 WL 2027841, at *2 (W.D.N.Y. July 11, 2007). Furthermore, not only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same property, visiting, package, commissary, telephone, and correspondence limitations typically experienced in SHU confinement. N.Y. COMP.CODES R. & REGS. tit. 7 §§ 301.6 & 302.2.

*6 Thus, regardless of whether Plaintiff alleges his due process rights were violated when he was transferred to another institution or when he was forced to serve his keeplock sentence in SHU, since Holloway had no liberty interest in remaining at one specific facility to serve his keeplock sentence or to remain in cell confinement to serve such sentence, there was no need to provide him with a hearing prior to his transfer to another prison and into SHU. Accordingly, this Court recommends **granting** Defendants' Motion for Summary Judgment and **dismissing** Defendants Kress and Thompson from this action.

### B. Personal Involvement

As to the remaining Defendants, Plaintiff alleges that 1) Defendant Goord failed to stop Plaintiff's transfer to Upstate and knew of or should have known of his subordinates' acts, yet failed to take action, Compl. at ¶¶ 48-50; 2) Defendant Glasheen approved the transfer and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 51-53; 3) Defendant Bennett failed to stop Plaintiff's transfer to Upstate and failed to provide Plaintiff with a hearing prior to such transfer, Compl. at ¶¶ 54-57; and 4) Defendant Ricks failed to transfer Plaintiff from Upstate back to Elmira and failed to provide Plaintiff with a hearing prior to keeping him confined at Upstate, Compl. at ¶¶ 58-60.

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)
(Cite as: 2007 WL 2789499 (N.D.N.Y.))

*Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978)); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

Despite Plaintiff's allegations to the contrary, and in light of his failure to oppose Defendants' Motion, it is uncontested that Defendants Goord, Glasheen, Bennett, and Ricks played no part in the decision to transfer Plaintiff. To the extent Plaintiff seeks to hold any one of these Defendants liable on the basis of supervisory liability,[FN7] such claim similarly fails since, as explained above, Plaintiff's transfer to Upstate without a hearing did not violate his due process rights. Therefore, this Court recommends **dismissing** these Defendants as well.

FN7. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 80) be **GRANTED** and the entire Complaint **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Holloway v. Goord
Not Reported in F.Supp.2d, 2007 WL 2789499 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 3149360 (W.D.N.Y.)
(Cite as: 2006 WL 3149360 (W.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Fred E. VAN GORDER, Plaintiff,
v.
Dan WORKMAN, et al, Defendants.
**No. 03-CV-6409.**

Nov. 1, 2006.

Fred E. Van Gorder, Malone, NY, pro se.

J. Richard Benitez, NYS Attorney General's Office, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

## INTRODUCTION

**\*1** On October 4, 2005, plaintiff filed a motion (# 107) to dismiss the claim against defendant Dan Workman ("Workman") on the ground that plaintiff fails to state a claim upon which relief can be granted, there is no alleged actual physical injury, and qualified immunity applies. For the reasons stated below, the Court grants Workman's motion.

## BACKGROUND

The First Claim in plaintiff's amended complaint (# 9) includes the following claim against Workman:

### A. FIRST CLAIM:

1. That between August 16, 2000 and September 1, 2000, Dan Workman violated the plaintiffs Eighth Amendment right to be free from cruel and unusual punishments causing severe emotional trauma and being a direct party to the pain and suffering of the plaintiff.

2. That between August 16, 2000 and September 16, 2000, Sergeant Austin violated the plaintiffs Eighth Amendment right to be free from cruel and unusual punishment causing severe emotional trauma and pain and suffering.

3. That an unknown number of corrections officers did, with malicious intent violate the plaintiffs Eighth Amendment rights to be free from cruel and unusual punishment, denied medical attention, and causing severe emotional trauma, physical pain and suffering, between August 16, 2000 and September 1, 2000.

4. That between about 10:00 p.m. and 10:30 p.m. on August 17, 2000, three unknown guards did violate the plaintiffs Eighth Amendment rights to be free from cruel and unusual punishment by assaulting the plaintiff causing severe emotional trauma, pain and suffering, and permanent physical damages.

5. At a meeting on August 16, 2000, with Counselor Workman, the plaintiff requested to be moved from the facility for personal reasons of safety. This was the same counselor who had been asked for a transfer several times before. Mr. Workman refused by stating that until the plaintiff is assaulted, the only option would be to sign into protective custody.

(Amend. Compl., at 2-3.)

## STANDARDS OF LAW

The standard for reviewing a motion for judgment on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3149360 (W.D.N.Y.)
(Cite as: 2006 WL 3149360 (W.D.N.Y.))

pleadings pursuant to Fed.R.Civ.P. is "the same standard as that applicable to a motion under 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Gowins v. Greiner,* 01 Civ. 6933(GEL), 2002 U.S. Dist. LEXIS 14098 (S.D.N.Y. Jul. 31, 2002); citing *King v. American Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002). Of course, the Court must read a *pro se* complaint liberally and interpret it to raise the strongest arguments it suggests. *Weixel v. Bd. of Educ. of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002).

A plaintiff, " 'has no constitutional right not to be transferred from one facility to another.' " *Arroyo v. Coughlin,* et al., --- F.Supp. ----, 1994 U.S. Dist. LEXIS 15077 at *3 (W.D.N.Y.1994) (*quoting* April 8, 1993 Order, *Arroyo v. Coughlin and Irvin,* No. 92-CV-0426E(F) (Apr. 8, 1993)) (citation omitted).

*2 It is well settled that state prison officials are afforded broad discretion to transfer **prisoners** for any reason or no reason at all. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976); *Meachum v. Fano,* 427 U.S. 215, 228 (1976). (Holding that the Due Process Clause of the Fourteenth Amendment does not entitle a state **prisoner** to a factfinding hearing when he is transferred from one prison to another where conditions are less favorable.) This is not to say, however, that **prisoners** may be transferred for unconstitutional reasons. **Prisoners** may not be transferred solely in **retaliation** for the exercise of their constitutional rights.

*Respress v. Coughlin,* 585 F.Supp. 854, 857 (S.D.N.Y.1984); *accord Grune v. Riley,* No. 89CIV. 5688(VLB)(SEG), 1992 WL 63396, *7 (S.D.N.Y. Mar. 20, 1992). The **denial** of a **transfer** request logically does not involve greater rights under the Due Process Clause. Further, **denial** of a **prisoner's transfer** request does not impose an atypical and significant hardship on an **inmate** in relation to the ordinary incidents of prison life. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995) ( **prisoner's** Due Process interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the **inmate** in relation to the ordinary incidents of prison

life.").

On the issue of qualified immunity, the Second Circuit, in *Sadallah v. City of Utica,* 383 F.3d 34 (2d Cir.2004), held that,

an individual defendant is entitled to qualified immunity any of three possible circumstances:

(1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; or (3) if the defendant's action was objective[ly] legal [ly] reasonable ... in light of the legal rules that were clearly established at the time it was taken.

*Sadallah,* 383 F.3d at 37 (quoting *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65-66 (2d Cir.1999) (alterations in original) (internal citations and quotation marks omitted)).

### ANALYSIS

Workman contends that plaintiff's complaint against him should be dismissed and gives three reasons for that contention: (1) plaintiff has no constitutional right to a transfer to another facility; (2) the claim against Workman is fatally defective; and Workman is entitled to qualified immunity. The Court will address each argument below.

The Court agrees that plaintiff has no constitutional right to a transfer. As the Court observed in *Arroyo v. Coughlin,* No. 92-CV-0426E(F), 1993 WL 117529, *1 (W.D.N.Y. Apr. 13, 1993) (Elfvin, J.):

While [an **inmate**] does have a right to be protected from violence from other **inmates**-*see Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991)-, which might include the right not to be transferred to a prison where there is a known threat of death-*see Fitzharris v. Wolff,* 702 F.2d 836, 839 (9th Cir.1983)-, in order to be held liable for a failure to protect, an official must be shown to have

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3149360 (W.D.N.Y.)
(Cite as: 2006 WL 3149360 (W.D.N.Y.))

demonstrated deliberate indifference to the **inmate's** safety. *See Hendricks v. Coughlin,* 942 F.2d at 109. An official demonstrates deliberate indifference when he has actual or constructive notice of a specific risk to an **inmate's** safety and fails to take steps to protect the **inmate** from injury. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989).

**\*3** *Arroyo,* 1993 WL 117529, at \*1. Reading plaintiff's complaint liberally, and interpreting it to raise the strongest argument it suggests, the Court finds that plaintiff has sufficiently plead a cause of action against Workman for deliberate indifference to plaintiff's safety and, although plaintiff has no constitutional right to a transfer, the allegations in his complaint raise an issue under the Eighth Amendment and *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir.1989). Thus, the Court finds that the complaint against Workman does raise a cognizable issue under 42 U.S.C. § 1983.

With regard to Workman's argument that plaintiff's claim is precluded because it alleges only that plaintiff suffered emotional damages, which cannot support a **prisoner** lawsuit without some physical injury, *see* 42 U.S.C. § 1997e(e), the Court disagrees. Again, reading plaintiff's complaint liberally, the Court finds that it implies Workman's alleged deliberate indifference was the proximate cause of plaintiff's physical injuries, suffered, he alleges, through the unlawful application of force against him by corrections officers on August 17, 2000.

Plaintiff's complaint alleges that Workman's denial of a transfer on August 16, 2000, which plaintiff requested for unspecified "personal reasons of safety," was a denial of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. In his Answer, Workman raised qualified immunity as a Second Affirmative Defense:

The defendant, at all times relevant hereto, acted without malice and under the reasonable belief that his actions were proper and in accordance with existing law. Accordingly, she [sic] is entitled to qualified immunity.

(Workman Ans. (# 24), at 5.) Although the law with respect to the constitutionality of transferring an **inmate**

upon his own request may not have been clear in 2000, what was clear is that correctional officers had a duty not to be deliberately indifferent to an **inmate's** safety. *See Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991). Plaintiff did not specify in his complaint that he told Workman he feared for his safety from the guards, and does not allege any physical assault by corrections officers until August 17, 2000. Thus, nder the circumstances present here, Workman's offer of protective custody was "was objectively, legally reasonable." *Sadallah,* 383 F.3d at 37. Accordingly, the Court finds that Workman is entitled to qualified immunity.

### CONCLUSION

Defendant Dan Workman's motion (# 107) to dismiss the complaint against him is granted, and Workman is terminated as a party to this lawsuit.

It Is So Ordered.

W.D.N.Y.,2006.
Van Gorder v. Workman
Not Reported in F.Supp.2d, 2006 WL 3149360 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Joel MURRAY, Plaintiff-Appellant,
v.
George E. PATAKI, Governor of New York State, Kang Yeon Lee, M.D., Daniel Senkowski, Superintendent of Clinton Correctional Facility, Dr. Melendez, R. Leduc, Corrections Officer, N. Irwin, J. Travers, J. Forth, Corrections Officer, R. Girdich, Superintendent at Franklin Correctional Facility, Glenn S. Goord, Commissioner of N.Y.S. D.O.C.S., Richard Roy, Inspector General, T. Reif, Corrections Officer, CNY Psychiatric Center, S. Jones, Defendants-Appellees.[FN*]
**No. 09-1657-pr.**

May 24, 2010.

**Background:** Pro se prisoner brought civil rights action against various government defendants. The United States District Court for the Northern District of New York, dismissed certain § 1983 claims, Lawrence E. Kahn, J., 2007 WL 956941, and granted summary judgment in favor of defendants on his remaining § 1983 and § 1985 claims, and dismissed his claim against prison employee defendant, Suddaby, J., 2009 WL 981217. Prisoner appealed.

**Holding:** The Court of Appeals held that United States Marshals' failure to effect service automatically constituted "good cause" for extension of time in which to serve prison employee defendant.
Affirmed in part, and vacated and remanded in part.

West Headnotes

Federal Civil Procedure 170A ⚷ 417

170A Federal Civil Procedure
   170AIII Process
      170AIII(B) Service
         170AIII(B)1 In General
           170Ak417 k. Time for Making. Most Cited Cases
Pro se prisoner provided information sufficient to identify prison employee defendant, and therefore United States Marshals' failure to effect service automatically constituted "good cause" for an extension of time in which to serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

Appeal from a judgment of the United States District Court for the Northern District of New York (Suddaby, J., Treece, M.J.).Joel Murray, pro se, Romulus, NY.

Andrew M. Cuomo, Attorney General of the State of New York; Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General (Sudarsana Srinivasan, Assistant Solicitor General; Kate H. Nepyeu, of Counsel), New York, NY, for Defendants-Appellees.

Present BARRINGTON D. PARKER, DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges.

**SUMMARY ORDER**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED AND REMANDED IN PART.**

Plaintiff-Appellant Joel Murray appeals *pro se* from an order of the United States District Court for the Northern District of New York (Suddaby, *J.*), entered March 29,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

2007, dismissing certain of his 42 U.S.C. § 1983 claims against various of the Defendants-Appellees, and from a second order, entered on April 9, 2009, granting summary judgment in favor of Defendants-Appellees on Murray's remaining claims under 42 U.S.C. §§ 1983 and 1985, and dismissing his claim against Defendant-Appellee Dr. Melendez for failure to timely effect service of process upon her pursuant to Federal Rule of Civil Procedure 4(m). We assume the parties' familiarity with the underlying facts and procedural history of the case, and with the issues presented on appeal.

We review *de novo* a district court's dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). We also review a district court's grant of summary judgment *de novo,* and determine whether there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003). While we construe the evidence in the light most favorable to the non-moving party, *id.,* "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002).

We have undertaken a *de novo* review of the record and relevant cases and, except as noted below, we affirm the dismissal of Murray's claims against all defendants for substantially the same reasons set forth in Magistrate Judge Treece's thorough reports and recommendations of March 5, 2007, and March 3, 2009; these reports were adopted by the district court in their entirety.

We vacate the district court's dismissal of Murray's claim against Dr. Melendez for failure to serve process. We review a district court's dismissal pursuant to Federal Rule of Civil Procedure 4(m) for abuse of discretion. *Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or clearly erroneous findings of fact, or its decision "cannot be located within the range of permissible decisions." *Lynch v. City of New York,* 589 F.3d 94, 99 (2d Cir.2009) (quoting *Sims v. Blot,* 534 F.3d 117, 132 (2d Cir.2008)).

**\*2** Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m). If the plaintiff shows "good cause for the failure" to serve, the district court is required to grant an "appropriate" extension of time in which to serve. *Id.* District courts also have discretion to enlarge the 120-day period even in the absence of good cause. *See Zapata,* 502 F.3d at 196. A *pro se* prisoner proceeding *in forma pauperis,* such as Murray, is "entitled to rely on service by the U.S. Marshals." *Romandette v. Weetabix Co. .,* 807 F.2d 309, 311 (2d Cir.1986). As long as the *pro se* prisoner provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes "good cause" for an extension of time within the meaning of Rule 4(m). *See, e.g., id.; see also Moore v. Jackson,* 123 F.3d 1082, 1085-86 (8th Cir.1997); *Byrd v. Stone,* 94 F.3d 217, 220 (6th Cir.1996); *Dumaguin v. Sec'y of Health & Human Servs.,* 28 F.3d 1218, 1221 (D.C.Cir.1994); *Sellers v. United States,* 902 F.2d 598, 602 (7th Cir.1990); *Puett v. Blandford,* 912 F.2d 270, 275 (9th Cir.1990). A *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g., Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

Here, albeit after receiving a number of extensions of time within which to serve Melendez, Murray provided information that was sufficient to identify Dr. Melendez by full name and as an employee formerly assigned to Clinton Correctional Facility. *See Doc. 103, Murray v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

*Pataki,* 9:03-CV-1263 (N.D.N.Y. Apr. 13, 2007) (letter from Murray to the district court styled "Notification of Defendant"). This was sufficient to satisfy Murray's burden to provide sufficient information for the Marshals to identify the defendant. Although the Marshals subsequently failed to serve Dr. Melendez at the Clinton facility on March 11, 2008, *id.* Doc. 134, they were clearly able to identify her from the information proffered by Murray, and service was unsuccessful merely because Dr. Melendez apparently no longer worked at Clinton. *See id.* As Murray had satisfied his burden, it was an abuse of discretion for the district court to require him to provide additional information regarding Dr. Melendez, and to dismiss Murray's claims against her pursuant to Rule 4(m) for failure to serve process upon her. District courts have a responsibility to assist *pro se* plaintiffs in their efforts to serve process on defendants. *See Valentin v. Dinkins,* 121 F.3d 72, 75-76 (2d Cir.1997) (recognizing district court's obligation to allow *pro se* plaintiff limited discovery to identify defendant for service of process). With the information that Murray provided, the district court here could have ordered the other defendants to contact Dr. Melendez to see if she would accept service or to provide the Marshals with Dr. Melendez's last known address.

**\*3** For the foregoing reasons, the judgment of the district court dismissing the claims against Dr. Melendez for failure to serve process is **VACATED,** and we **REMAND** to the district court for further proceedings in accordance with this decision. The judgment is **AFFIRMED** in all other respects.

FN* The Clerk of the Court is respectfully directed to amend the official caption as it appears above.

C.A.2 (N.Y.),2010.
Murray v. Pataki
Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.